**TOWN OF NORTH BONNEVILLE, WASHINGTON**

v.

**The UNITED STATES.**

No. 564–80C.

United States Claims Court.

Feb. 20, 1987.

Darrel B. Addington, Tacoma, Wash., attorney of record for plaintiff; James J. Mason and Shawn Flood, of counsel.

Fred R. Disheroon, Washington, D.C., with whom was Acting Asst. Atty. Gen. F. Henry Habicht II, for defendant; Robert E. Steinberg and James C. Brennan, Dept. of Justice, David P. Johnson, U.S. Army Corps of Engineers, of counsel.

## OPINION

HARKINS, Senior Judge:

Plaintiff, Town of North Bonneville (Town), filed its petition in the United States Court of Claims on October 20, 1980, to claim damages for breach of contractual arrangements alleged to have been made during the course of relocation of the Town that was necessitated by construction of a second powerhouse at Bonneville Dam.[1] Plaintiff's petition alleged six breaches of contract and claimed damages of $14,550,-000. Defendant filed an answer on March 12, 1981, a first amended answer on April 8, 1981, and a counterclaim on November 19, 1982. Defendant's counterclaim included a comprehensive restatement of facts; it listed four causes of action and claims that totaled $13,400,000. The case was transferred to the United States Claims Court on October 1, 1982, pursuant to section 403(d) of the Federal Courts Improvement Act of 1982.[2]

Some of the liability issues were decided in plaintiff's favor on cross-motions for summary judgment in a Memorandum of Decision, filed May 11, 1984.[3] At that time, it was determined that a Memorandum of Agreement dated May 23, 1975, and a Contract for Relocation, dated August 19, 1975, were included in the class of contracts subject to the jurisdiction conferred on this court in 28 U.S.C. § 1491(a)(1) (1982). It also was determined that defendant's repudiation, by October 13, 1976, of the provisions of those agreements relative to conveyance of certain parcels of land for the optimum town on the ground that the Town lacked authority to so contract, was without arguable foundation after a December 18, 1980, decision of the Supreme Court of Washington, and a February 17, 1981, decision by the Ninth Circuit adverse to defendant.[4] After the January 1, 1984, termination date for the United States to retain an interest in real property acquired for the new town site, the refusal of the Corps to convey was found to be a breach of the Relocation Contract. Damages, if any, for such breach were left for subsequent proceedings.

After the May 11, 1984, ruling on cross-motions for summary judgment, numerous liability issues remained on plaintiff's claims, and defendant's counterclaim raised significantly different liability issues. Further, the parties' concepts of the principles appropriate in this case for allocation of damages differed widely. Pretrial preparation, because of the parties inability to agree as to the basic factual structure of the relocation commitments, was difficult, and for the most part was unsatisfactory as a procedure to isolate and clarify disputed contentions of fact and law. Each party procured the services of a number of expert consultants and obtained reports that focused preselected facts on the topic

---

1. The Town of North Bonneville is a municipal corporation, organized and existing under the laws of the State of Washington as a noncharter code city. R.C.W. Chapter 35A.02. Documentary materials in this case variously refer to plaintiff as the Town of North Bonneville, or the City of North Bonneville. For purposes of consistency with the pleadings, plaintiff hereinafter will be referred to as the "Town."

2. 28 U.S.C. § 171, note (1982).

3. *Town of North Bonneville v. United States,* 5 Cl.Ct. 312 (1984).

4. *United States v. Town of North Bonneville,* 94 Wash.2d 827, 621 P.2d 127, 133 (1980); *Miller v. Peel,* No. C77–278T (W.D.Wash.), App. No. 79–4805 (9th Cir., Feb. 17, 1981).

or subject assigned for investigation. In pretrial, counsel were able to stipulate as to only 77 facts. Plaintiff, on 35 pages, identified more than 330 separate factual issues to be tried; defendant, on 36 pages, identified more than 200 separate factual issues to be tried.

During the period June 4 through June 28, 1985, 19 days of trial were held. Plaintiff's remaining liability issues and all of its damages issues were heard first. Liability issues and damages issues on defendant's counterclaim were heard following plaintiff's presentation. During the trial counsel were able to enlarge the stipulation to 98 facts.[5]

In posttrial briefing, plaintiff requested 178 findings of fact, on 71 pages; defendant requested 328 findings of fact, on 54 pages, and both parties substantially restated their claims. Plaintiff now seeks damages for five categories of claims in total amount of $28,436,238.32. Under its counterclaim, defendant now seeks damages in five categories of claims that total $4,874,639.45.

The legal issues in this case arise in an unusual context. Although the claims essentially are for breach of contract, the contracting parties are governmental organizations and the Town's relocation is collateral to the United States' assertion of the sovereign power of eminent domain under the Bonneville Project Act.[6] Special legislation was obtained to supplement the authority of the Corps of Engineers to assist relocation of the Town in connection with construction of a second powerhouse at Bonneville Dam.[7] This special legislation (referred to as Section 83 or the McCormack legislation) specifically autho-

rized the Secretary of the Army to relocate the Town of North Bonneville, Washington, to a new town site. As part of such relocation, the Secretary of the Army, acting through the Chief of Engineers, was authorized to cooperate in the planning of a new town with Federal and non-Federal interests, to acquire land necessary for the new town, and to convey title to that land to individuals, businesses, and other entities, including the Town. The special legislation authorized relocation of municipal facilities that were additional to, or constructed to higher standards than, those permitted under the substitute facilities rule applicable to eminent domain proceedings, provided appropriate non-Federal interests furnished binding contractual commitments to cover the additional costs.

The breach of contract issues also are exceptional because of the negotiating stance available to representatives of the parties because of their governmental interests. This public body relationship resulted in procedures atypical in government contracts, and produced a series of written instruments that embodied a sequence of understandings that were dependant upon prior actions. Changes due to future developments were implicit, agreements were expected to be amended and further agreements were expected to be reached at a later date.

## FACTS

Background information on the parties and the relocation project is provided in the May 11, 1984, Memorandum of Decision on the cross-motions for summary judgment.[8] The findings of fact set forth separately in

---

5. In view of the unsatisfactory state of pretrial preparation, special procedures were adopted at trial to identify and relate particular documents to the testimony of each witness, and for the admission of exhibits into evidence in the record applicable to the claims in this case. Prior to the trial, numerous items had been filed with the Clerk in connection with motions for summary judgment and motions in limine. For the purpose of disposition of the parties' claims, the record is limited to the testimony taken during trial sessions, and the exhibits admitted

during the trial sessions, in the order closing proof, and by special order thereafter.

6. Bonneville Project Act of August 30, 1935, 49 Stat. 1028, Act of Aug. 20, 1937, 50 Stat. 731.

7. Section 83 of the Water Resources Development Act of 1974, Pub.L. No. 93–251, enacted Mar. 7, 1974, 88 Stat. 12.

8. *See Town of North Bonneville v. United States,* 5 Cl.Ct. 312.

a subsequent section of this opinion include in Part I a chronology in detail of the facts involved in the parties' dealings to August 24, 1976, during the planning and design stages of relocation. Part II of the findings includes selected facts applicable to damages claims during the construction phase. Except as appropriate for continuity, information in the findings of fact is not repeated in other sections of this opinion.

Bonneville Dam, on the Columbia River, was completed in 1943. The northern half of the spillway is located in the State of Washington; the southern half of the spillway, the first powerhouse, and other facilities, are located on the Oregon side of the river. The Town of North Bonneville developed with the construction of the Bonneville Dam, and until 1975 its center was located adjacent to the dam on the Washington side of the river.

The Corps of Engineers constructed Bonneville Dam, and operates and maintains its facilities. In 1965, the Bonneville Power Administration, which markets electrical power generated by the dam, requested the Corps of Engineers to construct a second powerhouse. The site ultimately selected was on the Washington side.

In this case, defendant acted through the Corps' Portland District office, supervised by the District Engineer, who also acted in the capacity of contracting officer for the second powerhouse project. The Portland District Engineer reported to the North Pacific Division, which was supervised by the Division Engineer. Both the District office and the Division office were located in Portland, Oregon. The chain of authority and responsibility continued to the Office of the Chief Engineer (OCE) and the Secretary of the Army, located in Washington, D.C.

The Town of North Bonneville, as a municipality, acted through its mayor and Town council. On relocation matters, the mayor and council were advised by the Town's Planning Commission, managed by Pollard Dickson, and by the Town attorney, who before September 1974, was J. Richard Aramburu, and thereafter was James J. Mason. Pollard Dickson organized the Town's planning staff in 1973. His title initially was Planning Program Manager, subsequently it became Planning Director, and, ultimately, Director of Community Development. Pollard Dickson dominated the Town's relocation efforts and its dealings with the Corps. With the advice and support of the Town attorney, the Town's planning organization was able to secure unparalleled concessions from the Corps.

Relocation of the Town divides into three phases: planning, design, and construction. These activities occurred during the period August 24, 1971, when the Town was advised it had been selected as the site for the second powerhouse, to November 15, 1978, when the Town work north of the relocated highway and railroad was completed, except for some finishing details. In end result, the major objectives of both parties were realized. The Corps' objective to complete the second powerhouse and have power-on-line by May 1, 1981, was attained. The Town has been removed from the powerhouse site and the United States has demolished substantially all of the streets, public buildings and other municipal facilities in the Town as it existed prior to 1975. The Town, in fact, has been relocated, and the new facilities are substantially superior to the facilities that existed in the old Town.

## ANALYSIS

*General*

On August 24, 1971, the Corps advised the Town that the United States intended to acquire approximately 95 percent of the area then occupied by the Town, and that the powerhouse project would result in removal of substantially all of the residences, businesses and municipal facilities in the Town. The area within the then Town limits encompassed approximately 225 acres. After the August 24, 1971, meeting, the Town's officials advised the Corps that the residents desired to be relocated as a community.

Relocation of the Town was one element of the overall project to construct the second powerhouse, and the Town's relocation had to be coordinated with other project work. This work included: (1) relocation of the highway and railroad for access to the new powerhouse as well as the new town; (2) construction of a haul road to move excavated material to disposal points; (3) excavation for powerhouse construction; and (4) construction of a seepage cutoff wall to encircle the powerhouse project site.

In 1972, the Corps, in Design Memorandum No. 4 (DM 4), planned to have relocation of the Town substantially completed prior to starting excavation of the second powerhouse. Under the Corps' DM 4 schedule, the Town's relocation planning phase would be completed during the period April through August 1973; the design phase would be completed by the end of January 1974; and dwelling construction in the new town site would be during the period March 1974 through November 1975. The cutoff wall for the powerhouse was to be constructed during the period November 1975, through June 1977. Excavation for the powerhouse was to start in May 1977 and construction of the powerhouse was to commence in June 1978.

During performance, however, the objective to complete relocation before major powerhouse construction work began was not realized. The planning and design phases for Town relocation extended from July 26, 1974, when the contract for services was executed, to August 24, 1976, when the construction contract was awarded. During this period, the schedules that applied to the relocation work by mutual agreement or by the force of circumstance were changed substantially. Further, in actual performance, the completion dates as planned and agreed upon were not attained.

The as-performed schedule shows planning phase work extended from November 19, 1974, through April 28, 1975. Work in the design phase commenced on October 13, 1975, and plans and specifications were delivered on May 3, 1976. Municipal facilities were constructed during the period August 24, 1976, through April 1, 1978, at which time there was beneficial occupancy of the town hall, fire station and sewage treatment plant. Town construction north of the relocated highway and railroad was started on July 25, 1978, substantially completed by November 15, 1978, and completed by August 24, 1979. Dwelling construction occurred from September 1977 through December 1979. Construction of the seepage cutoff wall for the powerhouse started on August 24, 1974, and was completed on August 15, 1977. Excavation for the powerhouse started March 31, 1977, and was completed July 10, 1978.

The cost to relocate the Town increased substantially over estimates made in the planning and design phases. In August 1972, the Corps' DM 4 estimated the Town's relocation would cost $1,307,000. In 1973, in testimony before the House Public Works Committee, on a bill to provide financial assistance for the Town's relocation, the Town's representatives estimated that the planning, acquisition, and move would be in the neighborhood of $1.5 million. In June 1975, the planning effort reflected in DM 8 put the total estimated cost for the relocation at $14,164,500. As of June 30, 1979, the Corps' records show a total of $33,117,000 had been expended to relocate the Town. Related government expenses, including operating and maintenance costs, as of the time of trial, brings the total to over $36 million for the United States to relocate the Town.

Construction of the second powerhouse reflects comparable inflation in cost over estimates. Plaintiff points out that the Corps' contract with its general contractor for main powerhouse construction, Groves-Kiewit-Granite (GKG), was in the amount of $245,332,602. During the period of performance, adjustments increased the contract price to $305,133,253, a 24.4 percent increase.

*Constraints*

Analysis of the constraints under which representatives of the Town and the Corps

operated is needed for perspective on the course of negotiations that occurred during the relocation process. The Corps in its dealings with the Town was dominated by its objective to complete construction of the second powerhouse and to have power produced on line by May 1, 1981. The Corps had given such assurance in order to obtain congressional approval and funding for the project, and was in no position to jeopardize support for the project from power users in the northwest and the Washington and Oregon congressional delegations. The Corps' representatives were especially sensitive to lawsuits, or threats of lawsuits, where injunctions or delays likely would prevent timely completion of the second powerhouse.

Another constraint on the Corps' representatives involved limitations imposed by statute, regulation and case law applicable to exercise of the sovereign power of eminent domain. The Corps' authority to acquire a site for the second powerhouse is contained in the Bonneville Project Act. The Corps' authority under the Act includes the ability to furnish substitute facilities to compensate municipalities when public facilities are taken.[9] The substitute facilities rule, however, does not provide an adequate basis for the Corps to furnish financial assistance to plan and design a new site, or to construct new municipal facilities based on projected expansion in a relocated town.

The Corps' regulations that applied to the Town's relocation were designed to give effect to a decision of the 10th Circuit, and to correct actions that had been criticized by the Comptroller General.[10] The 10th Circuit, in the *New Woodville* case[11] decided that where the Government acquired an entire city, which dissolved and a new town was incorporated, and only about 50 of the 300 residents moved to the new town, the new town was not entitled to compensation for the costs of its streets,

sidewalks or alleys. The court reasoned that the old town had ceased to exist, so there was no obligation to provide substitute ways, and there was no monetary loss to be compensated. The court specifically found that the new town was not a relocation of the old city, which would have posed a different problem.

In 1968, the Comptroller General had criticized the Corps for use of arbitrary expansion allowances in relocation agreements that compensated replacement of municipal facilities. In a report to Congress, the Comptroller General stated that payment allowing for any contingency in determining the extent of replacement facilities constitutes compensation for indirect and speculative damages, which is prohibited by law. The Comptroller General recommended specific measures for the Army to improve its procedures for determining the compensation to be paid to municipalities for the relocation of facilities necessitated by Federal water projects.[12]

The Corps' regulations, effective January 1, 1969, provided guidelines for application of the substitute facilities rule. Section 73–601 affirmed that at that time neither Federal statutes nor Federal court decisions authorized the Secretary of the Army to pay the costs of physically relocating a town. Where project requirements dictate acquisition of private property within a project, the Government could participate in financing the cost of comparable streets and utilities in a new town in the event the governing body of the town, and its citizens, decide that a new town will, in fact, be established in lieu of the old town. If no new town is to be established, however, the regulation provides that the Government has no legal authority to pay other than nominal consideration for the streets and utility system in the old town.

Regulation ER 1180–1–1, Part 6 prescribed procedures in detail to be followed

---

9. *Brown v. United States,* 263 U.S. 78, 83, 44 S.Ct. 92, 94, 68 L.Ed. 171 (1923).

10. ER 1180–1–1, Part 6—Reestablishment of Towns, §§ 73–600 to 73–605, Dec. 1, 1969.

11. *United States v. New Woodville, OK,* 152 F.2d 735 (10th Cir., 1946).

12. B–160628, Feb. 27, 1968.

by the Districts. These procedures included:

—A determination that a portion of the town not taken by the project is incapable of absorbing the residents and businesses of the town located in the project taking area. When the capacity of the unaffected areas of the town are substantial but not equal to the occupied properties, a poll was to be made of the affected residents to determine their intention to relocate in the community.

—Any decision to relocate was to be made solely by the town, the town was required to formulate its own plans to relocate, and it was to select and acquire the new town site.

—The Corps' design memorandum was to state the population of the affected town and population trends apart from project induced growth. The design memorandum was to include statistical data on affected residential and business units, residents to be reestablished, and existing municipal facilities. No allowance or payment would be made for facilities in excess of those determined to be necessary to move.

Another limitation on the Corps' flexibility in relocation of the Town was imposed by section 122 of the River and Harbor Flood Control Act of 1970. This section directed the Secretary of the Army acting through the Chief of Engineers to promulgate guidelines designed to assure that possible adverse economic, social, and environmental effects relating to any proposed project have been fully considered in developing such project. Section 122 required consideration of the following: (1) air, noise and water pollution; (2) destruction or disruption of man-made and natural resources, esthetic values, community cohesion and the availability of public facilities and services; (3) adverse employment effects and tax and property value losses; (4) injurious displacement of people, businesses and farms; and (5) disruption of desirable community and regional growth.[13]

On September 28, 1972, the Corps published guidelines to implement Section 122 and to supplement the requirements of the National Environmental Policy Act of 1969.[14] The guidelines were designed to ensure that all adverse and beneficial effects are considered fully in planning Corps projects. As an integral part of the planning process, the Corps was directed to make an effect (impact) assessment. The effect assessment was defined as an "iterative process" that included: identification of anticipated effects, quantitative and qualitative description and display of the effects, evaluation whether adverse or beneficial, and consideration of measures to mitigate adverse effects. The guidelines summarized the sequence of steps to be made in effect assessment as follows:

1. Assemble a profile of existing conditions in the planning area;

2. Extend the profile to make projections of "without project" conditions through the expected life of the project;

3. Make "with project" projections, identifying causative factors and tracing their effects for each alternative;

4. Identify significant effects;

5. Describe and display each significant effect;

6. Evaluate adverse and beneficial effects;

7. Consider project modifications where adverse effects are significant;

8. Seek assessment feedback from other sources;

(Steps 1 through 8 are common to each iteration of the effect assessment process).

9. Use effect assessment in making recommendations;

10. Prepare a Statement of Findings;

11. Use effect assessment in preparing the Environmental Impact Statement.

The content of the material to be included in these steps was discussed in detail in

**13.** Pub.L. No. 91–611, 84 Stat. 1818 (1970).

**14.** Pub.L. No. 91–190, 83 Stat. 852; ER No. 1105–2–05, Dec. 15, 1972.

the guidelines. The discussion relative to step No. 8 emphasized the need for "continuous feedback from a variety of information sources." The Districts were encouraged to have informal exchanges with Federal, state and private groups and individuals at the beginning of the investigation. More formal discussions were to occur in the course of initial formulation and late stage public meetings.

The major problems that confronted the Town in its efforts to obtain relocation benefits involved the small size of its population and its limited financial resources. The number of residents and businesses desiring relocation was marginal, under the Corps' standards, to qualify for replacement facilities. The Town could not afford to plan its own relocation or to acquire a new town site. After 1972, the Town had to find a way to have its planning expenses, including its planning staff, financed by the Corps. After Section 83 was enacted, the question of the Town's ability to make the necessary financial commitments became a continuing problem to the parties.

In 1971, income to the Town from property taxes was approximately $5,700, and the total revenue from all sources was approximately $126,000. During the planning phase the Town searched for ways to raise revenues. On May 21, 1974, it enacted a tax (B & O tax) on the privilege to engage in business in the Town. The B & O tax was designed specifically to apply to contractors of the United States that were engaged to construct the second powerhouse and to relocate the Town. The B & O tax was a new source of income, and commencing in 1975, it was a source of substantial funds. During the period 1975 —1982, the B & O tax produced revenues to the Town that totaled $2,011,212.33.

*Town Population*

In 1940, the Town reached a maximum population of 640 as a result of construction work on the Dam. In the 1970 census, the population had fallen to 459. Without the prospect of a second powerhouse, and possible Town relocation, it is probable that the Town within the original corporate limits would have experienced a stable community population of from 550 to 650, and that the entire community area would have a population of from 750 to 850. When the Town was told in 1971, that it would be the site for the second powerhouse, its population was 470, and when the area outside the corporate limits is included, its population was estimated at 650 persons.

The planning phase of the relocation was accomplished by a team of architect/engineers selected by the Town's planning staff. Projections by the planning groups as to the number of residents that would relocate, and the future growth of the Town's population as a result of the impact of the construction of the second powerhouse, were overly optimistic.

In March 1974, a survey by the GMA Research Corporation determined that there were 182 housing units in the old town that were occupied by 444 persons. In December 1974, a survey by Williams & Mocine determined that 46 percent of the existing households were planning to relocate; 21 percent did not plan to relocate; and 32 percent were uncertain. The planning groups estimated that 60 to 70 percent of the residents would relocate to the new town. This estimate produced a relocation of existing residents at a total of approximately 350 to 400. On the basis of this estimate, the Corps agreed with the Town that the initial town should contain 210 residential lots, and not to exceed 50 business lots.

Throughout the planning phase, the Town planning staff insisted on the concept of planning for an optimum town. The optimum town concept was used to provide basic information necessary to determine the character, size, and location of the new town. Optimum town lands, for planning purposes, were to be lands sufficient to accommodate the existing population, and the growth of that population to 1,500 persons. The Town's planning groups assumed a 100–year period for the Town's population to reach the 1,500 person optimum size.

The population of North Bonneville, as projected by Keyser/Marston Associates in April 1975, compared with the actual population in fact realized, is as follows:

| Year | Projected Population | Actual Population |
|------|---------------------|-------------------|
| 1975 | 550 to 600 | 477 |
| 1976 | 600 to 650 | 387 |
| 1977 | 650 to 750 | 327 |
| 1978 | 750 to 850 | 312 |
| 1979 | 900 to 1,000 | 412 |
| 1980 | 800 to 900 | 432 |
| 1981 | 700 to 900 | 424 |
| 1982 | 700 to 900 | 418 |
| 1983 | 800 to 1,000 | 427 |

As built, the relocated Town consists of 196 new residential lots, 83 of which were vacant as of August 1984, and 11 residential lots from the old town's West End, which were upgraded. There are 50 commercial lots, 42 of which were vacant as of August 1984, and four industrial lots, two of which were vacant as of August 1984.

Defendant's expert reported that, according to Corps documents, 165 residential lots were claimed by eligible residents; of those, 83 were sold by the residents. As of October 14, 1980, 61 families, or approximately 158 persons of the Town's original population, actually relocated to the new town.

*Authority*

Section 83 supplements the authority conferred in the Bonneville Project Act and is the primary authority for the Corps to contract for the Town's relocation. Section 83 authorizes the Secretary of the Army, acting through the Corps:

(1) to contract with the Town to reimburse it for the cost of planning for a new town;

(2) to acquire lands necessary for the new town;

(3) to convey title to lands acquired for the new town to individuals, business or other entities, and to the Town;

(4) to construct a central sewage collection and treatment facility;

(5) to construct other necessary municipal facilities as substitute facilities, which were to serve reasonably as well as those in the existing town;

(6) to construct municipal facilities at higher standards as may be necessary to comply with applicable Federal and state laws;

(7) to construct additional municipal facilities, or to utilize higher standards than required for compliance with applicable Federal and state laws, only at the expense of appropriate non-Federal interests;

(8) to obtain from non-Federal interests, before any real property is acquired for the new town site, "binding contractual commitments" that all lots in the new town site either would be occupied when available, would be replacements for open space and vacant lots in the existing town, or would be purchased by non-Federal interests "at the fair market value."

The obligations of the parties on the claims in this case are to be derived from the provisions of Section 83. The clarifying language that was included in the reports of the Appropriation Committees for the FY 76 appropriations was not intended to amend Section 83 or to enlarge the authority of the Corps. Both parties sought a statement of congressional intent that would clarify the issues that had arisen with respect to the Corps' authority, and both agreed that insertion of language in the Appropriation Committees' reports would be adequate, without an amendment of Section 83. With the requisite clarifying

language in the Appropriation Committees' reports, enactment by Congress of appropriations for FY 76 satisfied the condition precedent in Article XIV of the August 19, 1975, Relocation Contract.

*Agreements*

The Corps used the authority conferred by Section 83 to enter a number of contracts with the Town and with other contractors. The Town secured a bargaining advantage at the beginning of the contractual relationship. In its contracts with the Town, the Corps consented to deletion of the customary disputes clause procedure, and failed to provide a substitute mechanism to resolve disputes during on-going contract performance. During negotiations on the first agreement, a vehicle to reimburse the Town for its planning expenditures, the Town would not agree to inclusion of the standard disputes clause. As alternatives, the Town proposed either an arbitration clause, or the omission of any clause related to disputes or arbitration. The Corps acquiesced and agreed to eliminate both a disputes clause or an arbitration clause. As a result, when the District Engineer could not settle an issue with the Town, and the Town was dissatisfied with the administrative decision at the Division or OCE levels, disputes could only be resolved by litigation. Neither party wanted, and outside forces would not tolerate, litigation to stop either the powerhouse project or the Town's relocation. As a result, decisions on hard issues frequently were deferred, approvals were given on condition, and ambiguous instruments were signed with reservations.

Pursuant to the authority conferred by Section 83, the Corps entered or authorized the series of written instruments that define the planning, design and construction phases of the Town's relocation. These written instruments were made in the following sequence:

1. July 26, 1974—Contract for Services between the Corps and the Town to reimburse the Town for its planning costs and for the Town to employ an architect/engineer (A/E) to produce planning documents;

2. October 9, 1974—Scope and Statement of Work for the A/E planning contract, agreed to by the Corps and the Town;

3. October 14, 1974—the Services Contract between the Corps and the Town was amended to provide that replaced municipal facilities would have the capacity to serve the same number of users as those in the existing town;

4. November 19, 1974—the Corps approved the A/E planning contract between the Town and Royston, Hanamoto, Beck & Abey (RHBA) as contractor to produce the draft design feature memorandum (DFDM), environmental assessment report (EAR) and a comprehensive plan; subcontractors included: Williams & Mocine; Kirk/Wallace and McKinley; Daniel, Mann, Johnson, Mendenhall/Hilton (DMJM/Hilton); Dames & Moore; and Keyser/Marston Associates;

5. May 23, 1975—Memorandum of Agreement between the Corps and the Town to resolve all points of nonagreement between the parties as of that date, to remove the threat of litigation, and to provide a procedure for continuation of the planning process and design process;

6. August 19, 1975—a Contract for Relocation between the Corps and the Town, an integrated agreement that memorializes prior agreements between the parties and is an attempt to define the rights of the parties in further design and construction phases in the Town's relocation;

7. October 7, 1975—Scope and Statement of Work for the A/E design contract agreed to by the Town and the Corps;

8. October 10, 1975—A/E design contract between the Corps and DMJM/Hilton; subcontractors included RHBA;

9. August 24, 1976, Construction Contract between the Corps and Valley Inland Pacific Company (VIPCO).

Other Corps contracts for the second powerhouse project included work that related to the Town's relocation. These contracts were:

1. September 7, 1974—August 1977—seepage cutoff wall construction; ICOS Corporation and BenCor-Petrifond, a joint venture;

2. June 1, 1976—August 19, 1978—fill placement, grading, highway relocation, and railway relocation; Harry Claterbos Co.;

3. September 19, 1975—October 6, 1976 —clear, grub and fill, construct temporary bridge, R.A. Heintz Const. Co.;

4. April 14, 1977—August 1, 1978—powerhouse excavation and spoil berms; S.J. Groves Const. Co. (SJG); and

5. July 25, 1978—August 24, 1979—general contractor for main powerhouse contract—town construction north of relocated highway and railway; Groves-Kiewit-Granite (GKG).

Although these written instruments were executed sequentially, in numerous instances they involved concurrent negotiations during the time after Section 83 became law on March 7, 1974, to the time the A/E design contract was signed on October 10, 1975. Negotiations for the July 26, 1974, Services Contract, involved many provisions that later appeared in the October 9, 1974, scope and statement of work for the A/E planning contract; numerous provisions of the May 23, 1975, Memorandum of Agreement were carried verbatim into the August 19, 1975, Relocation Contract. Drafting of the Relocation Contract was sufficiently completed in July 1975, to permit the Corps' audit report on the Town's capability to be delivered to the contracting officer on August 1, 1975. Negotiations for the October 7, 1975, scope and statement of work for the A/E design contract were in progress during July and August, prior to execution of the Relocation Contract.

One effect of these concurrent negotiations is a failure of any particular agreement in the sequence to be a self-contained statement of contractual obligations as of the time it was executed. Another effect is a failure of a later signed agreement to include changes that had been accepted during drafting of a different instrument.

Early in the negotiations, the Town secured actual or effective control of the relocation contract arrangements. Before enactment of Section 83, the Town on February 11, 1974, sought an official policy declaration from the Corps that the planning phase and the physical new town design would be under the "singular control" of the Town council. On April 23, 1974, the Portland District notified the Town that it would begin to prepare the scope of work for the A/E planning contract, to be let for the first phase of the relocation work. On April 24, 1974, the Town complained to the Washington State Governor that the Corps insisted on doing all of the planning on relocation of the Town through its own contracting arrangements, and requested the Governor's direct intervention on behalf of the Town. On May 2, 1974, Washington State officials convened the meeting the Town had requested. The Portland District at that time still recommended a contract structure that gave it control of the planning and design contracts. During further negotiations, however, the District Engineer agreed that the planning phase work would be done by an A/E firm under a contract made and administered by the Town. The services contract on July 26, 1974, specifically authorized the Town to employ the services of a planning consultant, subject to the approval of the contracting officer, to produce the DFDM, EAR, and comprehensive plan.

Experience with RHBA's work under the Town's contract administration convinced the Corps that the Town should not be the contracting party for the A/E design work. The Corps sought support in Congress, and at a May 20, 1975, meeting in Washington, D.C., the Town was told by Representative McCormack and congressional staff members that it could not direct the design contract or name the A/E design contractor. Accordingly, a main feature in both the May 23, 1975, Memorandum of Agreement, and the August 19, 1975, Relocation Contract, was a definition of the relationship of the parties which specifically provided that the Portland District Engineer

would be the contracting officer and administer the design contract.

Notwithstanding this change in contract administration, the Town was able to continue to dominate the design phase, and its position during the construction phase was not seriously impaired. The Memorandum of Agreement and the Relocation Contract specified that the Town's participation in the design process would include the right to have the scope and statement of work for the design A/E contract be derived mutually, and to be subject to the Town's written approval; any member of the Joint Board of Review could require the design contractor to furnish a written explanation of any proposed deviation from the standards and criteria in DM 8; the plans and specifications prepared by the A/E design contractor would be subject to the Town's approval prior to advertising; and any change order was to be subject to prior approval by the Town. Article 5 of the scope and statement of work for the design contract continued the arrangement that any member of the Joint Board of Review could require the design contractor to furnish a written explanation of any deviation from DM 8 standards and criteria, and their application. Article 12, Section 10, excepted from Joint Board review deviations from DM 8 general concepts on nine subjects.

## DFDM—DM 8

DM 8 occupies an anomalous position in the contractual arrangements. The Corps' regulations require a design memorandum for the Town's relocation. The DFDM prepared by the Town under the A/E planning contract, however, failed to meet the Corps' requirements for a design memorandum, and its provisions were never accepted by the Corps other than as a general statement of guidelines desired by the Town for the preparation of plans and specifications. The Town delivered preliminary drafts of the DFDM on April 25, 1975, with a notice that changes to embody provisions wanted by the Corps would not be tolerated. On May 7, 1975, the Corps determined that the DFDM contained 75 deficiencies,

numerous sections should be rewritten and some sections were either grossly misleading or were erroneous. These and other policy differences, however, were deferred for subsequent resolution. The DFDM was used by the Corps as a statement of what the Town saw as a desirable development, and as a document that was adequate to discharge the Town's obligation under the July 26, 1974, services contract. Both parties agreed that the DFDM did not, and that the DM 8 did not, describe the Corps' obligations.

In subsequent agreements, however, DM 8 was incorporated by reference and used for purposes that creates ambiguities as to its actual status. The Corps obviously used DM 8 to satisfy the requirement that a design memorandum be prepared before proceeding to the design phase of relocation. The Town views DM 8 as containing planning standards and design features that became part of the contractual agreements that render the Corps liable in damages.

## Negotiating Stance

Negotiations during the planning and design phases were impaired by a failure to cooperate toward the relocation objective each party wanted. From the beginning the negotiations were characterized by adversary tactics that are remarkable in the application of outside considerations unrelated to the merits of the particular issue then in negotiation. The tactics employed by the parties went far beyond any legitimate concept of "hard bargaining". Early in its dealings with the Corps, the Town sought and obtained bargaining concessions by threats to sue, by filing for injunctions to stop work on the powerhouse project, and by applying political pressure from state and Federal elected officials whose support was essential to the Corps.

These tactics became a routine part of the Town's negotiating posture. The Corps' anxiety to meet the May 1, 1981, power-on-line deadline produced a Pavlovian response to the Town's tactics. For its part, the Corps also employed, although less successfully, political pressure, and

threats of suit to force de-annexation of the powerhouse site, reconsideration of the B & O tax, and of the scope of Section 83. The Corps also threatened to delay the construction phase, and to withhold approval of the Town's annexation of lands necessary for the initial town, until the Town agreed to the Corps' de-annexation and B & O tax demands.

The parties' extensive use of these tactics, which in the circumstances were extreme, poisoned the negotiating process, and amounted to conduct sufficiently oppressive to raise questions of good faith and ethics. In the period February 11, 1974, through September 28, 1976, the Town injected threats to sue into the negotiations on eight occasions, and filed six law suits to reinforce its negotiating position. During the period December 31, 1975, through June 29, 1976, the Corps threatened to sue, or stimulated Skamania County to sue, on four occasions, and by September 20, 1977, the Corps had caused three cases to be filed against the Town. In this court, plaintiff's October 20, 1980, complaint, seeking damages for anticipatory breach, and defendant's November 19, 1982, counterclaim were filed in the context of ongoing negotiations between the Town and the Corps on relocation matters.

The Town's use of a law suit or the threat of a law suit was a tactic that was instrumental in the Town's obtaining important concessions from the Corps. These included:

—acceptance of Pollard Dickson's concept of an appropriate planning process and the resultant application in the planning and design phase of procedures neither understood by Corps personnel nor accepted as procedures required by the Corps guidelines to effectuate Section 122 of the National Environmental Policy Act of 1969.

—the Corps' agreement, reflected in the October 14, 1974, amendment to the services contract, that the new municipal facilities would have the same capacity as the facilities in the existing town, rather than a capacity measured by the number of persons who actually relocated.

—the Corps' acceptance of the Town's draft of the scope and statement of work for the A/E planning contract;

—the Corps' recognition of the Town's position on standards, site selection, and use of the workshop process;

—the Corps' agreement that the "clarifying language" in the Appropriation Committees' reports would permit:

1. land to be conveyed to citizens at the fair market value of unimproved land, without enhancement of value for the new municipal facilities.

2. up to 125 acres of open land within the initial town for common use areas could be conveyed without cost;

3. use of standards and criteria recognized by "technical groups" and good industry practice, in the absence of Federal or State required standards;

4. replacement for community service facilities available in existing elementary school if it is not relocated.

—The Corps' use of the DFDM as an adequate delivery under the services contract, and useable as DM 8 without a delineation of its function as to the extent of the Government's obligations in the design phase.

The Corps' misuse of negotiating tactics was not successful to bring about de-annexation of the powerhouse site or to restrict the use of the B & O tax only to Government contractors engaged in the Town's relocation. The site of the second powerhouse is owned and operated by the United States; the Town, however, has not disincorporated the site.

The Town council also employed its municipal powers to harass the Corps during the negotiation of relocation disputes. In 1976, when excavation and site preparation for the second powerhouse were underway, the Town declared a state of emergency in regard to the health, safety and welfare of its citizens to aid negotiations relative to the delivery of a plat to the Town and the refusal of the Corps to participate in the

acquisition and transfer of optimum town lands. This state of emergency, declared on September 28, 1976, was to remain in effect until those and other matters were resolved.

In addition, on September 28, 1976, the Town council adopted emergency ordinance No. 317, which declared that any breach of contract by any public agency that materially effects the Town's ability to conduct good government would constitute an emergency. On October 19, 1976, the council adopted a noise control ordinance to control all sound and vibration that effected any residential, commercial, or industrial property within the Town limits, and concurrently denied permit applications relative to excavation for the seepage cutoff wall that had been submitted and tabled on October 1, 1976. Motions for a preliminary injunction to enjoin the enforcement of ordinance Nos. 317 and 320 were withdrawn on December 15, 1976, on stipulation of the parties on mutually acceptable arrangements for their enforcement. Subsequently, in March 1977, in connection with negotiations for the commencement of deeding lots to residents and for variances under the noise ordinance, the Town gave written notice that the noise ordinance would be enforced against all Corps contractors, subcontractors and employees. In April and May 1976, the Town council postponed action on, or denied, Corps contractors permits for street closures and utility modifications.

The Town council employed its municipal powers to impede negotiations by changing the negotiating authority of its representatives. These changes reflect either a failure by the Town to understand the Corps' contract administration procedures, or they represent further attempts at harassment. On April 28, 1976, after the Portland District had rejected some of the Town's requests for reimbursement of relocation expenses, the Town by formal action rescinded the authority of its staff to negotiate resolution of relocation problems and required all negotiations to be with the Town council, at the regular Tuesday meetings, on written proposals submitted at a prior council meeting. The District Engineer, as contracting officer, was directed to personally represent the Corps at the regular council meetings until there was a final resolution of six items then in dispute. At a regular meeting on May 25, 1976, the District representative was required to address each of the six subjects in connection with a request for a writ of entry permit for construction of temporary water storage tanks. In July 1977, the council by resolution designated a single individual, the Town's planning director, Pollard Dickson, to represent the Town on all Relocation Contract matters. On July 22, 1977, Mr. Dickson met with the contracting officer and the North Pacific Division Engineer and requested that all such matters be negotiated personally and exclusively between the Division Engineer and the Town's representative. The scope of the contracting officer's authority was reiterated and the Division Engineer denied the request formally on August 5, 1977.

Mistrust between the parties caused by their adversary negotiating tactics was compounded by actions the other believed were particularly reprehensible. The Corps believed that the Town's enactment of the B & O tax, and the retention of its corporate limits around the powerhouse site, were applications of opportunistic trickery that were contrary to what the Corps believed Congress and the parties intended when Section 83 was enacted. The Town believed that the Corps' attachment to the Relocation Contract of an Exhibit A that was different from that agreed upon in May 1975 during negotiations for the Memorandum of Agreement was a deliberate attempt by the Corps to avoid its obligations for the initial town, and that it was an attempt to undermine the Town's position on the B & O tax.

The B & O tax was enacted by the Town council on May 21, 1975, at a time when the mayor and the planning director were in Washington negotiating for the May 23, 1975, Memorandum of Agreement. The Portland District representatives and OCE's representatives in the Washington

negotiations were not told about the B & O tax. Portland District personnel who attended Town council meetings, however, knew as early as April 22, 1975, that a B & O tax was contemplated, and the Corps' claim that it was surprised by the tax is not credible. The Corps' auditors and the Portland District counsel used revenue made available from the B & O tax to support their conclusions and recommendations that the Town had the capability to make the binding financial commitment required by Section 83. Notwithstanding the Corps' doubts about the possible illegality of the B & O tax, the Relocation Contract was signed when the Corps was completely informed about the tax. In fact, the tax afforded the Town the revenue base that the Corps needed to execute the Relocation Contract and to go forward with the relocation without delay.

The Portland District was advised on August 5, 1975, that the Town planned to retain its city limits around the new powerhouse after the Town had relocated. When the Corps executed the Relocation Contract, therefore, it was fully informed about both the B & O tax and the Town's position on the de-annexation issue. The Corps' decision to go forward at that time, indeed, relied upon the Town's imposition of the B & O tax as to those Corps contractors that were doing the relocation work. The Corps objected to the tax because of the added costs involved when the Town applied it to the Corps' contractors for work that was done on the powerhouse. The Corps' objection to the B & O tax, essentially, was an attempt to support its position on the de-annexation issue. The Town's objection as to the erroneous Exhibit A, likewise, was an attempt to support its position on the B & O tax and de-annexation. When the dispute on Exhibit A arose, the parties' disagreement as to those issues was paramount.

The Portland District's substitution of an Exhibit A to the Relocation Contract that was limited to the areas the auditors had used to compute the Town's financial capability to make the required binding contractual commitment illustrates how fluid the initial town concept was when the Memorandum of Agreement and the Relocation Contract were executed. The boundaries that the initial town ultimately would take were unknown on May 23, 1975, and on August 19, 1975, and no final agreement could or was made on those dates. Although a new Exhibit A was agreed upon on October 6, 1975, and formally attached to the Relocation Contract by amendment on December 17, 1975, the initial town boundary in fact subsequently was changed, at the Town's request, in numerous particulars. On April 13, 1976, the Town council agreed to revisions on Exhibit A in which lands not to be purchased were crossed out, to clarify which lands the Corps was authorized to purchase. On April 20, 1976, the Town attorney reminded the contracting officer that the Relocation Contract authorized Exhibit A to be modified by written agreement of the parties and that the Town was preparing a revision. The Town submitted a new revision on June 10, 1976. Additional planning resulted in changes that were not resolved until March 8, 1977. Exhibit A did not depict a final initial town boundary that both parties accepted until June 28, 1977, when it was made part of the Relocation Contract by amendment.

*Effects*

The lack of a procedure to resolve disputes, and the parties mutual mistrust, produced written instruments that do not reflect the intent of the parties at the time they were executed. Nor do the instruments memorialize the status of the planning and design phases as of the time they were executed. The written instruments were executed with the knowledge that some matters were not resolved and that each party had reserved powers to change what had been agreed upon. The parties' attitudes throughout were "to agree now" and resolve differences later.

The planning process devised by Pollard Dickson and incorporated in written instruments executed by the Corps, particularly the scopes and statements of work for the A/E planning contract and the A/E design

contract, created procedures of monstrous proportions and complexity. These documents illustrate a situation where planning devices, which were built upon guidelines suggested in the Corps regulations, were exaggerated to such extremes that even the very large, multidisciplined, international design firms could not deliver in the time allocated. The effectiveness of the numerous workshops in illustrating the intuitive judgments desired by the Town's planning director is not apparent on the record. It is clear, however, this contractually imposed planning process required enormous volumes of time and effort that strained the capacities of the A/E organizations that constituted the planning and design teams. One result was that, in order to maintain the artificial schedules, work that should have been completed in the planning phase had to be carried over into the design phase, and questions about plans and specifications that should have been disposed of before the construction phase, required rework and change during construction.

An example of this problem, and the deferral of disputes to subsequent decision, is illustrated in the attempts to reach agreement on the proper time to advertise an invitation for bids on the plans and specifications for the construction contract. The Town gave its conditional approval to DMJM/Hilton's plans and specifications on June 3, 1976. On June 8, 1976, at a time when its conditions required seven pages on 12 major categories to set forth, the Town notified the Corps that its approval satisfied the requirements of the Relocation Contract, and the IFB could be advertised. On June 22, 1976, the Corps responded with a listing of 13 items of nonconcurrence. On June 25, 1976, the Town responded, and listed six items that remained in disagreement. These conditions were not resolved before the plans and specifications were advertised. The plans and specifications that were the product of the design phase and approved for advertising contained a large number of design errors. The findings detail the nature and extent of design deficiencies that were un-covered by December 6, 1976, and which had to be corrected in the construction phase.

The May 23, 1975, Memorandum of Agreement and the August 19, 1975, Relocation Contract spell out numerous items on which the parties agreed. Neither of these documents, however, constitutes final agreements on the items of the specific claims for which damages now are sought. The parties, through these agreements, obviously are in a contractual posture and are bound by the terms of their agreements. The problem is to trace through the maze of changes and deferred decisions so as to determine the extent of agreement and resulting liability for damages as to particular items in the respective claims.

The Memorandum of Agreement essentially provided a procedure for going forward with the planning and design phases. The Memorandum of Agreement does not carry with it a final agreement as to the specific items that were identified nor of the actions that resulted from the procedures. When the Relocation Contract was signed there was as yet no agreement on the scope and statement of work to be used in the design contract. That document was left by the parties to be mutually derived in the future. The selection of the design team was deferred to future action.

In large part, the Relocation Contract carried forward verbatim the provisions and procedures of the Memorandum of Agreement, and those procedures and provisions were subject to further changes in the negotiations for a scope and statement of work for the A/E design contract. In this process, by the end of the construction phase, some issues which had been deferred for subsequent action and resolution, never were the subject of final agreement by the parties. The failure of the parties to reach an agreement on the construction of a community center is an example of a failure in the sequence of prior understandings to result in a final link in the chain of promises that would render defendant liable for damages for breach of contract.

*Community Center*

Plaintiff traces an obligation to construct a community center: (1) from the authority in Section 83; (2) through provisions in the Memorandum of Agreement and its Enclosure No. 1, and the clarifying language in the Appropriation Committees' reports; (3) through DM 8, Vol. 1, pp. 3–26, and 5–31; (4) through the Relocation Contract, Exhibit C, Item 14; and (5) through the scope and statement of work for the A/E design contract, Article 12, Section d(1), and Article 12, Section 7.

In all of these references, inclusion of a community center building in the final design was contingent on a decision by others of whether or not the existing school would be relocated. The parties throughout agreed that final design obligations on a community center could only arise after the contracting officer directed it be produced. In the planning process, both parties were in agreement that a community center was an essential community social facility and that it was desirable that the Corps should provide replacement facilities for those formerly available in the school.

In December 1975, the parties deferred further design because of continuing uncertainty as to whether the school district would relocate the existing school. DMJM/Hilton, in the design phase, through the A/E firm of Kirk/Wallace and McKinley, completed the community center only through preliminary design. On November 10, 1977, the school district accepted cash payment rather than relocation by way of replacement facilities.

On March 15, 1978, the Town requested the Corps to initiate a design for a community center, and suggested a format for a mutually agreed scope and statement of work. On June 20, 1978, the Town attorney requested the Portland District to schedule a design workshop under the Relocation Contract for the community center. The District provided to the Town a draft scope of work for the design of a community center that was based upon the work previously done in the RHBA planning contract and the A/E design contract. On June 27, 1978, the Town notified the District Engineer that the District's proposed scope of work was unsatisfactory, and that the Town would respond with a redraft of a scope of work for the community center. The Town proposed to concentrate on the workshop and conceptual design of the space, its specific location, and relationship to other public structures. On June 30, 1978, the District advised the Town that DMJM/Hilton had conducted a workshop and design briefing on the community center, and that no additional workshops would be held unless the Town paid for them.

On July 7, 1978, the District Engineer responded to the Town's June 27, 1978, notice and stated that the design contract scope of work provided for final design of the community center and that the planning and preliminary design had been completed by DMJM/Hilton. He stated that the work by DMJM/Hilton already had involved workshops, conceptual design of the space and the building's specific location and relationship to other public structures, and if the Town wanted additional workshops it would have to pay in advance for all associated costs. The District Engineer reminded the Town that all direct reimbursements to the Town had ceased as of June 30, 1978, and stated the Corps would not negotiate a lump sum amount for additional work to arrive at an approved scope of work for a community center.

The parties could not reach agreement on completing the design for the new community center. On November 28, 1978, the District Engineer requested authorization to negotiate a cash payment to the Town of $370,000 to avoid the complications that would arise in attempting to design a community center that would meet the Town's desires and to satisfy the Government's contract obligation under the clarifying language. The District Engineer was of the opinion that the new town could not be considered relocated until the Town either had a community center, or the school board decided to provide a new school in the town.

The issue was not resolved and ultimately the Town independently hired McKinley Architects to complete a preliminary design for the community center based upon a scope of work that the Town had prepared. McKinley Architects' report is dated August 16, 1979.

On November 23, 1979, the Corps reviewed the matter and communicated its position to the Town. The Corps' position included:

a. Preliminary plans provided for a community center with maximum gross area of 5,169 square feet, depending on options selected, and no outside play area or gymnasium. The document "North Bonneville New Town Design Municipal Building Design Analysis, Rationale and Standards, and Criteria for Design Development" dated 24 November 1975 and prepared under the design contract by Kirk, Wallace, McKinley, AIA and Associates, established the extent of the above-mentioned Government's obligations relating to the community center facilities, and this office indicated its acceptance of those obligations to your office by letter dated 28 April 1978.

b. Any modifications in the design of the community center desired by North Bonneville, which increase space and/or costs beyond the previously agreed upon Government obligations, would be betterments which require betterments cost payments by the City following terms under the relocation contract.

\*   \*   \*   \*   \*   \*

d. The Government is obligated to provide replacement community facilities through the provision of a community center only when the City of North Bonneville has accepted all municipal facilities in total and assuming there is no school facility in North Bonneville.

e. The offer for a cash settlement in the amount of $385,000 in lieu of construction and based on January 1979

prices is still viable for replacement of the subject facilities....

The parties were not able to negotiate a settlement of the community center issue, and they were not able to reach a final agreement that was sufficiently definitive to impose an obligation on the United States to respond in damages for a failure to construct the center. The unsuccessful negotiations for a settlement, and defendant's offer of compromise, do not establish the existence of an agreement for which defendant is liable.[15] At trial the Town's planning director testified that no agreement had been reached on a scope of work for final design of the community center.

The Town presented at trial the McKinley Report and the testimony of its author, David McKinley. This evidence went solely to the issue of damages claimed by the Town. The Town did not present evidence that established liability for breach of contract as to this issue.

During trial, on defendant's motion, as to the community center issue, a ruling was made that the Town had not established on the record a contractual obligation that could be the basis for damages, and this claim was dismissed. In posttrial briefing, the Town requests that the ruling made at trial be set aside and the record reopened for the defense to cross-examine Mr. McKinley and present additional evidence with regard to the community center claim. The ruling at trial was correct as to this claim and there is no necessity to set it aside. Additional evidence from defendant on this issue would not establish the obligation plaintiff failed to prove.

The community center issue is precisely the kind of dispute that should have been settled prior to trial. Both parties recognize the merit in a community center facility as part of the Town's relocation. The negotiating stance of the parties, however, including the reliance on extraneous political influences and resort to litigation as the final determinant, produced such extreme

---

**15.** *See Cheyenne River Sioux Tribe v. United States,* 806 F.2d 1046, 1050 (Fed.Cir.1986) (an unaccepted offer of settlement ordinarily is not admissible to show either liability or amount of liability).

intransigence that reasonable compromise could not be reached. In the circumstances of this litigation, the rules of contract construction regarding indefinite agreements have no place.[16] The cases cited and relied upon by plaintiff are based on facts that are not apposite to the Town's community center claim. As counsel were warned at trial, resort to litigation on a claim that in all reason should be settled exposes the client to the contingency of total loss if in the final reckoning there is a failure in the evidence to establish liability. That result confronts the Town on its community center claim.

*Optimum Town*

In the initial stages of the planning phase, the phrase "optimum town" was a generalized concept that was identified with the selection of a relocation site from among the several sites available in the reconnaissance area. This generalized concept was used by the Town when it presented its optimum town site location at the public meeting on January 10, 1974, and was so used by the District in the April 9, 1974, Supplement No. 2 to DM 4.

As the planning phase progressed, the phrase acquired a different, restricted meaning. In the July 26, 1974, contract for services, the specifications relative to the Comprehensive Plan stated the Plan would be based upon the development of an "Optimum Town" and the term was defined as a town with a central business district (CBD), with a population and economic base capable of supporting essential community services, providing adequate land for economic growth through a balance of land uses and meeting the requirements of a viable neighborhood unit. By the time the August 19, 1975, Relocation Contract was signed, the "optimum town" was the geographical area that encompassed and lay outside the boundaries of the "initial town."

The Corps viewed the initial town as the area sized to contain the 210 residential lots and 50 business lots needed to relocate the Town's 1974 population. The description of the physical boundaries of the initial town was not settled by the parties until June 28, 1977. Most of the initial town area was inside the second powerhouse project area. Part of the initial town area, however, was outside the project area and, to complete the Town's relocation, had to be acquired by the Corps under Section 83 authority. Most of the optimum town area was outside the powerhouse project area. The Corps' acquisition of property outside the project area for the optimum town and for the initial town was subject to the firm financial commitment requirements of Section 83.

The Corps' analysis of the Town's financial capability to go forward with relocation was based on the requirements of a move to the initial town. OCE was uncertain of its authority under Section 83 to purchase land outside the powerhouse project area that was not needed for the initial town relocation. Such purchases, for the optimum town, would involve the extension of Federal credit to acquire nonproject lands for resale for private development. The A/E design contract provided that DMJM/Hilton's work would be confined to the initial town area, and to such work outside the initial town boundary as necessary to complete the design of the initial town.

On October 22, 1975, the Town filed a law suit in the Western District of Washington to enforce provisions of the Memorandum of Agreement relevant to annexation of Government lands needed for relocation. In December 1975, negotiations for the Corps' consent for the Town to annex Government lands became deadlocked with negotiations for the Town to withdraw boundaries from around the second powerhouse site. On January 23, 1976, the District Engineer instructed the Portland District staff to assume for planning purposes that the initial town would be built and that optimum town land purchase was doubtful.

---

16. Plaintiff cites *Glazer v. Glazer*, 374 F.2d 390, 404 (5th Cir.1967); *Sylvania Electric Products, Inc. v. United States*, 458 F.2d 994, 1000, 198 Ct.Cl. 106 (1972); *Williamsburg Drapery Co. v. United States*, 369 F.2d 729, 177 Ct.Cl. 776 (1966).

The District Engineer recognized that this decision would require violation of the Corps' real estate acquisition procedures. Only the portion of the Pierce property needed to complete the initial town, for example, would be acquired, even though the price to acquire it piecemeal would be far more expensive than to acquire it in toto for the optimum town. The successor District Engineer on March 5, 1976, confirmed and continued the instructions to plan only for an initial town.

The Corps' January 1976 decision to proceed only with plans and design for the initial town was reasonable in the light of the status of negotiations at that time. OCE was uncertain whether Section 83 permitted the Town to retain jurisdiction over the second powerhouse area after the initial town area was occupied. Lands acquired by the Corps for the new town could not be conveyed to the Town in the absence of a capacity to make the firm financial commitment required by Section 83 and the Corps' planning had been based on application of the B & O tax only to contractors engaged in relocation work. Legal justification for acquisition of lands for the optimum town was clouded as to (1) whether Section 83 provided authority, (2) the Town's authority to participate directly in acquisition of land for expansion, and (3) possible violations of the Town's debt ceiling under Washington State law.

On June 17, 1976, the Town formally requested acquisition of lands for the optimum town of three parcels, identified as A, B and C. Parcel A was an area on the Pierce Ranch that fell outside the initial town on currently designated project lands. Parcels B and C were located within the powerhouse project lands. This request was denied by the District Engineer, on June 23, 1976, at a Town council meeting, and formally by letter on June 28, 1976.

Although the Corps' decision to proceed only as to the initial town was reasonable when made in January 1976, the Corps' continuing refusal to deal with the optimum town lands issue at later times was not reasonable and was unjustified. OCE, on June 4, 1976, decided not to seek a declaratory judgment as to the scope of Section 83 for reasons that included (1) the determination that the B & O tax was nondiscriminatory and not precluded by any contractual provision, and (2) the Relocation Contract was valid insofar as the Town's financial capacity was concerned. On May 17, 1977, the District Engineer advised the Town that the Government would have no additional project requirements for Parcels B and C following completion of the second powerhouse construction, and would not object to their disposal. After the decision by the Supreme Court of Washington on December 18, 1980, and by the Ninth Circuit on February 17, 1981, the Corps' argument that the Town lacked authority to contract for optimum town land was without arguable foundation.

■ Subsequent developments have rendered Parcel A unavailable. Negotiations between the Town and the District have enlarged Parcels B and C to provide substitute land for Parcel A. The obligation of the Corps as to optimum town lands in the Relocation Contract, as modified by these subsequent events, at least as applied to the lands in Parcels B and C which are within the boundaries of the second powerhouse project, continue. The Corps' refusal to go forward with this obligation renders it liable to the Town in damages for breach of contract.

*Experts*

Trials concerned with breach of construction contracts that involve governmental units frequently become battles between experts. In this case, both parties rely heavily on the testimony and reports of expert witnesses; plaintiff qualified nine expert witnesses, defendant qualified three.[17]

---

17. The testimony and the report of one of plaintiff's experts was excluded from evidence because plaintiff failed to comply with the requirement in the pretrial order for timely exchange of reports of proposed expert witnesses in order to permit deposition before trial.

Plaintiff's expert witnesses included representatives of two firms that had subcontracted work from RHBA in the A/E planning contract, and a representative of the Pittsburgh Testing Laboratory, which had performed tests for the Town in 1979. The reports of these witnesses were prepared prior to the filing of this case on October 20, 1980. The reports of plaintiff's remaining experts, and of all of defendant's experts, were prepared during the latter part of 1984, specifically to address the issues raised in plaintiff's complaint and defendant's counterclaim.

The testimony of the experts, for the most part, consisted of a recapitulation of information which was contained in their reports, as clarified during their pretrial depositions. The reports of the expert witnesses were found to be of limited utility, in part because the tasks assigned and guidance given to the experts by the parties included assumptions that precluded an objective or complete analysis. The main source of deficiency, however, was the erection of elaborate analyses on a foundation factually incorrect or incomplete. The delay analysis by the experts for each party included lists of documents that identified specific communications and events that could be verified objectively. Other than the actual completion date for the Claterbos contract, and the dates the SJG excavation contract and new town construction were substantially complete, however, there was little coincidence of items in the two lists. Further, the intermediate and ultimate factual conclusions in the experts' chains of analysis that were derived from the listed items were distorted by judgment factors. On examination of supporting references, the intermediate and ultimate factual conclusions were found to be argumentative and erroneous. The narrative statements by the experts, and the findings of fact requested by the parties, were grounded on these derived intermediate and ultimate factual conclusions. Each party, therefore, rejected the great bulk of the findings of fact requested by their opponent.

As a result of deficiencies in the experts' reports and in counsels' posttrial submissions, statements of facts recited in the narrative portions of the reports could not be relied upon. The necessity to eliminate the experts' judgmental gloss required the unusually detailed and comprehensive chronology of the relocation's planning and design phases that are included in the findings of fact that are set forth below in this opinion.

*Plaintiff's Experts*

Plaintiff's expert witnesses and a summary of their final conclusions are set forth below.

1. *Robert Ironside* is a partner in Williams & Mocine, a city and regional planning firm, that participated in the planning phase as a subcontractor to RHBA. Williams & Mocine conducted a survey of the old town in December 1974, and prepared the report captioned: Replacement Necessary for Social Viability: Essential Community Services, dated March 20, 1975, and revised March 24, 1975. This report is incorporated as Appendix J in the DFDM (DM 8). Mr. Ironside evaluated community needs from citizen input obtained through the 1974 survey and in workshop interactions under the RHBA contract. The Williams & Mocine survey, and discussions with Town officials and residents, was the basis for the conclusions that the optimum town size should be 1,500 persons, that the initial town size should be 600 persons, and that the list of essential community services in Appendix J, including a community center, were those needed for the economic and social viability of the initial town.

Mr. Ironside's testimony explained the interrelationship in the preparation of the DFDM (DM 8), the EAR and the Comprehensive Plan. He testified that, in the planning phase, no specific study had been made to measure any impact the threat of relocation may have had on old town residents or families. His testimony shows that the initial town and optimum town population estimates, for planning purposes, were not projections from the actual conditions and business potentials of the

old town. Rather, these estimates were a product of the inspired intuitive planning associated with gestation of the Comprehensive Plan for the new town. Concurrent development of the DFDM, EAR and Comprehensive Plan, with the requirement in the Scope and Statement of Work for the RHBA planning contract that the studies and investigations were to be made to such depth as necessary to satisfy the requirement of all three documents, resulted in a merger of these documents. These documents were the product of the RHBA contract, and marked the completion of the planning phase. Community services essential for an ideal Comprehensive Plan became design objectives and design determinants in DM 8. Mitigation measures to cope with unavoidable adverse effects to municipal income, in the impact assessment made for the EAR, became necessities for economic viability in the Comprehensive Plan that were used to justify imposition of a B & O tax and retention of Town boundaries that gave the Town jurisdiction over the site of the second powerhouse.

2. *Steven S. Pinnell* is a civil engineer and principal in Pinnell Engineering, a firm of consulting engineers and construction managers. He provided the Town's explanation for the cause and extent of delay in relocation by means of a comparison of the planned schedule in the Relocation contract with the "as built" conditions in the construction phase. This information was presented through an exhibit that graphically portrayed: (1) a planned Relocation Contract schedule, (2) a planned DMJM/Hilton design schedule, (3) a planned DMJM/Hilton construction CPM (critical path method) schedule, and (4) "as built" schedules under the VIPCO, Claterbos, Heintz, SJG and GKG contracts. The exhibit shows there was a 4–month delay in the start of construction, and 9 months delay in completion of VIPCO construction. The exhibit information was amplified in a report by Pinnell Engineering, dated December 27, 1984, captioned: Analysis of Delay.

Pinnell Engineering's assignment was to analyze the planned DMJM/Hilton construction CPM schedule, report in a formal written opinion as to its practicality, and to give a formal conclusion as to the Corps' ability to meet the beneficial occupancy date of November 1, 1976, and the final completion date of March 1, 1977, in the Relocation Contract. This assignment included preparation of the "as built" schedule and a statement of reasons and responsibility for any delay.

The starting point for his analysis was the Relocation Contract, and the analysis assumes that the schedule in the Relocation Contract, as the foundation for all subsequent schedules, should have been maintained. The list of documents used in the narrative portions of the report starts with a document dated November 21, 1974, and ends with a document dated February 17, 1983. No attempt was made to analyze the impact of delays in the planning phase, and no use was made of documents that originated prior to November 21, 1974.

The expert was of the opinion that the beneficial occupancy date of November 1, 1976, was feasible and that full beneficial occupancy of the CBD, residential building sites and municipal facilities was possible by March 1, 1977, if substantial expediting efforts were made to maintain the schedule. The report concludes, on the basis of application of Mr. Pinnell's judgment factor, that the Corps deliberately delayed advertising from May 18 to June 25, 1976, (39 days) and that the delay in advertising was a major factor in the 1–year delay to town construction.

Pinnell Engineering's treatment of concurrent delays, in the application of the judgment factor, leads to questionable allocations. The report states that in the design phase the Corps deliberately delayed advertising for the construction contract for 39 days. There was a 21–day concurrent delay, from May 14 to June 8, 1976, however, for the Town to approve the plans and specifications. On the ground that the Corps should have provided early review copies to the Town by May 5, 1976, and

thus could have permitted advertising by May 24, 1976, the report concludes that the Corps is responsible for a 32–day delay from completion of design until advertising for construction.

A summary of delays found in the Pinnell Engineering report follows:

| | | Total Days Delay | Due to Corps |
|---|---|---|---|
| (a) | Delays from execution of Relocation Contract to notice to proceed for construction | 121 | 62 |
| (b) | Construction delays – VIPCO Contract | | |
| | (1) Some lots available | on schedule | 0 |
| | (2) East of Hamilton Creek | 172 | 172 |
| | (3) West of Hamilton Creek | 82 | 82 |
| | (4) Municipal Buildings | 82 | 82 |
| | (5) Paving & Striping | 36 | 36 |
| | (6) Plant Establishment | 263 | 263 |
| | (7) Town Bridge | 90 | 90 |

The Corps was found to be either responsible for or accountable because it failed to compensate by acceleration of VIPCO's work, for all of the delays in construction.

| | | | |
|---|---|---|---|
| (c) | Claterbos Construction – Delays overcome by $1 million acceleration so VIPCO not affected | | 0 |
| (d) | SJG – town construction | 0 | 0 |
| (e) | GKG – delays occurred, but town work was completed on November 15, 1978 | | 0 |

3. *Clayton Sandstrom,* real estate appraiser and analyst, performed the appraisals of Parcels A, B and C that are described in a report submitted December 26, 1974, by the Aztec Appraisal Corporation. Parcels A, B and C were outside the plat boundaries of the initial town and within the optimum town boundaries.

The appraisal included comparable sales, and considered new town development and construction after August 1977. At that time, lots were offered by the Corps to original old town residents, and the Town received all unsold lots, which, primarily in the fall of 1978, it sold or leased.

Present trends in the Town were considered, taking into account the anticipated land uses as described by Town officials, primarily the Town's planning director. Parcels A, B and C were appraised as if filled and graded according to the fill and grading plan described in the Relocation Contract, and in the scope and statement of work for the A/E design contract.

Fair market value of Parcels A, B and C was developed through the consideration of two scenarios: (1) Giving full credence to the Town's plans with respect to a commercial greenhouse operation and the development of a 250–room convention resort hotel, and (2) Convention hotel not in being, but the subject properties available for development by entrepreneurs with no specific defined use in mind.

Scenario No. 1 was not completed.

Fair market value, based on the highest and best use as prescribed in the Town's zoning ordinance, for scenario No. 2, was:

| | Acres | Value |
|---|---|---|
| Parcel A | 257.40 | $ 706,000 |
| Parcel B | 62.93 | 469,300 |
| Parcel C | 25.50 | 1,355,600 |

4. *Nancy E. Guitteau,* economist, presented an analysis of potential losses to the Town because of its failure to become the economically and socially viable community as planned in DM 8. The analysis of fiscal impact is described in the report

captioned: Assessment of Fiscal Damages, dated December 1984, by the firm of Leland & Hobson, urban land economists and development consultants. The projections were based on application of the techniques used in the field of economics. The expert was not experienced in, and the report does not purport to utilize, principles that apply to computation of damages for breach of contract.

The report proceeds from the conclusion that the Corps had breached the Relocation Contract. This conclusion, and its articulation were given to Leland & Hobson by the Town's planning director. The major breaches of contract by the Corps, which set the parameters of the report, as given to the expert by the Town's planning director, were:

1. Delay in completion of site work of initial town lands, preventing an orderly and timely relocation process;

2. Refusal to sell the optimum town lands by the agreed upon date;

3. Failure to place fill on optimum town lands appropriate for development as contemplated by DM 8 and agreements.

The conclusions in the expert's report as to lost municipal revenues are erected on the assigned task defined by the Town. The utility of the report is dependent upon the validity of the assumed breaches.

Essentially, the report is an extension of the economic and fiscal impact assessments performed by Keyser/Marston Associates, incorporated in DM 8, Appendix D. Leland & Hobson did not analyze DM 8, the scope and statement of work for the construction contracts, or the as-built conditions, to determine whether the fill had been placed as contracted for by the parties.

The report concludes that the Corps' alleged contract breaches produced an inability in the Town to take advantage of economic development opportunities on the initial town lands during the powerhouse construction period, or on optimum town lands, and stymied population growth necessary to reach the critical mass of 1,500 persons as planned by Keyser/Marston in DM 8,

Appendix D. The report assumes that the failure to make Parcel B of the optimum town lands available prevented fruition of an opportunity based on a proposal in March 1981, for a 250-room hotel and resort development on Hamilton Island. Another lost opportunity assumed in the report was the inability to construct a geothermal heating system in the Town, which could have attracted greenhouses for the floral and nursery industry.

The fiscal impact and damages due to these lost economic development opportunities were calculated in a methodology that used two scenarios: (1) Existing conditions—Town continues to exist in condition resulting from alleged breaches of contract; (2) Town founded and developed as envisioned by the economic development presented in DM 8. The calculation used a projection period of 50 years beginning in 1977. The statement of assumptions for scenario No. 1 included: (1) data for the period 1977–83 are actual figures provided by Town, and (2) optimum town lands are never conveyed, and no other additional land is available for development. The statement of assumptions for scenario No. 2 included: (1) relocated population from the old town is assumed to be the 420 persons projected in DM 8, (2) the resort hotel on Hamilton Island would begin operations in 1987, and (3) the Town population would have grown 15 percent between 1977–80, 2.5 percent from 1982–85, and 5 percent from 1986–90.

In scenario No. 1, the report projected Town revenues from $54,800 in 1977, to $152,900 by 1990, and to $459,100 in 2025. In scenario No. 2, Town revenues projected were $70,000 in 1977, $648,200 in 1990, and $1,982,700 in 2025. The calculation of revenue loss was the difference between revenue produced in scenario No. 1 and scenario No. 2. This amount was considered to be damages due to the alleged breaches of contract. The revenue loss from 1977 to 2027, after adjustments for inflation and discounts for future years, was projected and used as the measure of damages. This calculation is given in the following table:

CALCULATION OF DAMAGES DUE TO PROJECTED REVENUE LOSS
TOWN OF NORTH BONNEVILLE
(In Thousands of Dollars)

| Period | Total Loss* |
|---|---|
| 1977–1982 | $ 467.5 |
| 1983–1985 | 273.2 |
| 1986–1990 | 1,428.4 |
| 1991–2000 | 4,207.6 |
| 2001–2010 | 4,297.6 |
| 2011–2020 | 4,262.0 |
| 2021–2027 | 2,485.9 |
| | $17,422.2 |

* Constant 1984 Dollars

In a supplemental report, Leland & Hobson made another calculation of damages. In this calculation, the assumptions were revised to provide that the delays in making lots available for development in the new town resulted in loss of population and commercial base. The population was considered to peak in 1980 at 432 persons, to drop in 1983 to 427, grow to 566 in 1990, and to 1,187 by year 2020. It was assumed the Parcels B and C of optimum town lands are conveyed through sale to the Town by the Corps; and that they are in suitable condition to be developed. Parcel A, originally planned for development of 100 single-family lots on 257 acres, was assumed not to be conveyed. No direct fiscal impacts from loss of revenue was ascribed to the loss of Parcel A. Other assumptions remained the same, and the methodology applied to scenarios No. 1 and No. 2 remained the same. Damages due to projected revenue loss, based on the revised assumptions, were calculated. This calculation is shown in the following table:

DAMAGES DUE TO PROJECTED REVENUE LOSS
(In Thousands of Dollars)

| Period | Total Loss* |
|---|---|
| 1977–1982 | $ 467.5 |
| 1983–1985 | 240.0 |
| 1986–1990 | 385.6 |
| 1991–2000 | 815.5 |
| 2001–2010 | 835.9 |
| 2011–2020 | 748.0 |
| | $ 3,492.5 |

* Constant 1984 Dollars

5. *Robert W. Glaeser,* professional land surveyor, conducted surveys and inspections on five topics, defined by the Town. The results are reported in a "Final Inspection Report" dated July 20, 1984, prepared by Minister and Glaeser Surveying, Inc. The report contains five major sections.

The first section is a review of the specific items dealing with the survey, monumentation, and lot staking for the Plat of Relocated North Bonneville and the First, Second, Third, Fourth, and Fifth Additions to these plats.

The second section describes the survey of tracts of land owned by the Town, referred to as parcels 2801 and 2810. It includes an estimate of the cost to perform a boundary survey of the "optimum town" lands.

The third section reviews the findings of surveys to determine the location and encroachments of certain municipal buildings and water lines on dedicated public lands, municipal lots, or privately owned lands.

The fourth section shows the results of field inspections of selected points along the paved pathways within the Town.

The fifth section deals with the volume of material contained within various spoils areas located in the vicinity of the Town, the topography of these spoils areas, and tabulated data that compared the actual volume of material which has been deposited to the designed volume on the new town plan dated November 30, 1975, delivered by DMJM/Hilton, and grading plans produced by DMJM/Hilton.

Cost estimates were as follows:

| | | |
|---|---|---|
| Section 1 | Reset Plat Boundary Monuments | $ 9,790.00 |
| | Reset lot corners | 9,670.00 |
| Section 2 | Survey – Parcels No. 2801 and 2810, Survey and Monumentation – Optimum Town Lands | 8,180.00 |
| Section 3 | Location of Municipal water line and buildings – alignment to lot lines and easements | 1,360.00 |
| Section 4 | Field Inspection in April 1984 showed water ponding and a failure to comply with specifications | no estimate |
| Section 5 | Comparability analyses of volumes of material in spoils areas were computed from original ground topography, "as designed" fill plans of DMJM/Hilton and "as built" ground data obtained from a contour map prepared for Town by David C. Smith and Associates, dated July 1981. The areas involved were Parcels A, B and C as described in the Town's June 17, 1976, request for optimum town land. | |

The relationship of "as designed" volumes to "as built" volumes in spoils areas A, B, E and C, in millions of cubic yards, was tabulated as follows:

| AREA | "AS DESIGNED" | "AS BUILT" | DIFFERENCE |
|---|---|---|---|
| A | 9.81 | 14.42 | +4.61 |
| B&E | 2.61 | 1.48 | −1.13 |
| C | 2.04 | 1.44 | −0.60 |
| TOTAL | 14.46 | 17.34 | +2.88 |

6. *James A. Gilmer*, civil engineer, performed an analysis with respect to the "as constructed" drawings supplied to the Town by the Corps, and made a field inspection of the storm drainage system. The drawings examined were the plans for street, storm drainage and pathway design, street profiles, storm drainage profiles, and plans, profiles and details for sanitary sewers and water distribution. The Final Report on these activities is dated October 5, 1984.

The report concludes that the "as constructed" drawings supplied to the Town do not satisfy the requirements of state law for certification and are not consistent with good practice. The field inspection is reported as revealing certain areas do not have existing underground storm drainage systems, and estimates of costs were prepared for construction on the basis of plans cited in the Relocation Contract. The field inspection identified missing concrete curbs and gutters. Pathways were inspected

against the construction technical specification in the VIPCO contract, Section 2C, Site Grading, Subsection 3.5, paragraph 3.5.3. The Town chose and excavated 35 locations, which were inspected by James Gilmer and Robert Glaeser. The pathways were found to have areas of ponding, poor drainage, broken pavements, and skin-patched areas. The report recommends a 1.5 inch overlay on the paths and adaptation to revise the drainage adjacent to pathway system, with new top soil, seeding and drainage piping.

The summary of costs for the corrections recommended were:

## SUMMARY OF COSTS

| Item | Amount |
|---|---|
| 1) Proposal to provide complete set of "As-Builts" | $ 90,865.00 |
| 2) Proposal to provide grading and drainage for the pathways | 17,980.00 |
| 3) Potential Liabilities: (future costs) | |
| Back hoe to locate utilities | 16,000.00 |
| Relocate Service Laterals | 82,500.00 |
| 4) Storm Drainage: | |
| Area–1 | 311,060.00 |
| Area–2 | 284,180.00 |
| Area–3 | 182,450.00 |
| 5) Construct Concrete Curbs and Gutters | 215,300.00 |
| 6) Pathway Improvements | |
| A.C. Overlay | 117,825.00 |
| New Pathways | 27,195.00 |
| Drainage Improvements | 70,000.00 |
| 7) Water System Improvements: | |
| 10–inch | 50,415.00 |
| 14–inch | 34,610.00 |
| Fire Hydrants | 18,400.00 |
| TOTAL ESTIMATED COST | $1,518,780.00 |

Mr. Gilmer made a field examination of the Central Business District (CBD) on June 29 and December 5, 1984, and submitted an addendum No. 1 to the report on December 28, 1984. The addendum submits cost estimates to replace small water meter boxes with larger commercial boxes, to seal approximately 90 percent of the sanitary sewer manholes to stop infiltration, to repair a section of the main sewer line that had a 5″ sag, and for other work. The summary of the estimated costs to do this work was:

| Item | Amount |
|---|---|
| 1) Water Meter Box Replacement | 4,940.00 |
| 2) Sanitary Sewer Collection System: | |
| Manhole Sealing | 32,200.00 |
| Main Line Repair | 6,800.00 |
| 3) Hamilton Creek Erosion Protection | 72,540.00 |
| 4) Water Service Line Replacement: | |
| Water Services | 25,380.00 |
| A.C. Overlay | 59,570.00 |
| TOTAL ESTIMATED COST | $157,490.00 |

7. *Donald R. Scott*, manager, Pittsburgh Testing Laboratory, performed density tests and sieve analysis tests on March 14, 15 and 16, 1979, in 24 test holes dug in locations in the Town selected by the Town's planning staff. Reports on both tests were delivered to the Town on May 17, 1979.

The report on density tests (report No. 3) included the observations that the "top soil" material was not consistent, but was composed of varying amounts of sand, gravel, cobbles, silt and some clay; that most test areas were a silty sand, or sandy silt with gravels and cobbles throughout; and that "top soil" material in the test holes usually consisted of two or three layers of material, differing in composition and density. Holes No. 12, No. 20 through No. 24 were in areas too rocky to make density tests. At trial, plaintiff did not pursue whether the density tests disclosed information relevant to a claim for damages.

The soil sieve analysis tests (report No. 4) were made on materials taken from 0 to 2 feet depths, which the Town said was to be top soil. The sieve analysis was to determine compliance with the specification that top soil would contain no more than 10 percent larger than No. 4 sieve size materials. Report No. 4 presented percentages passing by weight at each of the 24 holes tested. The report shows that the following holes had the indicated percentage passing through No. 4 sieve size:

| Hole No. | Percent Passing |
|---|---|
| 5 | 89.4 |
| 12 | 76.7 |
| 18 | 69.5 |
| 20 | 82.3 |
| 21 | 86.6 |

The report shows that the remaining 19 holes complied with the No. 4 sieve requirement.

Plaintiff on November 30, 1978, received a report from the North Bonneville Conservation District about a soil sieve analysis completed by the USDA, Soil Conservation Service, at the request of the Conservation District. Twenty-four hole sites were selected randomly in areas having fill at a depth that exceeded 4 feet. The 24 samples were analyzed for percentages retained on a No. 4 sieve. The report shows 9 samples retained 10 percent or less. The remaining 15 samples did not meet the No. 4 sieve specification.

8. *David A. McKinley*, architect, pursuant to a contract with the Town, prepared a report that included a final planning and preliminary design for a Town community center. The report, dated August 16, 1979, was signed by McKinley Architects. The report was prepared after the school district had decided not to relocate a school in the new town, and after the Town and the Corps had reached an impasse on completion of a final design. The McKinley Architects' report was based upon a scope and statement of work dated May 1979, which was prepared by the Town specifically for the completion of the final planning and preliminary design only. It was not reviewed or approved by the Corps.

The report outlined two programs: Concept 1, as set forth by the Scope of Work, and Concept 2, according to standards and criteria recognized by professional technical groups, custom and good practice and representing wise use of resources in space allocation and design. The standard was set forth in the Relocation Contract. A cost estimate was prepared on Concept No. 2, as follows:

| | |
|---|---|
| 1. General Architectural and Structural | $ 390,817 |
| 2. Mechanical | 134,490 |
| 3. Electrical (9925 sq. ft. @ $6.75/sq. ft.) | 66,994 |
| Subtotal #1 | $ 592,301 |
| 4. Site Development | 180,535 |

| | |
|---|---|
| 5. Irrigation and Drainage | 38,400 |
| 6. Site Athletic Equipment (Backstops & Goalposts) | 7,000 |
| 7. Furnishings Allowance (Folding Chairs & Tables) | 5,000 |
| 8. Kitchen Equipment | 12,000 |
| Subtotal # 2 | $ 835,236 |
| Sales Tax | 41,762 |
| TOTAL | $ 876,999 |
| Architectural/Consultant Fees (8% of Subtotal # 2) | 66,819 |
| Landscape Allowance (includes fees) | 55,000 |
| GRAND TOTAL (August 1979) | $ 998,818 |
| For projected one year inflation of construction costs, add 15%: | 149,823 |
| GRAND TOTAL | $1,148,641 |

Plaintiff's posttrial brief contends that as of October 1982, inflation adjustments raised the cost of design and construction of the community center to $1,549,002, in August 1983 to $1,626,452, and in August 1984, to $1,707,775.

*Defendant's Experts*

Defendant's experts were Donald E. Fillis, Executive Civil Engineer with R.W. Beck and Associates, Michael R. Schmidt, Executive Economist with R.W. Beck and Associates and Albert J. Hebrank, land surveyor, and proprietor of Hebrank & Associates. A report prepared for the Department of Justice by R.W. Beck and Associates, dated December 31, 1984, was filed as part of the experts' presentation. Mr. Schmidt testified with respect to Section I, Economic Analysis of the Relocation. Mr. Hebrank testified about Section III, Platting. Mr. Fillis' testimony was concerned with Section II, Schedules; Section IV, Construction Deficiencies; Section V, Improvements; and Section VI, Impacts.

The economic analysis made by defendant's expert in Section I contained a number of key conclusions, including:

—The Town is located in an area with a relatively stagnant or declining economic base of forest products and recreation-associated business;

—Prior to 1971, there was no "threat" of relocation, and the second powerhouse had no adverse impact on economic development of the Town prior to that time.

—The population of the old town primarily consisted of people at a relatively low socio-economic level; it is likely that less than half could afford to live in the new town.

—Economic realities of from going from substandard housing in the old town to above standard housing in the new town precluded most of the population from relocating. Income levels of residents of the old town, even when supplemented with relocation payments from the United States, precluded the majority of the residents from relocating to the new town.

—Keyser/Marston reported in March 1975, that the average household could not afford a home costing more than $17,000. In August 1984, real estate was not moving in the Town. Lots were priced from $4,500 to $12,000, and an "average" house sold in the &,000—$55,-000 range. The character of the Town in terms of value and population changed dramatically.

—The Corps spent approximately $36 million dollars in planning and building the new town's public facilities. In addition, the Corps paid over $3 million relocation assistance and over $6 million for the homes, land and businesses in the old town. The grand total was over $45,-800,000, or approximately $95,000 for every inhabitant of the Town in 1971.

—In 1984, 35 percent of the residential lots and 96 percent of the commercial lots in the initial town were vacant. This indicates that the Town did not have a need for optimum town lands during the period 1976–1984.

—The new town was planned for a population of 1500. This population level is unlikely to be reached in the foreseeable future.

Defendant's Expert Witness Report, in Section II, Schedules, lists a chronology of events that was developed for the purpose of analyzing impacts of delays caused by the Town in the relocation. The chronology covers the period August 24, 1971, to May 1, 1981. The listing is selective and the descriptions for the most part identify events subject to objective verification. The conclusions in Section II involve as-

sumption and argument that are outside the chronology, and conclusions include the application of judgmental factors to the events listed in the chronology. This impairs the validity of the intermediate and conclusory facts in defendant's chain of reasoning and argument that are derived from the chronology.

By application of estimated completion times developed in the DM 4 schedule, to the actual completion dates, defendant's delay analysis finds there was a delay of 30 months in relocating the Town, and a delay of 28 months in construction of the highway and railway relocations. These delays the report asserts were caused by the Town. Other conclusions in Section II were:

—The Town was responsible for 24 days delay in the submittal of the DFDM.

—The Town was responsible for 4 weeks delay in the approval of the scope of work for the A/E design contract.

—Changes requested by the Town in determining the final layout of the CBD, the town hall design, town bridge and town entrance resulted in 20 days delay in completion of the plans and specifications and 49 days delay in the completion of the design of the town bridge.

—The Town is responsible for a 10–week delay in the completion of the plans and specifications developed by DMJM/Hilton.

—Non-issuance of permits delayed SJG 79 days and delayed BenCor 14 days.

Section VI, Impacts, of the report uses the information gathered in Section II to conclude that a total of 7 months was added to the schedule developed by RHBA for DM 8, of which 4.5 months are attributed solely to actions of the Town. This was broken down: (1) 3 weeks RHBA contract; (2) 10 weeks DMJM/Hilton contract; and (3) 5 weeks during the interim periods between the RHBA and DMJM/Hilton contracts and the DMJM/Hilton and VIPCO contracts. No delay was found to be caused by the sole action of the Corps.

Defendant's expert on platting, and report Section III, Platting, assumed that Washington State law applied to the platting of the relocated Town. Definitions of the terms "preliminary site plan", "preliminary town plat" and "final town plat" used in the Relocation Contract and the A/E design contract were examined under Washington State, Skamania County, and Town platting laws and ordinances.

The report states that the Relocation Contract called for the "final preliminary site plan and a town plat" to be completed by December 9, 1975, and, in the A/E design contract, the "preliminary town plat" was scheduled to be submitted on December 24, 1975. The final town plat was scheduled for January 23, 1976. Mr. Hebrank examined correspondence and workshop documents to determine that DMJM/Hilton submitted the preliminary town plat to the Corps on December 30, 1975, and the final plat was submitted on January 29, 1976. The Town received the "final preliminary site plan" on December 1 and 2 at Workshop No. 2, and the Town had a "city plat" for use at a council meeting on December 16, 1975.

The report concluded that none of the required documents were submitted more than 1 week beyond the due date in the respective contracts, and that they had been submitted in a reasonably timely manner. Delays occurred, however, in reviewing and processing the plats. The report concluded that had the Town chosen to accept the Plat of Relocated Town of North Bonneville originally processed by Skamania County, the additional 6 months spent processing the major portion of the plats would have been saved.

With respect to the diagram attached to the Town council minutes of January 18, 1977, that estimated a total elapsed time of 37 days from preliminary plat submittal to recording of the final Plat of Relocated North Bonneville, the report concludes that the Town schedule was not practical. The Town schedule assumed approval with no conditions, did not provide for approval from outside agencies, made no provision

for checking by the town engineer and subsequent revision, and did not speak to review and approval of improvement plans. Actual processing shows that the plat was approved with conditions, including conditions of plat improvements, technical changes were requested by the town engineer and were made, and the process took 6 months.

In the Impact section, the report noted that deeding of lots in the new town was controlled by the platting and concluded that the Town's control of all review and approval of plats made it responsible for 8 months delay. No delay, in the platting process was found to be caused by the Corps.

Section IV, Construction Deficiencies, dealt with items identified in plaintiff's response on April 30, 1982, to defendant's interrogatories. Mr. Fillis examined at the site the identified work items for conformance to plans and specifications. The items examined and damages calculated because of nonconformance to plans and specifications are shown on the following chart:

| Item | Damages |
|------|---------|
| (a) Top soil | none |
| (b) Storm Drain and Drainage Systems | none |
| (c) Landscaping | none |
| (d) Pathways | some |
| (e) Streets and Access Roads | none |
| (f) Curbs and Gutters | none |
| (g) Street lights | none |
| (h) Rip-rap on Hamilton Creek | some (approx. $10,000) |

Section V, Improvements, defines improvements as facilities constructed in the new town that either were not existing in the old town or were expanded over those in the old town. The report's definition of improvements is not the same as the term "betterments" as defined in the Relocation Contract. The report concludes:

In summary, the new town as constructed in comparison to the old town as it existed prior to the construction of the Second Powerhouse is superior in facilities and quality. Further, the quality of living has been greatly enhanced by the construction of a larger park, 5 acres vs. 0.5 acre, playground and basketball court, bike paths (34,000 feet ±), noise attenuation berms, 125 acres of open area, sewage treatment plant, improved streets and town layout. All of the foregoing were constructed at no cost to the Town. In conclusion, the Town has benefited substantially from the relocation authorization and in no case have the newly constructed facilities been found to be inferior to what existed prior to the construction of the Second Powerhouse.

Section VI, Impacts, reviewed the material in Sections II and III, and concluded the delays in the schedule of work and platting caused the construction of the Town to be completed in the fall rather than spring of 1977 and deeding of lots to occur in mid–1977 rather than late in 1976. Because these delays caused rescheduling of construction contracts and the need for additional contracts, a considerable increase in costs was incurred by the Corps.

Section VI contained a table: Monetary Impact Summary. This table shows a zero monetary impact on the Town and a total impact on the Government of $5,153,507.99. At trial, a revised table: Monetary Impact Summary, was presented to reduce amounts the Government claimed for delays to the BenCor and SJG contracts, and for other claims. No change was made in the monetary impact on the Town. The revised total impact on the Government is $3,726,898.40. Mr. Fillis' revised Monetary Impact Summary is:

I. On the Town:
   1. Delays in Schedule ....................................... $ 0
   2. Delays in Platting ....................................... 0
   3. Loss of Revenue ......................................... 0
   4. Construction Deficiencies ............................... 0
   5. Conveyance of Optimum Town Lands ................... 0

   TOTAL                          0

II. On the Government:
   1. Changes in Design ...................................... 99,554.16
   2. Area of Early Occupancy ........................... 335,485.00
   3. Rescheduling of Town Fill ........................... 1,000,000.00 *
   4. Delay to Cut Off Wall Construction .................... 71,000.00 *
   5. Delays to Second Powerhouse Construction ............. 146,500.00
   6. Legal Fees For Construction Permits .................. 4,600.00 *
   7. Old Town Facilities Change Orders .................... 45,875.13 *
   8. Interim Resident and Business Contracts ............... 423,767.24 *
   9. B&O Tax ............................................. 1,600,116.87

   TOTAL ....................................... $3,726,898.40

   * changed from amounts in Report Section VI

## DISPOSITION

The claims alleged in plaintiff's complaint on October 20, 1980, and the counterclaim defendant filed on November 19, 1982, differed substantially, both in total amounts claimed and in subject matter, from the statements of claims filed on June 4, 1985, after pretrial preparation, and the statements filed in posttrial briefing. These changes reinforce the conclusion that the complaint and counterclaim when initially filed were efforts to use court process to harass and to influence negotiations. The parties' claims are resolved on the basis of the description and argument presented in the posttrial papers.

*Plaintiff's claims*

1. *Direct Damages* Plaintiff asserts it is entitled to direct damages for the Corps' failure to convey Parcels A, B and C as requested on June 17, 1976. The direct damages claimed are computed on the basis of the difference between the relocation contract price and the fair market value of the parcels.[18] The amount claimed is:

| | |
|---|---|
| Parcel A | $ 706,000.00 |
| Parcels B & C | 472,671.00 |
| | $1,178,671.00 |

To value damages relative to Parcel A, plaintiff used the fair market value computed by its real estate appraisal expert, without adjustment, because defendant had no acquisition cost since it had acquired the land as a donation on December 31, 1983. Damages for Parcels B and C were computed on the basis of the difference between the Corps' acquisition cost and fair market values for the parcels as computed by plaintiff's expert.

The appraisal of Parcels A, B and C by plaintiff's expert does not establish the fair market value of the parcels in the condition they were in at the time the appraisal was made. The appraisal was made on the assumption that the parcels had been filled in accordance with a grading plan that differed from fill conditions at the site. Another assumption was that present trends in the Town accorded with the anticipated land uses described by the Town's planning

18. For this rule on damages, plaintiff cites 11 *S. Williston on Contracts* § 1385, at 414–15 (3d ed. 1968); *Heiland v. Lee*, 207 F.2d 939 (4th Cir. 1953).

director. The appraisal also was prejudiced by consideration under two scenarios, both of which assumed conditions favored by enthusiastic enterpreneurs.

As of August 19, 1975, when the Relocation Contract was signed, the parties had not identified particular parcels to be acquired and used for optimum town purposes, and the Corps had not agreed to provide any specific optimum town lands. The parties recognized that many subsequent actions would be taken before particular lands would be identified, a price established, and even more steps would be required before any obligation to deliver could result in a liability for damages for breach.

None of the land described in plaintiff's June 17, 1976, request was acquired for optimum town purposes. Parcel A was wetlands in 1975 and was acquired in 1983 subject to continued use in that condition. Parcels B and C were acquired for spoil disposal in construction of the powerhouse, and were used for that purpose until July 10, 1978, and were used by the Corps until completion of powerhouse construction in 1981.

Parcel A now is unavailable for optimum town use. The Town has agreed to accommodate the wildlife refuge, and to accept a substitution of other land for Parcel A. The new descriptions for Parcels B and C provide for substitute lands for Parcel A, and they describe land that differs from the land appraised by plaintiff's expert.

The Corps contends the acquisition cost of Parcels B and C is $191,100.74, and that price conforms with the value of unimproved land in the Relocation Contract. In the absence of a valid appraisal that establishes a different price, plaintiff is entitled to recover direct damages for nonconveyance of Parcels B and C in the amount of $191,100.74.

2. *Consequential Damages* Plaintiff also claims it is entitled to consequential damages for contract breach based on intentional delay in completing the Town's relocation, and for nonconveyance of optimum town lands without sufficient legal justification. This claim contains the following elements:

| | | |
|---|---|---|
| a) | Loss of Municipal Revenues from Taxes; (Real Estate, B & O, Sales) 1977–1985 | $   707,500.00 |
| b) | Present Value of Probable Future Losses | 2,785,000.00 |
| c) | Lost Revenue Caused by Lack of Optimum Town Lands | 17,422,000.00 |
| | TOTAL | $20,914,500.00 |

When a breach of contract is proven, damages may include compensation for pecuniary loss, such as profits that could have been realized but for the breach, that are a consequence of the breach. The recovery of consequential damages, however, requires proof that such consequence was foreseeable in the normal course of events, that the loss in fact would have occurred, and the amount of the loss is susceptible to reasonable ascertainment.[19] Losses that are speculative or uncertain, however, may not be recovered as a consequence of a breach of contract.[20]

Both parties agree that the design phase and the construction phase of the Town's relocation were not completed in accordance with the target dates in the Relocation Contract. Beneficial occupancy of municipal facilities/utilities was targeted at November 1, 1976, and the target date for completion of all work on municipal facilities/utilities was March 1, 1977. Plans and specifications for the construction contract were not advertised until July 25, 1976, the construction phase under the VIPCO contract did not start until August 24, 1976, and beneficial occupancy of part of the municipal facilities was not accomplished

---

19. *J.D. Hedin Const. Co. v. United States,* 456 F.2d 1315, 197 Ct.Cl. 782 (1972); *Ramsey v. United States,* 101 F.Supp. 353, 121 Ct.Cl. 426 (1951), *cert. denied,* 343 U.S. 977, 72 S.Ct. 1072, 96 L.Ed.2d 1369 (1952).

20. *Olin Jones Sand Co. v. United States,* 225 Ct.Cl. 741 (1980); *Gardner Displays Co. v. United States,* 346 F.2d 585, 171 Ct.Cl. 497 (1965); *H.H.O., Inc. v. United States,* 7 Cl.Ct. 703 (1985).

until April 1, 1978. GKG's Town work north of the highway was not substantially completed until November 15, 1978, or fully completed until August 24, 1979.

The Relocation Contract required the parties to exert their best efforts to adhere to the scheduled target dates. The schedules in the Relocation Contract subsequently were modified in the scope and statement of work for the design contract, in DMJM/Hilton's CPM construction schedule, and in VIPCO's planned CPM schedule. The Town signed off on the changes in the VIPCO CPM schedule and approved the changes in plans and specifications made during the construction phase. The Town's approval of the change orders in the construction contracts carried with it approval of the related revisions of contract time. As modified by time extensions, VIPCO's work was performed on schedule. In these circumstances, it is questionable whether technically there was any delay in the construction phase, and even less that there were delays that would render the Corps liable for damages for breach of contract.

Plaintiff's claims are based on Corps performance relative to consent to annexation and platting, land acquisition, contract review and award, and deeding of lots to relocating individuals. Defendant's delay claims are based on plaintiff's performance relative to completion of the planning phase, approval of the scope and statement of work for the A/E design contract, changes requested by the Town in determining the final layout and design of the new town, approval of plans and specifications developed by DMJM/Hilton, and in reviewing and processing the plats.

The findings of fact show that each party bears a heavy responsibility for loss of time that culminated during the construction phase, and for not realizing the schedules that were planned in DM 4, DM 8 and the Relocation Contract. The fault gestated in the planning phase and in the initial contract negotiations. Both parties share a mutual responsibility that precludes either from eligibility for delay damages.

Plaintiff's claim for consequential damages includes the assertion that the failure to convey optimum town lands prevented the Town from becoming economically and socially viable. As a result, plaintiff claims the Corps is responsible, and defendant is liable, for potential revenues that the Town lost because it could not take advantage of economic development opportunities. The calculations for these damages, prepared by the Town's expert economists, included two erroneous assumptions provided by the Town's planning director: (1) that the refusal to sell the optimum town lands by July 1977 was a breach of contract, and (2) that the reason the Town had failed to prosper during and after relocation was caused by (a) delays that were the responsibility of the Corps and by (b) the refusal to sell the optimum town land by July 1977.

The expert's report as to lost opportunities relied upon and extended the planning concepts that are embodied in DM 8. These concepts, at best, were the product of the overly optimistic enthusiasm of professional planners and developers. In any event, the assumptions in DM 8 as to desirable goals do not define agreed upon criteria against which a failure of residents to relocate, or a failure of a 250 room hotel and resort development to proceed, are to be measured.

The Town's failure to prosper during and after completion of the relocation phase was not caused by delay due solely to actions of the Corps, or to a failure to deliver lands for the optimum town. Throughout the planning phase there was concern about the capability of residents and businesses to relocate. Early surveys indicated that some of the residents had no desire to relocate and there was uncertainty as to their ability economically to relocate. The future projections of population growth were blue sky assumptions, unlikely to be realized, even in the 100–year span postulated.

To show that economic and revenue consequences were foreseen, plaintiff relies upon work done by the parties under the requirement for impact assessments in Sec-

tion 122 of Pub.L. No. 91–611 and ER 1105–2–105 in the planning of a Corps project. This argument confuses the purpose of these planning prerequisites, and plaintiff's reliance is misplaced. The regulations require consideration of the factors listed as a prelude to decision on an overall project. Comprehensive analysis of minutiae of each element of a project, so as to give contractual overtones to ballpark estimates, are not an intended product of the requirement for an impact assessment.

Plaintiff's claim for consequential damages fails to satisfy the requirement of foreseeability. It also fails to meet the requirement that the fact of damage must be proven. The calculations of plaintiff's economic expert contain erroneous assumptions and at best the results are simply speculation. They do not establish any amount of consequential damages that would be acceptable. Plaintiff may not recover on this claim.

In connection with its direct damages claim for failure to convey optimum town lands, and its consequential damages claim for intentional delays, plaintiff seeks attorney and expert fees under the common law theory for acts in bad faith, vexations, wanton or for oppressive reasons. Recovery is sought under the Equal Access to Justice Act amendment, 28 U.S.C. § 2412(b) (1982), that made the United States liable to the same extent that any other party would be liable under common law. The "bad faith" exception is a common law exception to the American Rule of no attorney fees.[21] Plaintiff's claim is premature. RUSCC 81(e) requires applications for attorney fees and expenses to be filed within 30 days after final judgment as defined in 28 U.S.C. § 2412(d)(2)(G). Although applications for attorney fees and expenses usually invoke the provisions of 28 U.S.C. § 2412(d), no

substantial reason is seen for a different procedure for claims under Section 2412(b).

The negotiating tactics of both parties included misuse of access to the courts and harassment by collateral actions which, if pursued against an innocent party, may be reasons for invoking the "bad faith" exception.[22] In this case, however, the mutuality of untoward conduct in these matters makes recovery questionable by either party under the standards applicable to 28 U.S.C. § 2412(b).

3. *Construction Deficiencies* (a) One category of plaintiff's claim, is for construction deficiencies that do not accord with the plans and specifications approved by the Town and agreed to by the Corps. The elements of the claim for violation of approved detailed plans are:

| | | |
|---|---|---|
| (1) | Pathway deficiencies | $ 233,000.00 |
| (2) | Wrong meter boxes | 4,940.00 |
| (3) | Top soil deficiencies | 1,152,580.00 |
| (4) | Landscape planting deficiencies | 395,639.00 |
| (5) | Water main deletion | 103,425.00 |
| | | $1,889,584.00 |

(1) Pathway deficiencies

The approved plans and specifications provided for paths 8 feet wide, 8 inch gravel base, and 2 inch asphalt layer, with grading to prevent ponding after rains. Plaintiff's examination shows the gravel base varies from 5 inches to 8 inches and that in 57 out of 70 locations the deficit was greater than 2 inches. Plaintiff proposes to add a 1–inch asphaltic overlay to the entire pathway system at a cost of $117,825. Plaintiff also would add $17,980 to design and supervise drainage to eliminate ponding, and $70,000 for drainage improvements. The Corps deleted 3,592 linear feet of pathway to offset a betterment the

**21.** *F.D. Rich Co. v. Industrial Lumber Co.,* 417 U.S. 116, 129, 94 S.Ct. 2157, 2165, 40 L.Ed.2d 703 (1974) (long recognized exception to American Rule of no attorney fees when party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons).

**22.** *McQuiston v. Marsh,* 707 F.2d 1082, 1086 (9th Cir.1983) (court may award attorney fees under

§ 2412(b) if party acts in bad faith); *Donovan v. Dillingham,* 668 F.2d 1196, 1198 n. 4 (11th Cir. 1982) (bad faith is exception to American Rule); *National Assoc. of Letter Carriers v. U.S. Postal Service,* 590 F.2d 1171, 1176 (D.C.Cir.1978) (equitable power of court to award attorney fees when losing party acts in bad faith).

Town refused to pay; plaintiff would construct this pathway at a cost of $27,195.

Defendant contends pathways were approved as a substitute for sidewalks because of error in DM 8 that was not discovered by DMJM/Hilton in the design phase. DM 8 erroneously cited Washington State law as requiring sidewalks on both sides of the street for cities with a population of over 1,500. DMJM/Hilton substituted the pathways even though the Washington statute did not apply to cities with a population less than 1,500. Although the reference in DM 8 was in error, and the Corps never agreed to DM 8's particulars, it had ample opportunity to determine the legality of the sidewalk requirements. The Corps, accordingly, cannot avoid its responsibility for pathway construction deficiencies on the ground that they were an unjustified tradeoff for allegedly required sidewalks.

Defendant's expert acknowledged a ponding problem exists, but contends it is a result of turf build up and not a construction deficiency. This explanation is reasonable. Plaintiff's recommendation for an additional overlay is a practical method to correct strength loss due to subgrade deficiencies. Deletion of 3,592 linear feet of pathway as an offset for the lot size betterment cost the Town refused to pay is justified. Accordingly, plaintiff is entitled to $117,825, as damages to correct pathway construction deficiencies. The other elements of the pathway construction deficiencies claim are not compensable.

(2) Wrong size meter boxes

At 16 of the 50 commercial lots and at 10 of the multifamily lots, residential type meter boxes were installed. The smaller boxes, which are made of concrete, can be used for the purpose intended, but they do not conform to the drawing sheet BDR 7–14–59. Plaintiff's evidence has not shown how this departure from the approved plan results in damage to the Town. No recovery is allowed on this claim.

(3) Top soil

Plaintiff seeks $1,008,250 to place top soil in the initial town area constructed by VIPCO and $144,330 to place top soil on berms constructed by GKG. Plaintiff claims that there was final agreement that 2 feet of top soil would be placed in the initial town. Plaintiff relies on correspondence dated November 11, 1975, June 8, 1976, and June 22, 1976. The contracting officer's June 22, 1976, letter, as to item 8(b), Top soil Placement, speaks in general terms and does not constitute a final agreement. The Town's letter of June 25, 1976, indicates satisfaction with that answer. In any event, there is no showing that the final approved plans and specifications established the obligation asserted by plaintiff. The report of the North Bonneville Conservation District, and the Pittsburgh Testing Laboratory report, do not establish that the top soil was defective over the entire initial town area.

Plaintiff has shown no damages, and defendant has no liability on this claim.

(4) Landscape Planting

The plans and specifications for the VIPCO contract approved by the Town specified the number, types and locations of the plantings; they required the contractor to maintain and replace, and to guarantee survival for 1 year from final acceptance. Investigations by the Corps in December 1978 and in June 1979 disclosed exceedingly high planting mortality rates, in large part due to lack of watering. The Corps' efforts to correct these deficiencies with VIPCO were unsuccessful. After the Town occupied the initial town area it did not undertake a watering program. When defendant's expert examined the site in August 1984, the landscaping conditions remained bad, with minimal survival on noise berms, and a much higher mortality rate in the Town than anticipated. On January 15, 1980, the District requested the Town for a proposal for the Town to complete the Corps' landscaping obligation. This letter acknowledged responsibility to replace 682 trees, 1,888 shrubs and 5,587 ground cover plantings. The Town did not submit a proposal. On December 31, 1984, the Town submitted a claim for compensation for

2,222 trees, 9,648 shrubs, and 954 ground cover plantings. The total claim for landscaping was $286,520.74. The Town's final claim in posttrial briefing is $395,639.

The quantities specified in the District's January 15, 1980, letter are accepted as the quantities which did not comply with specifications approved by the Town. Unit prices are those obtained by the Town in preparation of its December 31, 1984, claim. A total of $98,313.94 is allowed on this claim, calculated as follows:

|  | Quantity | Unit Cost | Total |
| --- | --- | --- | --- |
| Trees | 682 | $61.67 | $42,058.94 |
| Shrubs | 1,888 | 15.00 | 28,320.00 |
| Ground Cover | 5,587 | 5.00 | 27,935.00 |
|  |  |  | $98,313.94 |

---

## (5) Water Main Deletion

Plaintiff presents three claims, each related to drawing deficiencies. The 10 inch water main erroneously was shown as being in place in the "as built" drawings. In fact, the water main installed was of a different size and different location. The different line was on approved constuction plans, and it served the same purpose as the design line. Plaintiff claims $50,415 to construct a redundant water main; it has demonstrated no damages. The 14 inch transmission main deviated from the plan in that 450 feet were on public property but otherwise outside the public right-of-way. Plaintiff claims $34,610 to relocate the line. In the circumstances, no damages are shown, the right-of-way can be adjusted, and relocation of the line would be a waste. Three fire hydrants shown on DMJM/Hilton design drawings, and required by DM 8, were deleted in construction. Plaintiff reviewed and approved changes made during construction. Plaintiff claims $18,400, the cost to install three additional hydrants. No recovery is allowed because no damage has been shown.

Defendant has no liability for damages with respect to the claim for $103,425 for this item.

(b) Another part of plaintiff's claim for construction deficiencies involves the contention that some of the construction is unacceptable by industry standards. The elements of the claim for departures from industry standards are:

| 1. | "As Constructed" Drawings | $106,865.00 |
| --- | --- | --- |
| 2. | Sanitary Sewer Corrections | 41,800.00 |
| 3. | Latent Water Line Defect | 84,950.00 |
| 4. | Corrective Survey Work | 20,820.00 |
|  |  | $254,435.00 |

## 1. "As Constructed" Drawings

Relocation Contract, Article 3, Sect. 3.04 required the Corps to provide "as constructed drawings" of completed municipal facilities and utilities. The Corps made final delivery of a set of "as constructed" drawings on March 18, 1980. The drawings the Corps delivered included sheets that had been prepared initially by DMJM/Hilton, and sheets that had been modified by Corps personnel for various construction bid packages, both of which have markings to designate changes made during the course of construction by VIP-CO and GKG. The drawings delivered by the Corps for the most part were sheets provided by the construction contractors and were in such condition as the Corps routinely accepts as "as built" from its contractors. The "as constructed" drawings are incomplete in that there is a failure to designate main shutoff valves, and sanitary sewer laterals as to depth and location from manholes. Also they do not reflect all changes made in contruction and do not depict actual conditions at the site. Plaintiff asks for $90,865 to prepare new as constructed drawings, and $16,000 to compensate for probable future expense to locate sanitary sewer laterals.

The term "as constructed drawings" does not have a precise meaning in the

construction industry, and there is no written agreement between the parties that defines this term. The failure to show the "deletion of the 10 inch water main" is an error, but it is without consequence in fact. Plaintiff fails to distinguish between major and minor variations that would require notations on the drawings. Defendant, however, does not address this aspect of the claim.

The "as constructed" drawings are inaccurate—plaintiff accordingly is entitled to the cost of correction, $90,865. The correction will locate the sanitary sewer laterals at the property lines. Therefore, the claim for $16,000 for probable future expense to locate is not allowable.

2. Sanitary Sewer Corrections

Plaintiff's expert testified that the sanitary sewage system had a level of infiltration of ground water that showed its construction did not meet good engineering and industry standards. Plaintiff claims this condition is a breach of the implied warranty in construction contracts that the work would be performed in a good workmanlike manner, free from defects in material or workmanship.[23]

Plaintiff did not establish that its experts conducted any tests to indicate the current level of ground water infiltration. Plaintiff offered no evidence of the condition of the sewer system at the time the facilities and utilities were turned over to the Town in 1978. The sewer system in its present condition is operating according to design and properly.

Nothing is allowed on the sanitary sewer correction claim.

3. Latent Water Line Defect

Commencing in 1982, 4 years after beneficial occupancy, there was extensive water service line leakage caused by corrosion of the copper pipe installed in construction. The water lines were constructed in accord-

ance with plans and specifications that the Town had approved. The cause of the corrosion problem is unknown and evidence was not adduced that indicates the materials were defective or installed in a manner that is not good workmanship.

Nothing is allowed on the latent water line defect claim.

4. Corrective Survey Work

The Relocation Contract required the Corps to prepare and furnish a city plat in sufficient detail to permit acceptance and filing. The claim is for corrective work to reset plat boundary monuments, reset lot corners, and for surveying to correct certain encroachments.

The survey work was done in a workmanlike manner, the monuments were placed as required, and there is no evidence the monuments were not placed properly. Some monuments still exist, others are missing or disturbed. There is no showing that the monuments became damaged, disturbed, or missing by reason of action or inaction on the part of the Corps or of its agents.

Nothing is allowed on the claim for corrective survey work.

(c) The third part of plaintiff's construction deficiencies claim involves unbuilt facilities for which there were no approved specifications. The elements of this failure to construct claim are:

| | | |
|---|---|---|
| 1. | Community Center | $1,707,775.00 |
| 2. | Underground Storm Sewers | 777,690.00 |
| 3. | Curbs and Gutters | 215,300.00 |
| 4. | Rip Rap Deleted | 28,600.00 |
| | | $2,729,365.00 |

1. Community Center—For reasons stated above, no damages are allowed on this element of the claim.

2. Underground Storm Sewers—DM 8, in Plate 12–3, shows there would be no underground storm drainage system north of the highway. The Relocation Contract Exhibit

**23.** Plaintiff cites *Pittsburgh Nat. Bank v. Welton Becket Assoc.*, 601 F.Supp. 887 (W.D.Pa.1985); *Standard Roofing, Inc. v. Ragusa Brothers, Inc.*, 338 So.2d 119 (La.App.1976); *Altevogt v. Brin-koetter*, 85 Ill.2d 44, 51 Ill.Dec. 674, 421 N.E.2d 182 (1981); *Busker v. Sokolowski*, 203 N.W.2d 301 (Iowa 1972); *Loyal Erectors, Inc. v. Hamilton & Sons, Inc.*, 312 A.2d 748 (Maine 1973).

C, items 10 and 20, do not provide for an underground storm drainage system. The scope and statement of work, article 12, section 11, provides that utilities, including the storm sewers, in the initial town shall be underground. DMJM/Hilton's plans and specifications did not provide for an underground storm drainage system north of the highway. In the correspondence, dated June 8, June 22 and June 25, 1976, relative to approval of the plans and specifications for advertising, the parties did not agree that the storm drainage system north of the highway would be underground. The parties never reached a final agreement on the construction of underground storm drainage north of the highway. No damages are allowed on this element of the claim.

3. Curbs and Gutters—The Relocation Contract, Exhibit C, item 8 provides for curbs and gutters on all new streets. All new streets north of the highway have curbs and gutters, but realigned streets and streets serving lots on the west end of the old town do not have curbs and gutters. Realignment of an old street is not construction of a new street.

Installation of curbs and gutters as requested by the Town would make an underground drainage system mandatory. On December 16, 1975, the Corps advised the Town that curbs and gutters in the west end would be a betterment. In the correspondence dated June 8, June 22 and June 25, 1976, the parties did not reach agreement on the provision of curbs and gutters on streets in the west end and on the question of storm discharge into Greenleaf Lake.

In letters dated April 1, 1977, December 1, 1977, and July 3, 1978, the Town was told curbs and gutters could be installed in the west end if the Town would assume the expense of resolving the associated drainage problem. The parties never reached agreement on the construction of curbs and gutters on all streets serving the west end. No damages are allowed on this element of the claim.

4. Rip Rap Deleted

Rip rap was not placed on two areas of constructed embankment along Hamilton Creek. The contracting officer's letter dated June 22, 1976, as to item 7(b), indicated that subsequent construction contracts would provide erosion control. GKG's contract did not so specify. The Corps' expert concluded that the bank has eroded, causing a portion of the pathway to fail.

Although the parties never reached a final agreement on this issue, good engineering practice indicates the Corps is at fault for not providing adequate erosion control. Defendant's expert estimates $10,000 would be in the range of costs to repair. Plaintiff's expert estimated that the reasonable cost to repair would be $28,-600. The estimate of plaintiff's expert is accepted, and $28,600 will be allowed on this element of the claim.

4. *Reimbursements* The Town claims the Corps has not paid for certain relocation expenses that the Relocation Contract, Article 3, section 4 requires it to reimburse. The elements of the reimbursement claim are:

| | | |
|---|---|---|
| 1. | Revision of Comprehensive Plan, zoning codes, shoreline master plan | $ 120,000.00 |
| | and EIR | 65,000.00 |
| 2. | Revise Plats | 20,000.00 |
| 3. | Relocation Expenses | |
| | Staff: Building Inspector | 22,406.21 |
| | Planning Director | 17,982.21 |
| | Experts: McKinley Architects | 29,195.00 |
| | RHBA | 12,567.90 |
| | Pittsburgh Testing Lab. | 3,861.00 |
| | James Gilmer | 43,740.00 |
| | Minister-Glaeser | 12,675.00 |
| | ASC | 456.00 |
| | David Smith & Assoc. | 3,520.00 |
| | Robert Glaeser | 1,300.00 |
| TOTAL | | $ 352,703.32 |

1. Revision of planning documents

This item seeks expenses to be incurred to make revisions in the Comprehensive Plan, zoning codes, shoreline master plan and the Environmental Impact Statement (EIR), so as to reflect the conditions that result from nonconveyance of optimum town lands. The Town already has the documents that were required for reloca-

tion and these documents were provided at Corps expense. The Town has responsibility, as does the Corps, for the changes that produced the conditions that now exist. The burden of any periodic revisions to update these documents must be borne by the Town.[24] Defendant has no obligation for this claim.

### 2. Revise Plats

The Relocation Contract provides that the plat would be in sufficient detail to permit acceptance and filing. The plat filed with Skamania County on January 14, 1977, was in sufficient detail to permit acceptance and filing. The Town in enactment of platting ordinances on May 25, 1976, permitted it to interject itself into the review process. The Town accepted the plats filed January 14, 1977, as preliminary plats under state law and delayed approval to obtain guarantees that individuals would receive warranty deeds and title insurance, and other conditions. The plat accepted and filed on June 14, 1977, by the Town was the same as filed on January 14, 1977, with Skamania County, with only the signature sheet altered. Skamania County was the appropriate approving authority for plats on August 19, 1975. Defendant has no obligation under this claim.

### 3. Relocation expenses

The Relocation Contract in Article 3, section 4.01 provided reimbursement for staff from August 1, 1975, until June 30, 1977. Section 4.02 provided that staff requirements and related expenses beyond June 30, 1977, would be negotiated to reflect changing needs and staff continuity. On July 22, 1977, the contracting officer agreed with the Town planning director to extend the reimbursement period to June 30, 1978. On September 21, 1977, the contracting officer forwarded MOD P00003 to the Relocation Contract for signature. This document was not executed. Although there was no final formal written agreement to extend the reimbursement period to June 30, 1978, the Corps may not resort to this formality to avoid its liability. The parties in fact agreed to extend the period and the contracting officer recognized that agreement in MOD P00003 and in other actions. The Corps is liable to reimburse staff and relocation expenses incurred during the period June 30, 1977, through June 30, 1978.

The Corps seeks to avoid the staff expenses on the ground that proper records were not maintained and documented. The Town's records were adequate for payments to be made prior to June 30, 1977, and any objection with respect to their adequacy is deemed waived as to the extension period. Accordingly, the Town is entitled to $22,406.21 to reimburse the salary of the building inspector, and $17,982.21 to reimburse the salary of the planning director, for the period ending June 30, 1978.

The other claims for reimbursement are for matters that were presented after June 30, 1978, and which are related to litigation either in this case or in previous litigation between the parties. These expenditures were not agreed to by the Corps and were not part of the relocation process. Defendant has no obligation to reimburse the Town for these expenditures.

### Defendant's Counterclaim

In its counterclaim defendant seeks affirmative damages and damages by way of offset against damages awarded to the Town. Defendant presents five claims:

| | |
|---|---|
| (1) Delays or Increased Costs Caused by the Town | $ 2,126,781.53 |
| (2) B & O Taxes Collected After July 1978 | 1,834,168.20 |
| (3) Operation and Maintenance Costs | 365,181.32 |
| (4) Betterments Not Paid | 431,907.00 |
| (5) Excess Open Space | 116,601.40 |
| | $ 4,874,639.45 |

### (1) Delays or Increased Costs

Defendant argues that the Town failed to cooperate in the relocation and willfully attempted to obstruct and delay both relocation work and work on the powerhouse. This assertedly violated Article 8 of the Relocation Contract and accepted principles

---

**24.** *See generally* Rev.Code of Wash.Ann. Chapt. 35A.63.

of contract law that require contractors to abstain from actions that prevent, hinder or delay performance of the other party.[25] For the reasons stated above, both the Corps and the Town share a mutual responsibility for delays in the relocation of the Town and in powerhouse construction that precludes either from eligibility for delay damages.

### (2) B & O Tax

Defendant does not challenge the Town's collection of B & O taxes during the period prior to the end of the relocation construction phase. Defendant contends, however, that after the Town moved to the new site in July 1978, it was contractually obligated to relinquish its old boundary around the powerhouse site, and the failure to do so renders the Town liable in damages.

The question of whether the B & O tax is lawful under state or Federal law is not before the court. Those issues have not been briefed by the parties, and are being resolved in another forum. The sole issue here is whether there is an obligation for the Town to withdraw its boundaries from around the powerhouse site that arises under Section 83 and the agreements of the parties.

■ The B & O taxes assessed against Federal contractors engaged in both relocation work and powerhouse work, in fact, were paid by defendant. The Town assessed the tax in order to be in a position to satisfy the Section 83 requirement that non-Federal interests furnish binding contractual commitments for some of the relocation costs. The Corps recognized that the Town, to satisfy this requirement, would need B & O tax revenues from its contractors doing relocation work. The Corps, with knowledge of the Town's intent, decided not to address in the Relocation Contract either the B & O tax issue or the withdrawal of boundaries issue. The parties never reached an agreement on ei-

ther removal of the old town boundary, or on the application of the B & O tax to contractors doing powerhouse work. When the parties to a contract intentionally permit the written agreement to remain silent on a recognized disputed point, a court should not assume the presence of a covenant as to the dispute.[26]

When Section 83 was enacted, and in the planning phase, both parties believed the movement of the Town would be a relocation to a new site and not an expansion of the old town boundaries. The initial town boundary did not include the part of the old town on which the new powerhouse was to be located. During the discussions in Washington in May 1975, the Town's representatives did not discuss with the Corps representatives institution of the B & O tax or retention of boundaries around the powerhouse site. When the Town recognized in July 1975 an opportunity to capture additional tax revenues, it decided to retain the old town boundary. Subsequently, release of the old boundary around the powerhouse was used by the Town as a bargaining chip in the negotiations. At a meeting on March 8, 1976, Town officials stated they would be willing to agree to de-annexation, but that the Town should not have to pay for fill on the optimum town land, for which B & O tax revenues were needed. At the Town council meeting on March 30, 1976, the planning director reported that at the last meeting of the Joint Board of Review, fill costs had been eliminated as a betterment cost.

On March 16, 1976, the Town listed items for which it required "funds in hand" before modification of existing boundaries in the powerhouse area would be considered. The Town's mayor testified he intended to retain the old town boundaries for use as "a little hammer" to assure the new town was completed to the Town's satisfaction.

---

25. *Sun Oil Co. v. United States*, 572 F.2d 786, 801, 215 Ct.Cl. 716 (1978) (citing *Wah Chang Corp. v. United States*, 282 F.2d 728, 733, 151 Ct.Cl. 41 (1960)).

26. *So Good Potato Chip Co. v. Frito-Lay, Inc.*, 462 F.2d 239 (8th Cir.1972); *Ryder Truck Rental, Inc. v. Central Packing Co.*, 341 F.2d 321 (10th Cir.1965).

Section 83 requires that binding contractual commitments needed for a portion of the relocation costs be furnished by non-Federal interests. The effect of the Town's retention of its old boundary around the powerhouse site is that the United States, in addition to funding directly the Town's relocation expenditures and the work in the construction phase, pays for the share of relocation expense that Section 83 required to be borne by non-Federal interests. The Corps' connivance with the Town to permit this result, by recognizing the propriety of tax assessments on Corps contractors that performed relocation work, does not justify continuation of that arrangement after the Town's relocation has been completed. Any financial or bargaining justification for continued retention of the old town boundary around the powerhouse site ended when the relocation work was completed and the new town facilities and utilities were occupied by the Town. For the purpose of balancing relocation cost accounts as between the parties, amounts of B & O tax collected thereafter from United States contractors doing work outside the initial town boundaries should be charged against the Town.

Defendant argues that the cutoff date should be in the summer of 1978, when the Town held a dedication ceremony in the new town. GKG's town work north of the highway, however, was not completed until November 15, 1978, and was not accepted finally until August 24, 1979. By December 31, 1978, work in the construction phase of the Town's relocation to the initial town boundary essentially had been completed.

The amount of B & O tax collected after the cutoff date from Federal contractors is not available with exactitude in the record. Defendant, at trial, calculated a total from the amount presented by its experts in the revised monetary impact summary for the period July 1978 through 1982 ($1,600,-116.87) plus a recently discovered amount paid by GKG ($214,168.29). In its final brief, defendant claims $1,834,168.20 for B & O taxes collected after July 1978.

The amounts listed in finding No. 135 were extracted from the Corps' audit report dated September 16, 1983. The amount of taxes collected from Federal contractors who have been reimbursed by the Corps for the years 1979 through 1982, according to that report, is $1,421,996.70. This amount is accepted as the amount available to defendant for use as an offset to plaintiff's claims allowed in this case.

(3) Operation and Maintenance Costs

On January 25, 1978, the Corps forwarded to the Town a proposed agreement for an exchange of municipal facilities; on January 30, 1978, the Town attorney notified the District Engineer that the Town accepted; and on February 28, 1978, the letter of understanding and agreement was executed. By Resolution No. 194, passed June 6, 1978, the Town breached the February 28, 1978, agreement. One of the reasons, Resolution No. 194 was passed was to avoid the expenses of maintaining the facilities and utilities. The Town started to occupy and use the new facilities and utilities in July 1978. The operation and maintenance costs incurred by the Corps between July 1978 and January 1982, total $365,181.32. Defendant incurred these as a result of the Town's breach of contract and is entitled to direct damages of $365,-181.32 on this claim.

(4) Betterments

(5) Excess Open Space

The record as to the parties' treatment of betterments is not clear. At the March 30, 1976, meeting of the Town council, betterment items were reported, and Joint Board of Review estimates for various items, which totaled $109,144, were discussed. At the June 22, 1976, meeting, of the Town council, seven betterment items, totaling $167,311, were discussed.

On July 22, 1976, the Town exacted Ordinances No. 313 and No. 314 to authorize $30,000 in Capital Improvement Bonds and to appropriate $58,613 for betterment costs for the city hall, and water tank. An escrow account in that amount was created in

the Rainier National Bank on August 11, 1976. On July 27, 1977, the contracting officer requested disbursement from the escrow funds to meet the Town's share of the following relocation betterment items, all of which were 100 percent complete:

| | |
|---|---|
| water tanks | $29,153.00 |
| city hall | |
| square footage | 27,638.00 |
| stone facing | 1,822.00 |
| Total | $58,613.00 |

No evidence in the record sets forth a contracting officer betterment determination relative to bike pathways with appurtenances in the amount of $413,344. This amount, however, now is claimed by defendant. The Town's payment from the escrow account for betterments to the city hall was a final payment. Defendant has not shown on the record that the remaining items of this claim were not resolved in accord with the procedures established for betterment determinations. Defendant is not entitled to recover on these claims.

## SUMMARY

Plaintiff is entitled to recover damages as follows:

| | |
|---|---|
| (a) Direct Damages for failure to deliver Parcels B & C | $ 191,100.74 |
| (b) Construction Deficiencies | |
| Pathways | 117,825.00 |
| Landscaping Planting | 98,313.94 |
| As Constructed Drawings | 90,865.00 |
| Rip Rap Deleted | 28,600.00 |
| (c) Reimbursements | |
| Salary Building Inspector | 22,406.21 |
| Salary Planning Director | 17,982.21 |
| TOTAL | $ 567,093.10 |

Defendant is entitled to recover on its counterclaim as follows:

| | |
|---|---|
| (a) As an offset to damages allowed plaintiff: | |
| B & O taxes collected 1979–1982 | $1,421,996.70 |
| (b) Damages: | |
| Operation and Maintenance Costs | $ 365,181.32. |

## FINDINGS OF FACT

### PART I CHRONOLOGY to AUGUST 24, 1976—PLANNING and DESIGN

1. (a) Bonneville Dam, on the Columbia River, was authorized in 1935 and completed in 1943. It was constructed and is operated and maintained by the United States Army Corps of Engineers (Corps). The northern half of the spillway of the dam is in the State of Washington; the southern half of the spillway, and the first powerhouse, navigation lock and other facilities are on the Oregon side of the river. The Town of North Bonneville (Town) is an optional code city organized pursuant to R.C.W. Ch. 35A and situated in Skamania County, Washington. It was incorporated in 1935. Prior to 1975 the Town's center was located adjacent to Bonneville Dam.

(b) The Town of North Bonneville and Skamania County are divorced from major transportation routes serving the area, and most of the development and growth in this area has been on the Oregon side of the Columbia River, because the interstate highway is located on the Oregon side. The population of the Town was 640 in 1940. It was placed at 459 in the 1970 census taken by the United States Census Bureau. Without the prospect of a second powerhouse at the Bonneville Dam and possible town relocation, it is probable that the Town within the original corporate limits would have experienced a stable population of from 550 to 650, and that the entire community area would have a population of from 750 to 850. In 1971, income to the Town from property taxes was approximately $5,700 and the total revenue from all sources was approximately $126,000. In 1971, the Town had no sewer system, but had qualified for a grant of $472,000 from EPA and the State toward such a system. The grant was withdrawn because of the pending relocation. The Town's population in 1971, including areas outside the corporate limits, was estimated at 650 persons. In 1972, revenues from general property taxes amounted to $5,997.

2. (a) In 1965, the Administrator of the Bonneville Power Administration requested the Corps to construct a second powerhouse to provide additional electric generating capacity. In 1971, the Corps after con-

siderable evaluation decided to locate the second powerhouse on the Washington side of the Columbia River, even though a location on the Oregon side had previously been the preferred site.

(b) On August 24, 1971, at a public meeting, the Portland District advised the Town that the United States had selected a site for the second powerhouse. At the meeting, the Corps advised the Town that the United States intended to acquire approximately 95 percent of the area then occupied by the Town, and that construction of the powerhouse project would result in the removal of substantially all of the residences, business and municipal facilities in the Town. Following the announcement at the public hearing held on August 24, 1971, Town officials indicated to the Corps that the residents desired to be relocated as a community. The Corps informed the Town that it would be willing to assist in the relocation as a community in whatever way it could, but it had no authority to reimburse the Town for planning, design and construction of the new Town.

3. (a) In the Corps' Design Memorandum No. 4 (DM 4), dated August 1972, for the second powerhouse, the initial Town relocation cost was estimated at $1,307,000. This amount was based on relocation costs under existing authorities.

(b) The DM 4 schedule showed that the relocation of the town would occur prior to starting excavation for the second powerhouse. Under the DM 4 schedule for the Town's relocation: planning would be completed during the period April through August 1973; design would be completed by the end of January 1974; dwelling construction in the Town would be during the period March 1974 through November 1975. DM 4 scheduled construction of the haul road for the project during the period April 1975 through August 1975; cutoff wall for the powerhouse was to be constructed November 1975 through June 1977; powerhouse excavation was to start in May 1977, and powerhouse construction was to commence in June 1978.

4. (a) During 1973, the Town established a Relocation Advisory Board, with a representative from the Corps, to facilitate cooperation with the Corps. A planning program was initiated in conjunction with Evergreen State College, with support from a state relocation planning study grant.

(b) On September 24, 1973, the Town council passed Resolution No. 153. This resolution outlined in detail a policy to be followed in relocation, and authorized creation of a planning commission and a planning staff to assist the Relocation Advisory Board. The planning process outlined in Res. No. 153 included development of community workshops, on-going technical assistance by the planning staff, and required analysis of community operations and individual options to be considered prior to relocation of the Town. The Relocation Advisory Board provided a forum for discussion, and acquisition and exchange of information. Participants included representatives of the Town and the District and such other organizations as requested for advice.

(c) On November 8, 1973, the Town's mayor notified the Portland District that the Town was not satisfied with the consideration that had been given to the suggestions from the Relocation Advisory Board. A copy of Res. No. 153 was provided for guidance at a meeting to be held on November 15, 1973, in lieu of the Corps proposal to have an in-depth discussion of land acquisition procedures and assistance under the Uniform Relocation Act. The letter suggested such topics be deferred to future separate meetings.

(d) On November 16, 1973, the Town requested that appraisals of property in the Town be delayed until February 15, 1974. The Portland District responded that (1) appraisals of property could not be halted until all questions raised by all individual land owners and residents were analyzed and answered, (2) a number of residents had requested an early appraisal and purchase of property, (3) those individuals understood the procedures involved, and (4)

since the District believed that considerable work could be accomplished before February 15, the appraisal programs should be pursued vigorously to maintain the project schedule.

(e) On November 21, 1973, the Town by letter requested Senator Magnuson for assistance in opposing the Portland District's plan to conduct immediate appraisals of some properties. The letter stated that the Town's policies embodied in Res. No. 153 provided citizens be given the opportunity to review all possible relocation options prior to appraisal and negotiation for this property. The Town requested time in advance of actual appraisal and purchase to provide information on all relocation alternatives. The Town requested assistance in deferring any scheduling of appraisal of property until February 15, 1974, with negotiations to purchase not to begin until April 1974 at the earliest.

5. (a) On February 11, 1974, the mayor notified the District that the Town was dissatisfied and disturbed that the District was continuing land appraisals and purchases without a written formal official policy relative to the Town's relocation. The letter demanded that an official Army Corps of Engineers letter be written and distributed to all residents. The Town demanded that eight specific concerns be stated as a formal part of the relocation plan as official policy. These concerns included:

4. *New Town Option:* Informing all land owners and renters that they will have a new town option within which to build new housing under the provisions of the Uniform Relocation Assistance and Real Properties Acquisitions Policies Act of 1970, prior to the time they are faced with finalization of relocation negotiations and decisions. Those persons who have already concluded negotiations and sold or agreed to sell their private property must be informed in writing that they are still eligible to exercise their relocation options within the new town. It must be clearly explained that their relocation commitment will not be considered "legally final" until they have full freedom to make an educated choice with respect to a new town.

5. *Interim Housing:* Informing all those property owners or renters faced with immediate purchases of their property by the Federal government and being required to vacate their living quarters prior to the completion of the new town, that they will be provided with interim housing within the immediate vicinity. Interim housing will be provided in a manner that each person will be guaranteed the "right" and "convenience" of exercising relocation as part of a new town if they so desire.

\* \* \* \* \* \*

8. *Physical New Town Design:* The design programming for the new town will be an outgrowth of the relocation planning program and will remain under the singular control of the North Bonneville Town Council. The Town of North Bonneville is the "client" in this relocation matter and no agency or person will act as its "agent" unless specifically authorized to do so by the town council. The Town "assured" the District that if an in-depth and clearly defined "official policy response" was not supplied to all of the Town citizens by February 20, 1974, official legal action would be taken on the matter.

(b) The District's response, dated February 20, 1974, addressed each topic that the Town had raised. The District protested that its policy had been stated on the topics requested in past public meetings and in meetings with the Relocation Advisory Board. The response included advice that, before the Corps could make a decision as to whether a new town site could be partially within the project area and partially outside, there must be a public meeting. Such meeting was scheduled for mid-March 1974. With respect to Nos. 4, 5 and 8, of the Town's concerns the District responded:

—As to the matter of advising all landowners and renters that they will have a new town option, we are informing the persons contacted during negotiations

that the place of relocation for the individual is entirely their decision. If the individual, based on the information furnished to the individual by the town in the 10 January 1974 meeting or through subsequent meetings, elects to remain on his property until a determination is made as to the town's actual relocation, then every effort will be made to abide by his wishes. Where this cannot be done due to construction needs, interim housing can and will, under the existing rules, be furnished based on appropriate approvals. However, the exercised use of interim housing is based upon specific needs and should not be interpreted as general policy. As I indicated to you at our 6 February meeting, the town may place any appropriate information it wishes regarding the proposed new town in our Real Estate Field Office. However, while we recognize the new town option, it is the responsibility of the town to convince the prospective residents of its merits.

—The points you raise with regard to "Physical New Town Design," are not clear and appear to violate the spirit of a joint effort in preparing a town relocation plan. Although Town Resolution No. 148 states that "The Mayor and Council of the Town of North Bonneville accept the responsibility of planning the town site", I would anticipate a considerable contribution of planning effort by my office should the McCormack legislation become law. That same legislation would also place the Corps in the position of an "agent" for the town in land acquisition based upon formal contractual agreements.

6. (a) The Town lacked financial capability to continue its planning effort. In order to clarify the authority of the Corps to participate in planning for relocation of the Town and for construction of municipal facilities in the relocated town, the Town sought additional legislative authority. In testimony before the Subcommittee on Water Resources, of the House Public Works Committee, in 1973, on H.R. 8756 (a bill to provide assistance to the Town of North

Bonneville, Washington, in planning a new town and for other purposes) the Town manager requested an allocation of resources to facilitate comprehensive planning for relocation before actual building of the second powerhouse. He estimated that the planning, acquisition and move of the Town would be in "the neighborhood of $1.5 million."

(b) Pub.L. No. 93–251, Section 83 (88 Stat. 35) was enacted on March 7, 1974 (hereinafter Section 83). It modified the Bonneville Project Act (Aug. 30, 1936, 49 Stat. 1028 and Aug. 20, 1937, 50 Stat. 731) so as to authorize the Corps to relocate the Town to a new town site.

(c) Section 83 specifically authorizes the Secretary of the Army "to relocate the Town of North Bonneville, Washington, to a new townsite." As part of the relocation, the Secretary was authorized "to cooperate in the planning of a new town" with Federal and non-Federal interests, to acquire lands "necessary" for the new town, and to "convey title to said lands to individuals, business or other entities, and to the town as appropriate." Municipal facilities provided under Section 83 were to be "substitute facilities which serve reasonably as well as those in the existing town," but were to be constructed to such higher standards as may be necessary to comply with applicable Federal and state laws. Additional municipal facilities, or higher standards, were authorized, but "only at the expense of non-Federal interests." Appropriate contractual instruments were expected to be used. Section 83(d) provides that before the Secretary acquires any real property for the new townsite, "appropriate non-Federal interests shall furnish binding contractual commitments that all lots in the new townsite" will (1) be occupied, (2) be replacements for open space and vacant lots in the existing town, or (3) "be purchased by non-Federal interests at the fair market value."

7. In 1974, North Bonneville was the poorest town in the poorest county in the State of Washington. As of March 7, 1974, that area within the then existing bound-

aries of the Town encompassed approximately 225 acres. Fifty-six percent of the houses were in a delapidated condition, and the median rent for rental units in the Town was $50 to $55 per month. In 1973, income to the Town from various sources of Federal, state and local revenues was $58,224.17, and total Town expenditures were $52,491.74.

8. (a) At a public meeting on January 10, 1974, the Town presented its optimum town site location for a relocated town in an area lying south of Greenleaf Slough, north of Hamilton Island and east of Hamilton Creek. The planned residential area, and a portion of the business district would occupy part of an area designated as the powerhouse project day use area.

(b) On April 9, 1974, the Portland District submitted Supplement No. 2 to DM 4 to the North Pacific Division. This letter supplement outlined proposed changes to the scope of the project in accordance with the desires of the Town and as authorized by Section 83. Approval was requested for two planning proposals: (1) redesignate a portion of the powerhouse project area so it would become ultimately a part of the new town site, and (2) relocate the railroad out of the town site area.

(c) The Portland District concurred with the site selected by the Town, in part, because the location would not be subject to periodic flooding, initial relocation could take place without extensive site preparation, and it would provide a capability to immediately move the town prior to commencement of any significant powerhouse excavation.

(d) Supplement No. 2 noted that the District's own investigation supported the Town's selection of a new town site within the project boundary, that there was overwhelming support for that location by the Governor and congressional delegation of the state as well as by the people in the region, and that Section 83 of Pub.L. No. 93–251 had been enacted. The District recommended that an area lying within present project boundaries approximating that shown on the Town's relocation draw-

ing be redesignated to become ultimately a part of the new town site. Lands included within the project boundary, if not used for Town purposes, would continue to be used as a part of the powerhouse project as authorized. The Portland District estimated that a 40–acre residential area and about a 10–acre business district would accommodate those people living in the present town who have indicated a desire to relocate to the new town and the 50–acre area would not have serious effect on the capacity of the project area to accept all of the disposal from the powerhouse excavation. Relocation of the railroad was recommended because otherwise 44 percent of the 131 families that wanted to relocate would not move, and such a reduction of relocatees would impact adversely on the viability of the relocated Town.

(e) The District's final recommendation was that all lands as initially authorized for powerhouse project purposes be acquired. Subsequently a portion would be deeded to the Town for a new town site, upon determination of the exact area and upon obtaining the necessary contractual commitments required by Section 83. The North Pacific Division recommended approval of the changes proposed in Supplement No. 2. Land acquisitions involved in these recommendations were limited to lands in the powerhouse project area as initially authorized.

9. (a) On April 17, 1974, the Town reiterated its demand that the Portland District provide a final official written policy commitment, and a complete relocation plan, prior to any further appraisal and acquisition of properties in the Town. The letter stated that the Portland District's actions dispersed the community, contrary to the provisions of the Uniform Relocation and Real Property Acquisition Policies Act of 1970 (Policies Act). The Portland District was accused of having used the Policies Act as a license to circumvent the Town council. The letter concluded that the Town council had instructed the mayor to resolve these matters in a court of law.

(b) On April 20, 1974, the Town's special counsel notified the Portland District that the Town believed there was no valid relocation assistance advisory program as required by the Policies Act and that the Corps Environmental Impact Statement for the powerhouse project was completely inadequate. The notice stated that if by April 27, 1974, the Portland District had not ordered the cessation of activities toward acquisition of property and other activities in furtherance of construction, legal action would be commenced in the United States District Court to enjoin such activities.

(c) On April 23, 1974, the Portland District informed the Town that the Office of the Chief Engineer (OCE) had approved relocation to the site favored by the Town, in principle, as a basis for continuation of planning and preliminary negotiations. The letter requested the parties to enter into negotiations with a view toward drafting a memorandum of understanding which would provide a basis for future cooperation in planning the new Town and would outline the division of responsibility between the Corps and the Town. The Portland District proposed to begin to prepare the scope of work for an architect-engineer contract, which would be let for the first phase in the relocation work.

(d) On April 24, 1974, the Town advised the Governor of Washington State that the Corps at a meeting with the Town council on April 23, 1974, made it clear that no adjustment of real estate activities would be made and that the Corps insisted on doing all of the planning for relocation of the Town through its own contracting arrangements. The letter pointed out that the Town wanted to do its own planning and have the right to contract with private consultants and engineers, and that its threatened litigation would impact on the powerhouse project. In order to avert litigation, the Town requested the Governor's direct intervention in these matters. One suggestion was to place the State of Washington as the prime contractor with the Corps for all relocation planning for the Town. A meeting to discuss these matters was requested to take place no later than April 29 or 30, 1974.

(e) On April 25, 1974, Senator Magnuson forwarded to OCE three questions that the Town had requested early and complete written answers from the Corps. One question was: What financial assistance in dollar amounts does the Corps formally propose to provide the Town to assist it in planning a new town site? OCE was requested to "Please immediately advise the mayor by telegram and me as to when this information will be provided."

(f) On April 25, the Portland District answered the charges by the Town's special counsel concerning noncompliance with the Policies Act and the Environmental Impact Statement. The Portland District pointed out that Policies Act information had been provided the Town and that a special relocation assistance office had been opened in the Town which had been in operation for several months. With respect to the Environmental Impact Statement, the Portland District stated the Town's late objections were unconscionable, because the Town had reviewed the statement, and the Town's comments made at the meeting on August 24, 1971, were included. At the time the final environmental impact statement was filed, the Portland District believed it met the requirements of the Act.

(g) As to continuation of appraisals, the Portland District stated there was no present intention to comply with the demand for a cessation of activities directed toward acquisition of properties and other activities in furtherance of construction. The District asserted it was considering for acquisition only those tracts required for construction, or requested by the individual owners for early acquisition.

(h) On May 1, 1974, OCE answered Senator Magnuson's inquiry on the Town's three questions. As to financial arrangements for Town planning, OCE advised that the Water Resources Development Act of 1974 authorized the Corps to cooperate in the planning of a new town, to acquire and convey title to lands, and to construct a

central sewage collection and treatment facility. The Corps would reimburse the Town for certain direct planning expenses incurred as the planning progresses, but it was not possible at the time to give an indication of the actual dollar amounts involved. The extent of Corps participation would be covered under the terms of a contract with the Town to be negotiated later.

10. (a) On May 2, 1974, Washington State officials convened the meeting the Town had requested. The meeting was chaired by the State Director of Community Development; there were three representatives from the Portland District; the Town was represented by the mayor, a member of the Town council, the Town attorney and the Town planning staff; State of Washington personnel included a member of the State Attorney General's staff.

(b) The Portland District recommended a structure for relocation actions that gave it contractual control. In this arrangement there would be: (a) a contract between the Corps and an architect/engineer to draft a feature design memorandum; (b) a memorandum of understanding between the Town and the Corps, approved at the Division level, that would outline the degree of supervision and control each party would exercise over the A/E; (c) a service contract between the Corps and the Town to reimburse the Town's direct expenses associated with the relocation planning, approved at OCE level; and (d) additional contracts between the Town and the Corps such as a real estate contract, relocation contract, etc. The meeting closed with concurrence that representatives of the Town and the District would meet to draft a memorandum of understanding.

(c) Another topic discussed at the meeting concerned replacement of municipal facilities. The Town representatives contended the Corps should replace all municipal facilities in place as of September 1971, regardless of the number of residents who eventually moved to the relocated Town.

The Corps' representatives contended this was prohibited by law.

(d) The Corps' representatives raised the question of the Town's legal capacity to contract with the Corps in order to furnish binding contractual commitments as required by Section 83. The Corps contended that at some point in time the old Town would cease to exist and the Corps was concerned that the old Town could not bind the new Town. The Corps requested an opinion from the State Attorney General.

11. On June 21, 1974, OCE interpreted Section 83 as to the Corps' obligation to provide substitute municipal facilities and utilities. OCE advised that the United States is obligated to provide substitute facilities and utilities which would serve reasonably as well as those presently existing. The design and construction, however, should be sufficient only to service the estimated number of residents who will relocate to the new Town. Allowance was to be made for replacement capacity to serve vacant lots only to the extent that existing vacant lots in fact are served, or are capable of being served, by existing facilities and utilities.

12. (a) The first agreement to be negotiated and executed was the vehicle to reimburse the Town for its planning expenditures. On July 9, 1974, at a negotiating session between attorneys for the parties, attended also by members of the staff of the State Attorney General, all but one issue was resolved. The Town would not agree to inclusion of the standard disputes clause. As alternatives, the Town proposed either an arbitration clause, or, the omission of any clause related to disputes or arbitration.

(b) On July 11, 1974, the contracting officer yielded and agreed to eliminate both a disputes clause or an arbitration clause. As a result, if the parties could not settle their differences after review of a contracting officer decision by superior administrative authority, disputes could be resolved only by litigation. The contracting officer agreed to this concession in an effort to accelerate execution of the contract. The

July 11, 1974, letter cautioned that great care would be required in contract administration to avoid time consuming negotiations or litigation. The letter advised the Town that, to qualify for reimbursement, its activities must be reasonable, necessary and directly related to its relocation. By this time, the parties had agreed that the Town could be the contracting party with an A/E firm to prepare the Feature Design Memorandum and an Environmental Assessment Report. The contracting officer warned that the Corps would contract for the preparation of those documents if the Town had not executed the reimbursement contract by July 31, 1974.

13. (a) On July 26, 1974, a cost reimbursible contract for services (DACW 57–75–C–0032) was executed by the District engineer, as Corps contracting officer, and by the mayor and members of the Town council. For this contract, the Corps initially allocated $341,529 for the Town to employ the services of a planning consultant, subject to the approval of the contracting officer, to produce the following documents: a Draft Feature Design Memorandum (DFDM), (b) an Environmental Assessment Report (EAR), and (c) a Comprehensive Plan.

(b) Specifications for the articles to be delivered were extremely detailed. The DFDM was required to include discussion on 15 itemized basic elements. The EAR was required to include discussion on six elements that included a profile extended into the future to show expected conditions with and without the proposed relocation. The DFDM and the EAR were required by the Corps as part of the powerhouse project. The Comprehensive Plan primarily was of interest to the Town. The Comprehensive Plan was to include discussion of 13 specific elements. No. 13 provided:

(13) The scope of the Comprehensive Plan shall be based upon the development of an "Optimum Town". The Comprehensive Plan will provide all the necessary data, illustrations, models and materials required to define an Optimum Town plan within the Design Area. The Optimum Town is defined as a town with a central business district, with a population and economic base capable of supporting essential community services, providing adequate land for economic growth through a balance of land uses and meeting the requirements of a viable Neighborhood Unit.

(c) The contract for services provided the Town would be reimbursed for reasonable and necessary costs involved in providing services necessary for relocation. Items to be reimbursed included the services of a legal counsel, and for services of such additional legal counsel as mutually agreed to in advance on a case by case basis. The Corps also agreed to expenses for a relocation staff that consisted of one administrative assistant, one planning director, one senior planner and one secretary.

(d) The contract provided that the Town would proceed with the work 10 days after execution, and would deliver preliminary drafts of the DFDM and EAR to the Corps 150 days after the Town executed a contract for the production of the documents with the planning firm. Final drafts of the DFDM and the EAR to be provided 30 days thereafter. The contract would terminate at the end of the 1975 fiscal year or on execution of a relocation contract. The relocation contract was to provide for the preparation of plans and specifications. If the relocation contract was not signed by June 30, 1975, the contract would be extended if further performance was needed.

14. In August 1974, a disagreement arose as to the extent of the Corps' authority to provide municipal facilities under Section 83. The Town construed the authority to mean that the new municipal facilities should have the same capacity as the facilities in the existing town; the Corps interpreted the authority to mean that it could only provide new facilities for persons who actually relocated. The Town on September 11, 1974, sought a declaratory judgment in the Western District of Washington (*Town of North Bonneville v. United States*, No. C74–133T).

15. (a) During August 1974, disputes arose also with respect to the Scope of Work for the A/E planning contract. During the week August 12 through 16, 1974, a draft was agreed upon. On August 29, 1974, the Town notified the contracting officer that, after a presentation by the relocation staff, the Town council concluded that scope of work as originally worded was not consistent with the language of the contract for services. A new scope of work had been prepared as a result of directions given to the staff with the assistance of legal counsel. The major revisions in site selection processes and definition of the design area were to mold the "content requirements to a planning process that will guarantee the direct involvement of the local citizens." The Town cited provisions of the services contract relative to the scope of the comprehensive plan, and the definitions of optimum town plan and the design area, to require that the search for site alternatives must be undertaken from the approach of seeking a site for the optimum town.

(b) As result of the difficulties that arose in reaching agreement on the Scope of Work for the A/E planning contract, District personnel perceived that the source of power as to relocation matters had shifted from the mayor and Town council to the planning staff and Pollard Dickson.

(c) Difficulties in the negotiations included standards, site selection, 100 percent replacement of facilities, and the workshop process. The inability to reach agreement resulted in the Town filing suit on October 3, 1974, for an injunction against further work on the powerhouse project.

(d) On October 7, 1974, at an internal meeting, the Corps decided to acquiesce on the procedures to be followed to resolve the major issues then outstanding in the Scope of Work: the capacity of municipal facilities and utilities to be relocated, relocation of the railroad, and final site selection for the new Town. With respect to the relocation of the railroad, the Corps concluded that additional legislative authority was needed. The Corps concluded that,

with an agreement on the scope of work for the A/E planning contract, both the suit for declaratory judgment filed September 11, 1974, and the suit for injunctive relief filed October 3, 1974, would be withdrawn.

(e) On October 8, 1974, the Town transmitted a copy of the Scope of Work for the A/E planning contract which had been mutually agreed upon. On October 9, 1974, the Portland District accepted the scope of work in fulfillment of the contract.

(f) On October 14, 1974, the Services Contract was amended to provide:

Replacement of said municipal facilities and utilities provided at Government expense will, however, have the same capacity and be able to serve the same number of users as those in the existing town, subject to the town furnishing the Government a contractually binding commitment that all lots in the new town site will be either occupied when available, will be replacements for open space and vacant lots in the existing town, or will be purchased by non-Federal interests at the fair market value.

(g) On October 17, 1974, the Town dismissed the injunction action and on October 22, 1974, it dismissed the declaratory judgment action.

16. (a) The A/E planning contract, captioned Contract for Professional Services, dated as of November 19, 1974, had as contracting parties the Town, as "Owner", and Royston, Hanamoto, Beck & Abey (RHBA) as "Contractor". This contract was approved by the contracting officer on November 19, 1974. It obligated RHBA to produce the DFDM, EAR and Comprehensive Plan as defined in the July 26, 1974, contract for services, as amended, and the Scope of Work attached as Exhibits A, B, C, and D. The A/E planning contract recited that the Town would be reimbursed by the Corps pursuant to the July 26, 1974, contract for services, and provided that the Town would pay RHBA $739,761.32 for the work.

(b) The A/E planning contract in operation, through a series of subcontractors,

provided a team approach to planning the Town's relocation. The prime contractor, RHBA, provided planning and landscape architect services. Williams & Mocine, an economics consultant firm responsible for town planning imput, and for facilitating public participation; Kirk/Wallace and McKinley, design consultants, and Daniel, Mann, Johnson, Mendenhall/Hilton (DMJM/Hilton), an architect/engineer firm that provided civil engineering services; Dames & Moore provided geo-technical engineering services; and Keyser/Marston Associates, a firm of economists and financial consultants, provided planning studies.

17. (a) The Scope of Work in the A/E planning contract established a procedure of extraordinary complexity. The document is large, 46 pages; and it is divided into four sections: Exhibit A, General Information and Specifications, Exhibit B, Environmental Assessment Report, Exhibit C, Comprehensive Plan, and Exhibit D, Draft Feature Design Memorandum.

(b) Exhibit A had four subdivisions: (1) Products, (2) Priority Considerations, (3) Definitions, and (4) The Planning Process. The Products section recognized that the DFDM and the EAR were to be provided primarily for the Corps, and the Comprehensive Plan for an optimum new town was to be provided primarily for the Town. Because many requirements of the DFDM, EAR and the Comprehensive Plan were recognized to be the same or similar, or based on the same information and data, the studies and investigation were to be made to such depth as necessary to satisfy the requirements of all three documents. The Priority Considerations section provided for reexamination of a new town site that had been recommended by the District on April 9, 1974. The reexamination was to include exploration of an enlarged reconnaissance area and alternatives within the design area. The Definitions section included definitions for "Optimum Town" and "Design Area."

(c) The Planning Process section of Exhibit A was stated to be designed to maximize citizen involvement. It required RHBA to prepare and conduct a series of four workshops and to supply graphic illustrations and the three-dimensional representations of concepts and images that possibly will influence physical design. The organization and orientation of the workshops was to reflect the primary obligation of the contract: the development of an optimum new town plan for the relocation of North Bonneville. The four workshops were to be conducted over a period of 3 days each, in a time period not to exceed 4 months. The following table sets forth salient workshop information:

Workshop No. 1 (Needs Workshop)

*Product:* "Needs Statement" that documents individual expressions of needs and wants. The workshop also was to provide citizens with an illustrated "intuitive judgment" of what constitutes an optimum town. The statement of work provided: The "intuitive judgment" must include the basic abstract concepts of urban design in a rural setting, the concepts of what constitutes a Neighborhood Unit, details as to population ranges, densities, abstract land use patterns, land areas required, identification of essential community services, and analysis of how the concept provides for the essential community services and what influences of scale and character are exerted by the environment of the Columbia River Gorge. At the conclusion of the workshop, RHBA was to provide an outline for the Comprehensive Plan, EAR and DFDM to both the Town and the Corps.

*Schedule:* Prepare for and initiate 21 days from contract signing; complete workshop in 3 days; refine and print the formal Needs Statement in 10 days.

Workshop No. 2 (Site Alternatives)

*Product:* Field examination of four alternative sites and preparation of a Site Alternatives Statement, which will include an update of the Needs Statement and an initial imput of major environmental impacts that would result if any par-

ticular site is selected as the site for the optimum new town.

*Schedule:* Prepare for and initiate 24 days from the printing of the Needs Statement; complete workshop in 3 days; refine and print Site Alternatives Statement in 7 days. The Site Alternatives Statement must be received within 70 days of signing of contract.

Workshop No. 3 (Land Use and Design Images)

*Product:* Illustrate by a series of preliminary layouts each of the major site alternatives presented in the Site Alternatives Statement; and a decision by the Town and RHBA of the most acceptable layout for each alternative. The workshop was to translate the terms "essential community services" and "requirements of a viable neighborhood unit" into abstract physical design images that interrelate through social and physical flow patterns. A formal "Land Use and Design Images Statement" that was to include, among other items, the range of environmental impacts or potential impacts for each alternative town layout, address the use of a distribution pattern for 18 million cubic yards of excavated materials to be disposed of within the design area; and an analysis of any interface that would occur between the development of the new town and the proposed project day use area.

*Schedule:* Prepare and initiate 14 calendar days from the Site Alternatives Statement; complete workshop in 3 days; refine and print formal Land Use and Design Images Statement in 14 days. The formal printed statement must be submitted within 100 days from the signing of the contract.

Workshop No. 4 (Optimum New Town Concept Plan (ONTCP))

*Product:* A qualitative and quantitative analysis of the optimum new town concept that includes: (1) elements of the Comprehensive Plan; (2) alignment or realignment of transportation facilities; (3) comparison of differences between ex-

isting municipal facilities and utilities, with detailed sketches of the size, quantity and quality of all proposed replacement facilities and utilities; (4) sizing and location of sewage treatment facility and collection system; (5) detailed statement of betterments that would be required to effectively implement initial relocation and the first phase of development of the ONTCP; and (6) a land acquisition plan for the optimum town that designates lands to be dedicated to the Town as replacement for existing lands.

*Schedule:* Prepare for and initiate 14 calendar days after Land Use and Images Statement; complete workshop in 3 days; refine and print formal Optimum New Town Statement (ONTS). The formally printed ONTS must be received by the Town 130 days of signing of the contract.

(d) Formal Presentation: A formal 2–day presentation was required in the Planning Process section to illustrate the site studies presented in the DFDM and the products of the four workshops and the refined results as presented in the ONTS. The formal presentation would be attended by high level representatives of Federal, state and local governments. Six calendar days after the presentation, the formal site and Comprehensive Plan would be approved and executed by the Town, and forwarded as the Town recommendation in the DFDM.

(e) RHBA was to supply 25 copies of all working papers and statements at the time prescribed in the planning process. On completion of the 2–day formal presentation, RHBA was to have 14 days to supply the Town 25 copies of formal drafts of the EAR, DFDM and Comprehensive Plan. Drafts of the final products were to be submitted 30 calendar days from receipt of the ONTS and within 160 days of the signing of the contract; RHBA was to be furnished written comments within 15 calendar days after receipt of draft copies.

(f) Exhibit B provided that the EAR would be adequate for a draft supplement to the existing Environmental Impact

Statement for construction of the second powerhouse. It was to be prepared to comply with guidelines in Corps of Engineers' Regulations ER 1105–2–507 (Preparation of Environmental Impact Statements) and ER 1105–2–105 (Guidelines for Assessment of Economic, Social and Environmental Effects of Civil Works Projects). Also, it was to reflect the policies and objectives of Engineering Manuals EM 1110–2–38 (Environmental Quality in Design of Civil Works Projects) and ER 1165–2–2 (Consideration of Aesthetic Values in Water Resource Development) and would comply with national and Washington State Environmental Policy Acts.

(g) Exhibit B specified numerous requirements to be satisfied by the EAR, including the guideline that it should address the effects of the Second Powerhouse Project on individual citizens and the community of North Bonneville over a continuum of time from initial authorization through project completion, identifying specific points in time when major impacts have been imparted or will be imparted upon the natural environment and the physical and social environment of individuals and the community of North Bonneville. RHBA was to conduct a study of the community that considers the ecological, institutional and normative dimensions of the community and shall view the community as a complex system of stratification, (either hierarchical or horizontal), kinship ties, friendship networks, and formal and informal economic and societal associational relationships rooted in family life, religious activities, and on-going socialization processes. RHBA was directed to prepare the EAR in accordance with an outline that included the following major topics, each with multiple subtopics: (1) The Proposed Action; (2) Existing Conditions of North Bonneville and Other Affected Areas; (3) Environmental Impact of the Proposed Action; (4) Any Unavoidable Adverse Environmental Effects; (5) Alternatives to the Proposed Action; (6) Relationship Between Local Short Term Environmental Uses and Enhancement of Long Term Productivity; and (7) Any Irreversible and Irretrievable

Resource Commitments with the Proposed Action.

(h) Exhibit C provided that the Comprehensive Plan would comply with Washington State laws RCW 35A.63,060 and RCW 35A.63,061 and to reflect the policies of EM 1110–2–38 and ER 1165–2–2. The Comprehensive Plan was to be based upon the development of an "Optimum Town" as defined in the planning process; eight objectives and three policies were listed. One objective was to insure that the Optimum Town Plan contains the necessary elements to meet the requirements of a viable neighborhood unit. One policy was that the planning and design processes will evolve around the priority of maximizing citizen involvement, with process planning to dictate the evolution of physical design. Elements of the Comprehensive Plan were specified, each with multiple subjects: (1) People; (2) Land Use; (3) Economic Base; (4) Transportation-Circulation; (5) Conservation; (6) Open Space, Park and Recreation; (7) Public Use; (8) Public Utilities; (9) Housing; and (10) Implementation.

(i) Exhibit D provided general instructions for preparation of the DFDM and dealt separately with the following topics and subject matters: (1) Inventory of Existing Facilities; (2) Substitute Facilities and Betterments; (3) Site Selection and New Town Planning; (4) Special Considerations Requiring Detailed Analysis; (5) Special Considerations Requiring General Analysis; (6) Cost and Economic Analysis; (7) DFDM Preparation; and (8) Finished Materials.

(j) The general instructions of Exhibit D provided the DFDM would be an integrated report that, after approval, would serve as a basis for the apportionment of Federal cost with respect to design and preparation of plans specifications and physical construction for all aspects of the relocation of municipal facilities and utilities. It was to make clear what portions of the cost of the relocation design and construction are to be at Federal expense and what portions are to be at the expense of appropriate non-Federal interests, and was to contain infor-

mation on how binding contractual commitments for the payments are to be furnished the Government prior to purchases of land for the town site. The following subtopics were identified as special considerations requiring detailed analysis: (1) Eighteen Million Cubic Yards of Excavated Material; (2) Railroad and Highway Relocations; (3) Water System and Source; (4) Sewer Facility and Collection System; and (5) Foundation Exploration. The following subtopics were special considerations requiring general analysis: (1) Archeological and Historical Consideration; (2) Municipal Structures; and (3) Scheduling and Coordination.

(k) The section of Exhibit D on cost and economic analysis required RHBA to provide a comparability analysis describing qualitative and quantitative differences between the existing municipal facilities and utilities and the proposed substitute facilities, to be accompanied by a detailed cost analysis of those differences. Seven analysis guidelines were provided, including:

4. Growth projections of each alternate site shall be made for a 100–year period. Base study must be in support of conclusions drawn therefrom. The projections shall be made with and without project conditions.

5. A common time frame must be used for all costs and benefits. Proper discount methods shall be used to calculate average annual costs for each alternate over a 100–year period. A 3¼ percent interest rate shall be used.

\*   \*   \*   \*   \*   \*

7. The benefits to cost ratio of the second powerhouse project indicating all cost of the Optimum Town at the location recommended by North Bonneville shall be shown.

18. (a) During the period November 27, 1974, to March 21, 1975, the District sought advice from the North Pacific Division and from OCE on issues that arose in negotiations with the Town. On November 27, 1974, the District requested authority to provide temporary housing for residents displaced prior to the time the relocated town was ready for occupancy. OCE approved an interim housing program on December 6, 1974, which was subsequently accepted by the residents.

(b) Another issue involved the size of the replacement town to be provided. The Town wanted to annex the Fort Rains area and the Brown Tract; the District questioned whether the annexations would be included in the land area and capacity computations, and whether there should be a cutoff date for annexations. The Division believed the issue moot because residents of Fort Rains and the Brown Tract were eligible for interim housing and eligible to acquire lots in the new Town. OCE on February 3, 1975, had not resolved this issue. On March 21, 1975, the District noted the effect of annexation of Fort Rains was minimal and recommended that, on the date the relocation contract was signed, annexation of any areas be limited to boundaries of the powerhouse project.

(c) Another issue concerned the selling price at which the Corps would convey lots in the new town to residents and businesses and to the Town. Section 83 provides that lots would be conveyed at their fair market value. The District took the position that the term "fair market value" is well defined and the lots should be sold at fair market value as improved by the municipal facilities provided by the Corps. The Town contended that the fair market value of the lots should be no more than the cost to acquire the bare land without improvements because the Corps was obligated to provide improvements at no cost to the Town. The Division concurred with the District. On February 13, 1975, OCE continued to have the matter under consideration.

(d) On March 21, 1975, the District asked for further guidance on conveyancing land in the new town and outlined three proposals: (1) sell the lots to all businesses, individuals, and the Town as improved lots; (2) sell the lots in the new town to all eligible parties as unimproved lots at the fair market value, with the purchasers being enriched approximately $750 per lot for inconvenience and disruption of the relocation;

and (3) sell the lands in the new town in their entirety to the Town as unimproved lots. The District recommended No. 3 because it eliminated disputes as to the obligation to replace all facilities at no cost; a bulk sale would lower costs; and with the Corps out of the land sale business, the Town would have the task of administering sales to residents and businesses.

19. On March 24, 1975, the District requested the Town to provide information relevant to the Town's capacity to satisfy the requirements of Section 83(d) for binding contractual commitments. The District wanted information to establish that the Town was a public body with full authority and capability to contract and to pay damages in the event of failure to perform. The Town was asked to provide: (1) a supporting statement by its principal legal officer citing applicable state and/or local laws, rules and regulations for its power to contract, levy taxes, sell bonds, or otherwise assess constituents, and (2) a statement of current financial status which demonstrates the ability of the Town to perform insofar as meeting non-Federal costs, payment of damages, if necessary, and costs of maintenance following completion.

20. (a) On April 10, 1975, the District stated to the Town its position on four issues: (1) Section 83 is a substitute for the Corps' normal relocation procedures and precedents and is the sole remedy available to the Town and its residents in connection with town relocation; (2) Section 83 required the Government to acquire and convey title to the appropriate parties for lots in the new town, and that these lots would be conveyed to all parties at the fair market value as improved; (3) The Town must sign, prior to acquisition of any land for the new town site, a binding contractual commitment to purchase all lots in the new town which are not occupied when available or replacement for open space or vacant space in the old town, and the contract would provide for payments in full at the time the Town purchases the lots; and (4) Section 83 requires the Government to provide municipal facilities only to substitute for such capacity as existed in the Town at the time the law was approved, March 7, 1974.

(b) On April 23, 1975, a District staff representative notified the Town that the Corps' April 10, 1975, position on fair market value, binding contractual commitments and the annexation of Fort Rains must be incorporated in the DFDM and other documents, as appropriate.

21. The Town council on April 22, 1975, directed the Town attorney, James Mason, to draw up an ordinance covering business licenses for contractors to coordinate with a business and occupancy (B & O) tax. The Town's planning director, Pollard Dickson, suggested that a workshop be set up with Keyser/Marston to discuss the tax situation.

22. On April 25, 1975, the Town delivered to the District preliminary drafts of the DFDM, EAR and Comprehensive Plan. In the transmittal letter, the Town's planning director stated that the DFDM and EAR do not reflect the Corps' April 10, 1975, position on purchase price of lots in the new town, binding contractual commitments with payback requirements, and the annexation of the Fort Rains area. RHBA and the Town viewed the Corps' position in the April 10, 1975, letter as a change in the Scope of Work for the A/E planning contract. The District engineer was reminded of previous statements he had made during Town council meetings and during workshop sessions. The transmittal letter stated:

> The preliminary drafts of the DFDM, EAR and Comprehensive Plan have evolved out of the planning process established by the Town. The direct involvement of the Corps of Engineers in this process was to insure constant feedback and eventual consistency of data and comparability analysis for all these products. Any alteration of the DFDM or EAR to reflect the contents of your April 10, 1975, letter would actually constitute a change in those products which would not be mutually agreed to by the City and the Corps. Such changes would

adversely affect the concept and viability of the Comprehensive Plan. Should the Corps persist with the position of demanding the indicated changes, the City will be forced to consider such action as a violation of our contract, the Scope of Work, and the evolution of a Comprehensive Plan through a contractually established planning process.

The letter also stated:

Should the intent of the Corps be to change the documents in-house the City must caution the Corps about its contractual commitments. Although the DFDM will be the sole property of the Government, the City maintains the right of review and formal comment.

23. (a) On April 30, 1975, representatives of OCE and the Pacific Division met with members of the Washington Oregon congressional delegations and staff to discuss relocation of the Town and the Town's April 25, 1975, suit to enjoin the project. On the issue of whether transfers of property to the Town and individual relocatees would be the fair market value or Government acquisition cost, the Corps maintained transfers at other than fair market value would exceed its legal authority. Representative McCormack stated he was willing to provide a clarification of Section 83 that would allow the Corps to convey the properties to the Town at Government acquisition costs. Mr. McCormack suggested, and all agreed, that the committee reports should be used as the vehicle to express the "intent of Congress." A plan of action was adopted to resolve outstanding disagreements and to deal with the Town's "propensity to file for injunctions against the project." Issues that stood between the Corps and the Town would be identified and reduced to a Memorandum of Agreement, which essentially would say that they are all of the major issues between the parties and that the Town would not sue pending clarification of the law and an expression of congressional intent in the forthcoming Appropriations Bill and committee reports. Town and Corps field representatives would come to Washington to hammer out the agreement and appropriate language for inclusion in the Appropriations Bill and committee reports. Congressional staff aides were to notify the Town of their desire for a Memorandum of Agreement.

(b) After the meeting, the OCE and Pacific Division representatives met separately and divided the relocation issues and plan of action into three categories: (1) issues reasonable to the Corps but not permitted by law, to be clarified by language in the appropriations bill, (2) issues for which that the law provides (replacements), but the Town's demands are unreasonable to the Corps, to be clarified by language expressing the intent of Congress in the committee's reports, and (3) issues that are not provided for by law and the Corps considers unreasonable, no clarifying language to be included in either the bill or the reports.

(c) The Corps representatives on April 30, 1975, planned a schedule that would result in execution of a Memorandum of Agreement on May 26, 1975, and final approval of the DFDM, EAR, and Comprehensive Plan on June 10, 1975. The schedule recited that the legislative action would not be completed until late summer; and that the Town could not by contract in the Memorandum of Agreement divest itself of its right to initiate a law suit.

24. On May 6, 1975, the Washington-Oregon congressional delegations sent to OCE and the Town a letter to follow-up arrangements made at the April 30 meeting. OCE was told that no delay in the powerhouse construction schedule can be tolerated, that the position taken by the Town on several of the issues in dispute is reasonable and can be accommodated by the Corps within the authority granted by Section 83, and that, the delegation believed the law permits the Corps to convey lots in the new town site to the Town and Town's people at the prices paid by the Corps for those lots. OCE was told the delegations stood ready to propose report language to the House and Senate Appropriations Committees for inclusion in their

Reports on the FY 1976 Public Works Appropriations Act if the Corps feels clarification of Section 83 was necessary to permit it to satisfy the reasonable requests of the Town, and that they would seek to obtain written assurances from the Public Works Appropriations Subcommittee Chairmen prior to June 1975 to support inclusion of the language in the reports.

25. (a) On May 7, 1975, the North Pacific Division Economic Studies Section completed an analysis of the preliminary DFDM. The report listed 75 deficiencies, recommended that numerous sections be rewritten, and pointed out sections that were either grossly misleading or were erroneous.

(b) On May 12, 1975, the District returned to the Town its comments on the preliminary drafts of the DFDM, EAR and Comprehensive Plan. The transmittal letter stated there were still issues to be resolved and that the Corps proposed to resolve questions of policy, regulations and matters of law and other issues under the procedures established in the May 6, 1975, letter of the congressional delegations. To enable the Corps to accept the DFDM from the contractor without major revision prior to the agreement on major issues with the Town, the District proposed wording to be inserted at the beginning of the DFDM:

The purpose and scope of the design memorandum is to present a plan for town relocation and recommendation for replacement of municipal facilities but does not delineate the extent of the Federal Government's obligations. The plans in the design memorandum are intended to outline a desirable town development and should not be construed as a description of the Government's obligation. The extent of the Government's obligations will be mutually agreed upon with the Town and defined in the relocation contract.

26. (a) On May 13, 1975, the Town council, to permit further negotiations with the Corps, authorized a 2-week extension of a scheduled court hearing. The council also approved a delegation that included Pollard Dickson, James Mason and Asa Hanamoto of RHBA to represent the Town in discussions in Washington, D.C. with the OCE and the congressional delegations. The proposed B & O tax and implementing business licensing ordinance also were discussed at this meeting.

(b) On May 21, 1975, the Town council enacted Ordinance No. 285, to provide for a tax on the privilege to engage in business in the Town (B & O tax). This tax was drafted specifically to apply to contractors with the United States who were involved with the construction of the second powerhouse.

27. (a) On May 20, 1975, a 25-hour meeting on the Town's relocation problems was held in Washington, D.C., attended by Representative McCormack and congressional staff personnel, representatives from the Town, and representatives from the Corps. The problems to be faced within Congress in an attempt to amend the statutory authorization, as distinguished from the problems involved in getting clarifying language in an Appropriations Committee report, were brought out. It was the consensus that an attempt would be made to insert language into the reports of the Appropriations Committees on the FY 1976 appropriations bill. This was the procedure proposed in the May 6, 1975, letter, to clarify the Corps' authority. The clarifying language would include standards and criteria to be used for replacement facilities, transfer of lands for open space at no cost when not an identifiable replacement for existing Town owned land, and the fair market value issue as applied to conveyance of land to the Town and citizens.

(b) The Town representatives argued vigorously that the Town should be the contracting party with the A/E and have control of the A/E design contract. Mr. McCormack told the Town representatives that, in view of the Corps' responsibilities, the Town could get no support from the congressional delegations for its proposal. A staff member from the Subcommittee on Public Works said the Appropriations Com-

mittee would not tolerate direction that the Corps give up the control of the A/E contractor. Congressman McCormack spoke of the extreme measures that had been taken to help the Town and the potential for jeopardizing all support for the Town if it persisted in attempting to direct the design contractor. The Town's representatives then proposed that the Town name the design A/E firm. The Corps replied that the A/E selection must follow established procedures.

28. (a) On May 23, 1975, a document captioned Memorandum of Agreement was executed by the mayor for the Town, by the Deputy District Engineer and by the Chief, Engineering Division, OCE, for the Corps. Its stated purpose was:

> to set forth current understandings, agreements, and planned actions and procedures and relationships between the Town of North Bonneville, Washington and the U.S. Army Corps of Engineers in regard to the relocation of the Town under the provisions of Section 83, Pub.L. No. 93–251.

(b) Structurally, the document consisted of a series of separate items.

(1) Memorandum of Agreement (main document)—13 sections on six pages;

(2) Enclosure No. 1

(A) Document, captioned: Memorandum for Record, dated May 20, 1975, executed by the same individuals as the Agreement;

(B) Document, captioned: Joint Position Paper between Portland District, U.S. Army Corps of Engineers and City of North Bonneville, Washington, dated May 16, 1975, executed by the Town mayor and the Deputy District Engineer.

(C) Letter, dated May 12, 1975, addressed to the mayor and signed by the Deputy District Engineer with an attached enclosure No. 1, captioned: Corps' Position on Government's Obligation to Replace Municipal Facilities and Utilities for the Town of North Bonneville, WA;

(3) Enclosure No. 2—Document, captioned: Suggested Language for Appropriations Committee Report;

(4) Enclosure No. 3—Letter, dated May 6, 1975, addressed to the Director of Civil Works, OCE, executed by Senators Magnuson, Packwood, Jackson and Hatfield, and Representatives McCormack and Duncan, with an attachment, captioned: Memorandum.

(c) The Memorandum of Agreement provided a vehicle to record the status of disputed issues in planning for the Town's relocation, and to remove the threat to timely completion of the powerhouse project caused by plaintiff's suit for an injunction (case No. C75–81T) which was pending when the Memorandum was executed. The Memorandum of Agreement, in essence, is an agreement on procedures to be followed. It provided a procedure for continuation of the planning process and design process, and a framework for agreements in the future on the specific actions required for relocation of the Town. The Memorandum does not constitute final agreement on specific actions that result from the procedures.

(d) The Memorandum of Agreement, in sections 2, 12 and 13, refers to "such clarifying language as may be adopted by the Congress"; "clarification" of Section 83; and "subject clarifying report language." These references do not mean that the agreement is conditioned on amendment of Section 83 by enactment of additional statutory authority. The parties agreed that the inclusion of language in the reports of the Appropriations Committees, when followed by enactment of the appropriations recommended in those reports, was adequate to resolve the Corps concerns about the extent of its authority under Section 83. Insertion of language in the committee reports of the intent of Congress, the parties agreed, would be adequate to resolve the issue of the Corps' authority, and amendment of Section 83 would be unnecessary. The Town's negotiating committee reported on May 27, 1975, to the Town council that the clarifying language in the Appropriations Committees' reports would resolve

the issues raised in the Corps' April 10, 1975, letter. Execution of a relocation contract and the withdrawal of the court action both were conditioned on acceptance by Congress of the clarifying report language.

29. The Memorandum of Agreement, in Enclosure I, records the position of the parties on 45 issues in negotiations between April 30, 1975, and May 20, 1975. Provisions in the main document of the May 23, 1975, Memorandum of Agreement resolved all points of nonagreement that remained after the May 20, 1975, meeting. Resolution of these 45 issues provided a basis for going forward with negotiations for the Town's relocation. Although there were a number of agreements in principle on policies to be followed in subsequent negotiations for relocation of the Town, there was no final agreement on application of these policies in particular circumstances.

30. On June 3, 1975, Representative McCormack was notified by OCE that the Memorandum of Agreement had been signed and that this Agreement "resolves the remaining issues between the Town and the Corps." The June 3, 1975, letter emphasized that in order for the second powerhouse project to remain on schedule (power-on-line by May 1981), the relocation contract must be consummated by June 18, 1975, and stated:

> For these reasons, I am pleased to report that in the Memorandum of Agreement the Town has agreed to withdraw the suit it had filed in Federal District Court for western Washington. The Town has further agreed to forgo any other court action until Congress acts on the FY 76 Public Works Appropriation in the hope that the attached report language will be approved.

31. On June 10, 1975, the Portland District counsel notified the Town that it did not expect passage of the FY 1976 Public Works Appropriations Act until the latter part of August or the first part of September, and requested the hearing be "set over until the Town and the Corps ascertain what action Congress finally takes in connection with the Appropriations Act." The June 10, 1975, letter also stated that, notwithstanding the expected delay in passage of the FY 1976 Appropriations Act, the "Portland District stands ready to finalize a relocation contract immediately which will become binding on the parties if and when the necessary clarifying language becomes a part of the FY 76 Appropriations Act."

32. (a) On June 16, 1975, the Town's planning director transmitted to RHBA a supplement to the November 19, 1974, A/E planning contract that extended by 21 days the period for delivery of the DFDM and EAR, with no change in contract price. The supplemental agreement, which had been approved by the Corps on June 3, 1975, recited that additional time was needed to review and incorporate the extensive comments that had been made on the drafts.

(b) The Town's planning director complained in the letter about RHBA's memorandum, dated May 30, 1975, "General Comments on the Comprehensive Plan." Item No. 3 of RHBA's memorandum indicated that the relocation agreement would resolve the issue of what is "essential" and that the table of essential community services and other municipal facilities should be revised to reflect this agreement. The planning director contended that the determination of what constitutes "essential community services" was not to rest on the "highly political" negotiations between the Town and the Corps. The determination of what is essential was to stand or fall on the validity of the social and economic research of the professional team. The letter emphasized the interrelatedness of the EAR, the DFDM, and the Comprehensive Plan with respect to the supporting information on social and economic problems over a continuum of time, and complained that, in all three of the draft planning documents, a total inadequacy exists in the description of the existing social-physical fabric of the community which is being severely impacted and needs to be replicated as nearly as

possible in the new town. The social-physical patterns in the existing Town, the letter said, have not been documented in the planning documents. The letter concluded that in view of the fact that final drafts of the DFDM, EAR and Comprehensive Plan already were prepared, it was extremely important for RHBA to review the documents from the above perspective and that a final review by the Town planning staff would be performed similarly.

(c) The Town relocation staff on June 16, 1975, was:

| David Hussell | - Administrative Asst. to Mayor |
| Pollard Dickson | - Planning Director |
| Harold (Barney) Meyer | - Senior Planner |
| Mike Bergstrom | - Planning Intern—Evergreen St. College |
| Lisa Gardner | - Planning Intern, Evergreen St. College |
| Gil Kelley | - Planning Intern, Evergreen St. College |
| Michael Mills | - Planning Intern, Evergreen St. College |
| Marilyn Vogel | - Vista Volunteer—Housing |
| Mary Lynne Myer | - Asst. Planner |

33. The final draft of the EAR is dated June 18, 1975. The section on "Local Community Patterns" in the chapter on "Unavoidable Adverse Effects and Mitigation Measures" contains a subsection on "Municipal Income." (Section 5.2.4.7) The subsection notes that Federal subsidy doubtless would be required to help meet the 1976–77 municipal deficit of $100,000. Several methods to reduce the deficit were suggested. One suggestion was substitute House Bill 86 under consideration by the Washington State Legislature, a bill to amend the State Revenue Act. This bill would redefine a "consumer" of goods to allow the state and local sales tax to be imposed upon Government contractors for tangible personal property incorporated into buildings or structures being constructed for the Federal Government. The EAR states:

To be eligible for such revenues the City of North Bonneville should retain its existing city limits. In general, the city would maximize existing and proposed municipal receipts by retaining the existing town city limits, and annexing the site of the new town as well as the sites

of the highway and railroad relocation. (page 5–28)

34. House Report No. 94–319, on H.R. 8122, dated June 20, 1975, incorporated clarifying language for Section 83 substantially as had been recommended in the Memorandum of Agreement, with provisos to preclude windfall profits.

35. On June 23, 1975, the Town transmitted to the Corps final copies of the EAR and DFDM. The transmittal letter stated that the final sections of the EAR were not supplied to the Town until Saturday, June 21, 1975.

36. The District's Selection Board considered the eligibility of DMJM/Hilton and RHBA as the A/E contractor for the design contract. On July 25, 1975, the District Selection Board met with representatives of DMJM/Hilton and RHBA to discuss how DMJM/Hilton planned to put a team together to do the work and to discuss the Corps' concerns about the product from the previous planning contract with RHBA. During the discussions, the District personnel were assured that DMJM/Hilton would exercise management responsibility, and that the architectural work would be handled by a separate subcontractor. RHBA stated it would have no problem working with DMJM/Hilton as the single contractor, rather than in a joint venture. DMJM/Hilton and RHBA assured the District personnel that they would not be unduly influenced by their former association with the Town in the planning contract. There was discussion of the Corps' concern about the previous work under the A/E planning contract and that additional planning would have to be done in the next contract.

37. (a) Audit Report No. 75–0–9 was delivered to the contracting officer on August 1, 1975. It was a review of the financial capability of the Town to execute the proposed relocation contract, then in draft form, and to undertake the significant monetary obligation under Section 83 to furnish binding contractual commitments. The audit report was concerned with land pur-

chases for the new town site. Land in the initial town site was to be priced at the fair market value of unimproved land paid at the time of Government purchase, with no enhancement in value from municipal facilities. Lands for the Optimum Town that came from lands acquired for the powerhouse project would be priced at the unimproved land value as for the initial town, but lands acquired outside the designated powerhouse project area would be conveyed at the original price, plus acquisition costs.

(b) The audit report concluded that the exact amount of the Town's land indebtedness was not known at that time. Preliminary data indicated that a minimum debt amount under the proposed contract, without interest costs, would be about $150,000, while the maximum amount would be about $1,500,000. The audit staff was not in a position to state unequivocally that the Town was financially capable of meeting indebtedness of that magnitude, even though repayment of principal would not be required until 1984. The audit staff had sent an inquiry to the Washington State Auditor's office that requested review of the Town's proposed indebtedness as related to its ability to repay over the extended time period.

(c) As to future revenues, the audit report noted that the Town had enacted a 0.5 percent Business and Occupation (B & O) Tax on all gross sales within the city boundaries, and that all contractors including those doing Government relocation work would be taxed. The long range effect of the B & O tax could not be determined at the time because of uncertainty as to the legality of the tax. Also, it was uncertain as to the extent of the application of the B & O tax to existing town lands to be conveyed to the Federal Government, to the initial town lands, or to optimum town lands. The audit report noted that the new B & O tax as presented by the Town would be a significant revenue source enabling it to repay readily a loan of even the maximum indebtedness amount.

(d) The audit report recommended that, to evaluate future revenues, a determination be made whether the recently enacted B & O tax will apply to the Corps contractors involved with both powerhouse work and relocation work, and if the tax is applicable, the places where the tax would be applied.

38. On August 5, 1975, the Town requested the contracting officer to submit a petition for the Town to annex project area land in accordance with RCW 35A.14.120 so as to set in motion the procedures under which property owners requested annexation. An attached sketch illustrated land in the powerhouse project area which would become part of the optimum town area.

39. (a) Portland District counsel, on August 6, 1975, submitted to the contracting officer his legal review of the draft of the proposed relocation contract. District counsel concluded that a legally enforceable and binding contractual commitment, as required by Section 83, could be made by the Town. He found the Town, acting through its elected council, has the capacity to execute the proposed contract, including the binding non-Federal commitment portion of the proposed contract.

(b) District counsel reasoned that financial capacity of the Town was to be found in the ability of the Town to raise between $150,000 to $450,000 in tax revenues from a new tax source not utilized prior to the last State of Washington audit in September 1974. The opinion notes that the B & O tax was adopted by the Town on May 21, 1975, and that it authorized the collection of such a tax from the gross receipts and inventories of all businesses, including Federal contractors, doing business within the enlarged city limits. He also noted that the mayor and Town planners had advised the Corps on August 5, 1975, that the Town planned to retain its city limits around the new second powerhouse even after the fee title to the old town site had been conveyed to the U.S. Government in exchange for replacement municipal facilities/utilities in the new town site.

(c) The District's current estimate of construction costs for the second powerhouse within the Town limits was about $400 million, and Town planners estimated revenues from the B & O tax would exceed $2 million by 1984.

(d) District counsel had serious doubts as to the constitutionality of the B & O tax as applied to the second powerhouse contractors. Even if the tax ultimately were declared to be unlawful as to Federal contractors, however, he reasoned that until set aside, it was enforceable in U.S. District Courts. Before the B & O tax ordinance could be set aside, the Town undoubtedly would have collected, from the private construction of homes in the new town site and from local businesses, more than sufficient revenues required under Section 83 to repay the Government for lands in the new town site. Therefore, he was of the opinion that the Town's binding non-Federal commitment met the test of Section 83.

40. (a) Design Memorandum No. 8 (DM 8), dated June 1975, was submitted by the Portland District on August 8, 1975, for review by the North Pacific Division and OCE. DM 8 was the DFDM that RHBA had prepared for the Town under the A/E planning contract. The transmittal memorandum noted that the Portland District had not revised the DFDM, and that the Town had not taken action on some of the District's comments. As a result, the transmittal memorandum said, DM 8 contained a number of features desired by the Town that did not necessarily represent the Government's obligations. The extent of the Government's obligations were to be defined in the Relocation Contract, and final work on that contract, and the A/E design contract, was to be controlled by the adoption of clarifying language by Congress to Section 83.

(b) The District noted that the cost estimate in DM 8 did not reflect either the proper items, quantities or individual costs of relocation, but that it was the best available. The total estimated cost of the relocation in DM 8 was $14,164,500, which was an increase of $12,604,500 over the $1,560,-000 estimate that had been made in PB–3, effective July 1, 1974.

(c) The District identified four problem areas that were considered to be the most serious in the plan presented in DM 8: (1) Sound barriers and sound insulating walls were required to be replanned because the railroad would not permit construction for sound abatement on its right-of-way; (2) Building sites in DM 8 were near elevation 40 feet, and since the 100–year flood plain is about elevation 37 feet, most of the sites would not accommodate basements. The Town had been asked to make an official decision on the A/E planning contractor's suggestion that construction of basements be restricted by ordinance; (3) Objections by fishery agencies required replanning of the Town layout on the west side of Hamilton Creek; (4) Special arrangements with the United States Coast Guard were required to permit construction of a temporary bridge in September 1975 across a navigable waterway. The District recommended that the selected site and general concept proposed in DM 8 be approved, and that approval was not requested for the multitude of details presented as many would be changed by subsequent negotiation, agreement, or clarifying congressional language.

(d) The Pacific Division on August 15, 1975, recommended qualified approval of DM 8, notwithstanding its failure to meet Corps requirements for feature design memoranda, to the extent that it provides the general criteria and guidelines for the preparation of plans and specifications. OCE approved DM 8 on August 21, 1975, with the notation that extreme care would be needed in the course of replanning and in the development of plans and specifications. OCE stated much care was needed in order to insure that numerous items included in the design memorandum which are not Corps responsibility do not attain the status of Corps approval and responsibility by virtue of the use of DM 8 as a partial basis for development of plans and specifications.

41. (a) DM 8 contains a schedule for planning, design, and construction of the relocation. Paragraph 17.02 provides that in order to complete the relocation by May 1, 1977, the final design must be started by July 15, 1975; and that the construction contracts must be awarded by February 1, 1976. Under the DM 8 schedule, the planning phase would be completed during the period November 1974 through May 1975; design would be completed during the period July 1975 through November 1975; construction contracts would be advertised in January 1976, and construction would be underway from January 1976 through February 1977; dwelling construction would be from August 1976 through February 1977.

(b) Other activities scheduled in DM 8 were:

| Feb. 1, 1976 | - Completion of construction of haul road and placement of town fill. |
| Mar. 1, 1976 | - Completion of new town earth work; start of construction for railroad and highway earth work. |
| Sept. 15, 1976 | - Completion of construction of railroad and highway earth work in new town. |
| Oct. 1, 1976 | - Start of moving into new town. |
| Mar. 1, 1977 | - Completion of construction for new town. |

42. (a) Supplement No. 1 to Audit Report No. 75–0–9 was submitted on August 15, 1975, to the contracting officer. The revised estimate of the financial amount involved indicated a minimum initial town land cost of $265,000 and the estimated maximum initial town land cost of $490,-000. Land purchased by the Town could be resold at a profit, and the estimate of land sale revenue that could be anticipated by the Town totaled $190,000.

(b) The audit report noted that the B & O tax was the only known source of new revenue. Legality of the B & O tax was questioned as to its application to Federal contractors for work on the second power-house, but its applicability to Federal contractors for relocation work was not questioned. For audit review purposes, the B & O tax was considered only in relation to Federal contractors engaged in relocation work. Supplement No. 1 found that future revenues from the B & O tax would total $175,290 of which $125,430 came from Fed-

eral contractors doing relocation work and $49,860 from commercial sales.

(c) Audit Report, Supplement No. 1, noted that review of future Town revenues and expenditures in DM 8 showed a $1,493,398 deficit over the period 1975 through 1984, and that this deficit could absorb all of the new B & O tax revenue, along with all of the Town's current and future bonding capacity. Supplement No. 1 concluded that the contracting officer should consider the Town to be financially capable for the known indebtedness amount ($75,000) if it can be determined that the new B & O tax revenue ($175,290) is available for the Federal payments.

43. (a) On August 18, 1975, representatives of the Portland District, North Pacific Division, and OCE met in the office of the General Counsel at OCE for a staff discussion relative to approving the Portland District's execution of the proposed Relocation Contract.

(b) The question of authority of the District Engineer to sign the contract was raised. Article 5, section 3.01, of the proposed Relocation Contract provided that section 3.01 constitutes the binding contractual commitment required by Section 83. OCE previously had determined that such a commitment should be in the nature of a Section 221 Agreement that required OCE action. It was agreed that the message that authorized the Portland District to execute the contract, signed by the Acting Deputy Chief of Engineers, would constitute a delegation to the Portland District Engineer to accept the Section 83(d) commitment.

(c) There also was an extended discussion of the B & O tax. It was unanimously agreed that the B & O tax was a matter separate and apart from relocation of the Town, and that legality of the B & O tax could be challenged notwithstanding execution of the Relocation Contract. In addition to revenues from the B & O tax on contractors engaged in relocation work, the Town's financial ability to pay for lands to be conveyed could be augmented because

the Town could profit substantially from the sale of lots that remain after direct sales by the Government. The conferees agreed that the Relocation Contract would be considered without reference to the tax.

(d) The conferees recognized that all outstanding issues were not resolved in the proposed contract and that there would be a multiplicity of problems developing later in all areas, including real estate. The problem areas discussed included: the sound barriers issue and negotiations with the railroad; the necessity to raise the level of site fill so as to allow for basements; and bridge problems with the Coast Guard.

44. (a) On August 19, 1975, DMJM/Hilton officially was notified that it had been selected as the contractor for the A/E design contract. The notice stated that the Scope of Work had not been mutually agreed upon by the Town and the Corps, and that it would be completed during negotiations with DMJM/Hilton.

(b) Contract No. DACW57–76–C–0039, a contract for relocation, replacement, rearrangement and/or alternation of facilities (Relocation Contract) was executed on August 19, 1975. The Relocation Contract was executed by the Portland District Engineer as contracting officer and by the Mayor and members of the Town council. The contract uses 14 recitals to specify the statutory authority for the contract and to set forth previous actions the parties considered relevant. Recital No. 2 states Section 83 authorized the Government "to acquire lands and to relocate a major portion of the City to a new townsite." Recital No. 3 states that the new town site had been agreed upon, and that it consists of the initial town and optimum town areas designated on Exhibit A. Recital No. 9 states that the Town was willing to convey all of its fee title in land, easements and rights-of-way located within the portion of the boundary for the second powerhouse project delineated on Exhibit B in consideration for the construction of replacement facilities and utilities, as listed in Exhibit C. Recital No. 11 states the July 26, 1974, contract for services, the November 19, 1974, A/E planning contract, and the May 23, 1975, Memorandum of Agreement continue in effect to the extent undertakings therein have not been completely performed. Recital No. 14 states that the preliminary master plan and general concept for design were set forth in DM 8, conveyed to the Corps by the Town as the DFDM, required by the July 26, 1974, contract for services.

45. (a) The Relocation Contract contains 14 Articles on 22 pages; it reflects an attempt to define the rights of the parties in the further design and construction involved in relocation of the Town to a new town site. In large part, it reiterates in its various sections, frequently in identical language, provisions that previously had been part of the Memorandum of Agreement or of the Scope of Work for the A/E planning contract. Article 14, Condition Precedent, states that the obligations of the parties contained in the contract are subject to the adoption by the Congress of the clarifying language contained in House Report No. 94–319, pages 50–51, by attachment to appropriate legislation. This condition was a part of the procedure established in the May 23, 1975, Memorandum of Agreement and it would be satisfied by inclusion of the clarifying language in the committee reports, followed by subsequent enactment of the Public Works Appropriations Act for Fiscal Year 1976.

(b) The following provisions reflect the nature and structure of the contractual relationship and are particularly related to plaintiff's claims.

Article 1—Relationship of Parties

Provides that the Portland District Engineer would be the contracting officer responsible for administration of the design contract and that the Town would participate in the design process.

Sec. 1 provides that the scope and statement of work provisions of the A/E design contract, and any modifications, will be mutually derived and will be subject to written approval by the Town.

Sec. 3 provides that the final design stage shall be addressed in two workshops, (1) a forum-type presentation of explanation, and (2) a review of the final preliminary plan for site development and articulation of standards and criteria to be utilized as design determinants for individual features. In addition, there would be a minimum of two briefings with the Town council and planning commission.

Sec. 4.02 provides that the standards and criteria in the Scope of Work for the A/E planning contract are accepted. The standards and criteria as proposed in DM 8 were stated to be of specific interest to the Joint Board of Review and the A/E design contractor would be required to furnish an explanation or justification of proposed deviations orally or in writing as any member of the board may require.

Sec. 5 provides that plans and specifications for municipal facilities/utilities will be subject to approval by the Town before they are advertised for bids, and that change orders will be subject to prior approval by the Town.

Article 3—Obligations of the Government

Sec. 1 obligated the Government to contract with the A/E design firm to prepare plans and specifications for the relocated Town in accordance with a mutually agreed upon Scope of Work.

Sec. 2 obligated the Government to contract for the construction of the municipal facilities to be relocated, as described in the plans and specifications. The items listed in Exhibit C were to be provided at Government expense, less any betterments as determined by the Government.

Sec. 3 provided the Government would furnish the final preliminary plan for initial Town development, plans and specifications for construction of municipal facilities, "as constructed drawings" of completed municipal facilities and utilities, and a "city plat" sufficient in detail to permit acceptance and filing. The plat was required to be completed not later than 60 days after execution of the A/E design contract.

Sec. 4 listed reimbursible relocation expenses, including expenses for a 5-man relocation staff, and legal services directly related to completion of the relocation, but not for lobbying or litigation. Staff expenses beyond June 30, 1977, were to be renegotiated.

Article 5—Conveyance of Real Property

Sec. 1.01 states the Government agrees to convey all lands in the initial town and optimum town area within currently designated powerhouse project boundaries to individuals and to the Town at "prices corresponding to the value of unimproved land paid at the time of purchase by the Government, (without the enhancement in value from municipal facilities being provided as replacement facilities)."

Sec. 1.02 provides that the Government agrees to convey "additional lands outside the initial Town area and outside currently designated Project lands at prices corresponding to the original price paid by the Government for said lands plus Government acquisition costs."

Sec. 1.03 provides that contracts for all land in the optimum town outside currently designated project boundaries on Exhibit A, as well as land in the initial town not required for replacement lots (210 residential and commercial not to exceed 50) or open spaces (125 acres), will bear interest at legal Treasury notes from the time the Government reports to the Town that such land is available for conveyance.

Sec. 3.01 states the parties agree that this section constitutes the binding contractual commitment required by Section 83, Pub.L. No. 93–251, and that upon fulfillment of this contract no interest in real property acquired for the new town site will remain in the name of the United States after January 1, 1984. Nothing in this section prohibits the Government from retaining title to real property needed for Government purposes. Con-

veyancing is to be done on forms annexed as Exhibits F and G, and all conveyances are subject to the approval of the Secretary of the Army.

Sec. 3.02 provides the Government will convey land in the initial town necessary for replacement facilities/utilities without cost. Open spaces within the initial town development required for common use area not to exceed 125 acres also will be conveyed without cost. The Town agreed to purchase all land not conveyed to relocating individuals or businesses at a price set forth in Sec. 1.01 of Article 5 and to pay for such lands by January 1, 1984.

Sec. 3.03 provides that the Town will provide the Government a written request for the acquisition by the Corps of all additional lands required by the Town for the optimum town site. The written request will be provided within 30 days after acceptance by the Town of the final preliminary site plan. Additional lands requested for optimum town development within currently designated powerhouse project lands shall be conveyed at the unimproved land value; additional lands for optimum town development that fall outside currently designated project lands shall be conveyed at a price corresponding to the original price paid by the Government, plus Government acquisition cost.

Article 6—Schedule of Performance

States the parties will exert their best efforts to adhere to the following schedule:

Sec. 1 provides that the A/E design firm will be selected no later than 15 days following execution of the Relocation Contract and will receive a notice to proceed from the Government no later than 15 days following execution of the A/E design contract.

Sec. 2 provides that the A/E design firm will be required to submit final construction plans and specifications within 120 days following the notice to proceed. The Government and the Town will complete a review and re-turn review comments to the A/E firm within 30 days following such submission. Plans will include the final preliminary site plan and the city plat, which will be completed not later than 60 days following notice to proceed.

Sec. 3 provides that the target date for construction and site development wherein the Town can take beneficial occupancy of municipal facilities/utilities is November 1, 1976. The target date for completion of municipal facilities/utilities including landscaping is March 1, 1977.

Article 8—Ownership and Conduct of the Work

Provides the facilities will be property of the Town on execution of the deed referred to in Article 5. It was agreed that the Government could award other contracts for additional or other work in connection with the same project or in the same vicinity. The Town agreed to conduct operations so as to cooperate fully with any such work being performed by the Government or its contractors and to carefully fit the Town's work to that provided under other contracts as directed by the contracting officer, with a caveat that nothing in Article 8 shall limit the authority of the Town to enforce ordinances or regulations applicable to all persons similarly situated.

(c) Exhibit A, when the contract was executed on August 19, 1975, was a map that bore a legend that indicated: Initial Town Boundary—designated by a red line; Optimum Town Boundary—designated by a blue line; Current Project Boundary [Second Powerhouse]—designated by a green line. The Optimum Town Boundary and Current Project Boundary each enclosed a distinct area on the map by a continuous line. The red line for the Initial Town Boundary depicted three separate, noncontiguous areas, all three of which were within the Optimum Town Boundary. Two of the areas for the initial town, and part of the third, were outside the Current Project Area of the Powerhouse. The red line for the Initial Town Boundary did not depict a

single distinct area enclosed by a continuous line.

(d) Exhibit C, was captioned "Government's Obligation to Provide Municipal Facilities for the Relocated City of North Bonneville." It provides that the Government shall construct the relocated town, sized for 210 residential lots and not to exceed 50 business lots, and the initial industrial area with required utility services. The 210 lots include the trailer park lots and all residents of the existing Town who will remain part of the relocated city.

The following items were to be provided at Government expense, subject to determination of betterments:

(1) Underpass for vehicular and pedestrian traffic over relocated highway and railroad;

(2) City streets designed with right-of-way widths of 60 feet;

(3) Open spaces for initial town development for common use areas, not to exceed 125 acres;

(4) Land apportionments for noise abatement measures will be analyzed during the design phase considering the preliminary site plan development as set forth in DM 8. The parties recognize that DM 8 indicates 37.18 acres of the 125 acre total will be used for noise abatement. Actual requirements will be determined during the design phase. In the event the 37.18 acres is not sufficient for appropriate noise abatement measures, additional lands needed for a reasonable solution will be conveyed at current fair market value;

(5) 5-acre park;

(6) Landscaping of municipal property—areas outside initial town but within optimum town boundaries and day use areas which involve spoil material would be graded and provided erosion control and landscaping per Corps established procedures;

(7) Street lights along new streets and sidewalks;

(8) Street signs, trash receptacles; traffic light, kiosk, and a landscaping design for town entrance sign;

(9) Curbs and gutters;

(10) Storm drainage system;

(11) Water system, including well of 1,000 gpm capacity;

(12) Central sewage collection and treatment facility;

(13) Flood control measures, slope stabilization and bank construction along Hamilton Creek;

(14) School or replacement community facilities (community center) as provided in the clarifying language contained in H.Rep. 94–319, pages 50–51;

(15) City hall and separate fire station;

(16) General maintenance building in conjunction with sewage treatment plant;

(17) Training for sewage treatment plant operator;

(18) Reasonable design solution for noise abatement;

(19) Central business district off-street parking, including 210 paved parking spaces in total for off-street or on-street parking; and

(20) All utilities to be designed and relocated underground.

46. (a) Negotiations to draft the Scope of Work for the A/E design contract were in progress during July and August, prior to execution of the Relocation Contract. A first draft Scope of Work was forwarded by the District to the Town on August 1, 1975. The Town provided comments on August 12, 1975. These comments were incorporated by the District in a draft dated August 22, 1975, which was forwarded to the Town on that date.

(b) The August 22, 1975, transmittal letter notified the Town that DMJM/Hilton had been selected as the A/E design contractor, and that the August 22, 1975, draft of the Scope of Work was being provided to DMJM/Hilton for use in the negotiations of the A/E design contract. The District believed the draft Scope of Work reflected the written and verbal understandings documented in the Relocation Contract and related agreements and that any changes would be minor in nature.

47. (a) On August 27, 1975, the Town notified the District that, after further analysis, Exhibit A to the Relocation Contract did not appear to be consistent with agreements that had been made in negotiations for the May 23, 1975, Memorandum of Agreement as to the designation of the initial town boundary. The Town stated that the Exhibit A submitted and agreed on in Washington, and during the contract negotiations that followed, must be reinserted as the indicator of the initial town boundary.

(b) The Town's August 27, 1975, letter also raised a number of issues on which the contracting officer was requested to take immediate action and to inform the Town in writing of the actions taken.

(c) As to the Scope of Work, the letter stated staff review of the draft indicated problems with the text, and that the Town would not waste time in lengthy negotiations on a Scope of Work that appears to renegotiate the terms of the July 1974 contract for services and the standards and criteria set forth in the planning documents submitted to the Government by the Town. The District was notified that until such time as the Town has had the opportunity to completely rework the Scope of Work, discussion would be limited to the relationship of the design team to the Town and its citizens, and the responsibility of the design team to coordinate with the Town in the design process. The relationship desired by the Town provided a procedure for many changes to be made in the design phase. The letter stated:

> The fact that the Site Planners and Landscape Architects, Architects and Engineers will constitute the principal team members, we must first define their relationship to the City under this next contract. We have agreed that the City has a paramount interest in the architectural design of municipal buildings and architectural features of the relocated town. In addition major influences will cause revisions in the $C_2$ concept in many areas. These changes and influences must be thoroughly understood by the citizens

and they must be directly in the process and content of any changes made.

48. On August 29, 1975, the Town attorney reminded the District that the Corps had taken title or possession to several properties within the optimum town boundaries and that no action had been taken on the requests for annexation by the Town of property acquired by the Corps. The letter noted that at a meeting on August 27, 1975, District staff had informed Town representatives that the annexation documents had been forwarded to OCE, with a recommendation they not be approved. The Town attorney referred to the provision in the May 23, 1975, Memorandum of Agreement that provided for annexation of optimum town lands and questioned why any further decision by the Corps was necessary as to whether it would comply with the contract. The Town attorney contended the Memorandum of Agreement provision required the Corps to process the necessary annexation documents within a reasonable time after the Corps acquires the property, and that a reasonable time will have expired on October 1, 1975. The letter gave notice that if the executed annexation documents have not been delivered to the Town on or before October 1, 1975, the Town would commence an action for a writ of mandamus to compel the action, and would seek recovery of damages for breach of contract.

49. On September 8, 1975, the District engineer responded to the Town's August 27, 1975, letter. With respect to Exhibit A to the Relocation Contract, the contracting officer explained that the depiction of initial town lands in Exhibit A was based upon the agreements that had established that the replacement of 210 residential lots plus commercial lots not to exceed 50 would comply with the intent of Section 83 with respect to the Town's binding contractual commitment for the purchase of lands in the new town. The area depicted on Exhibit A as initial town lands, accordingly, was the area used for audit purposes regarding the binding contractual commitment financial capability of the Town, and it was not intended to change any portion

of the May 23, 1975, Memorandum of Agreement. The contracting officer attached a new Exhibit A which was asserted to conform with that portion of the Memorandum of Agreement which establishes the basis for determining the price to be paid by the Town for land purchases in various areas.

50. (a) On September 12, 1975, the District engineer forwarded to the Town a revised Scope of Work dated September 12, 1975. The letter noted that this draft had been prepared as a result of meetings with Town staff on August 27, September 2, 3, 5, 9 and 10, 1975.

(b) The letter advised the Town that because of the time consumed in preparing the draft Scope of Work, as well as the increase in the duration of the design contract made at the request of the Town's negotiating team, the District would not be able to start the town construction contract until May 1976. Sites then would be available for home construction in October 1976, and that this schedule should allow people to move into their new homes in 1977.

51. (a) On September 16, 1976, the Town Mayor sent the District engineer a response to the September 12, 1975, draft Scope of Work. The response stated that the detailed comments were forwarded with the notice that they were being brought before the Town council and until they had been reviewed by that body the comments could not be considered as the final decision of the Town. The Town's comments were contained in a 6–page letter, and an attachment that listed numerous, specific changes in the text of the September 12, 1975, draft that were substantive in nature. The magnitude of the changes sought in the comments is indicated in the following table:

| DRAFT PROVISION | NUMBER OF CHANGES |
|---|---|
| Article 1 | |
|     1.   General | 4 |
|     2.   Design Process and Relationship to the City | 16 |
| Article 2 | 5 |
| Article 3 | No change |
| Article 4 | 4 |
| Articles 5 – 11 | No change |
| Article 12 | |
|     1.   General Requirements | 7 |
|     2.   Preliminary Town Design | 1 |
|     3.   Fill Contract | 1 |
|     6.   Public & Municipal Buildings | 3 |
|     10.  Industrial Area | 1 |
|     12.  Sanitary Facilities | 3 |
|     13.  Water System | 2 |
|     22.  Highway and Railroad Bridges and Structures | Entire text to be deleted and rewritten |
|     23.  Sound Barrier Berms | 2 |
|     24.  Landscaping | 1 |

(b) The District engineer was notified that the page by page notations in the attachment should be addressed, with a written disposition of all comments provided to the Town council, prior to final agreement on the Scope of Work. The notice stated the Town mayor's letter would be presented to the Town council on Tuesday, September 16, 1975, for consideration. The letter concluded that the mayor was hopeful that the Corps' consideration of the comments could result in final agreement this week.

(c) On September 16, 1975, the Corps advised the Town that approval of annexation of optimum town lands would require additional review by the Department of the Army and the Corps. On that date the Corps also advised the Town that the Office of the Secretary of the Army must approve the annexation of Government lands under jurisdiction of the Department of the Army.

(d) At the September 16, 1975, meeting, the Town council approved the revisions appended to the mayor's September 16, 1975, letter, and approved further revisions in the draft Scope of Work.

52. (a) On September 19, 1975, the Town transmitted to the District engineer the September 12, 1975, Scope of Work and an attachment, captioned: Coordinated Revisions, dated September 18, 1975. The letter stated that the draft, as revised, was approved tentatively by the Town. The Town stated it did not concur with the $6 million estimated amount for construction in Article 11 because it appeared to conflict with the $14 million estimate for the relocation in the Relocation Contract. The Town's approval also was conditioned on the agreement by the Corps and the Town that nothing in the Scope of Work or in the A/E design contract shall be deemed to modify the Relocation Contract, or to abrogate any right of either party under (1) the July 26, 1974, contract for services, (2) the October 8, 1974 Scope of Work for the A/E planning contract, or (3) the November 19, 1974, A/E planning contract with RHBA.

(b) The attached Coordinated Revisions included all changes that had been listed in the mayor's September 16, 1975, letter, and made additional changes in Articles 3, 11, and 12.

53. (a) On September 23, 1975, the District engineer provided a breakdown of the costs in the $6 million construction estimate contained in the draft Scope of Work for comparison with costs in the $14 million estimate in the Relocation Contract. The District asserted this data showed that the difference between the estimates was valid, and that inclusion of the construction esti-

mate in the Scope of Work did not indicate that the relocation would cost less than the Relocation Contract estimate. The District engineer's letter stated that the estimate in Article 11 of the draft Scope of Work did not constitute a price limitation and was subject to revision during the course of the contract.

(b) The District engineer objected to the Town's condition that its approval of the Scope of Work was dependent upon reference to four specified documents. He contended that the Relocation Contract addressed the documents listed, and an extraneous general reference by letter would create an ambiguity. The District engineer indicated he was willing to state that nothing contained in the Scope of Work of the design A/E contract repudiates or supercedes any part of the Relocation Contract.

54. On September 26, 1975, the Town mayor notified the District engineer that the explanation provided for the $6 million construction estimate in Article 11 of the draft Scope of Work was considered to be acceptable when clarified as not constituting a price limitation. The letter gave notice that the Town council had provided formal instruction by recorded motion that final approval of the Scope of Work was to be executed with the District engineer's concurrent signature, and attached a draft letter of approval, dated September 26, 1975, to be executed by the parties. The attached approval letter included the condition and reference to the four contracts to which the District engineer had objected. The Town mayor stated he was authorized to sign the attached letter upon receipt of an original and one copy signed by the District engineer as contracting officer, and that until such time as the Town has received the contracting officer's concurrent signature there can be no final approval of the Scope of Work.

55. On September 29, 1975, the District engineer objected to the procedure established in the mayor's September 26, 1975, letter. He referred to recital No. 11 in the Relocation Contract which specified that the documents referred to in the Town's

September 16, 1975, letter will continue "in effect to the extent that any undertakings therein shall not have been completely performed." The District engineer argued that the Town already had contractual guarantees that all the work contemplated by those four documents will be performed fully without any side agreement to that effect, and that the respective negotiating teams had explored this area fully during negotiations leading to the Relocation Contract. He objected to now reopening those discussions under the guise of agreement relating to the Scope of Work for the A/E design contract. The letter stated the parties must get on with the relocation work and that any further delay in agreeing to the Scope of Work that now included the coordinated revisions dated September 19, 1975, would constitute an unreasonable withholding of approval not based on any material fact related to the quality, appearance, value or aesthetics of the Town.

56. (a) On October 2, 1975, the mayor advised the District engineer that the Town council had reviewed the objections in his September 29, 1975, letter and that the specific instructions of the Town council remain firm—there will be no approval of the Scope of Work without the contracting officer's concurrent signature prior to placement of the Town mayor's signature. The letter continued that the references to the four documents in recital No. 11 of the Relocation Contract were insufficient because the recitals make no mention of the Town's right to implement any of the products obtained in the final design and construction. The letter noted that the operative agreements in the Relocation Contract begin on page 4, and observed that the District engineer's refusal to provide the requested concurrent signature was interpreted as rejecting the intent of the recitals in the Relocation Contract and a failure to recognize the totality of all of the agreements between the Town and the Corps.

(b) The Town's letter contended that it was a breach of the Relocation Contract for the District to have provided a draft of an unapproved Scope of Work to the prospective A/E design contractor. The District engineer was given notice that any and all negotiations with the A/E design contractor without first having the formal written approval of the Scope of Work by the Town would be viewed as a breach of the Relocation Contract. Further, the Town demanded it be represented in negotiations with the A/E design contractor for the design and development of plans and specifications.

(c) The Town also objected to its exclusion from negotiations with the railroad and stated the District engineer's actions demonstrate another effort to avoid the Town's direct involvement in critical matters. The letter assured the District engineer that nothing short of full and complete noise mitigation to acceptable decible levels would be acceptable to the Town. The Town stated it was prepared if necessary to file suit against the Corps to insure development of plans and specifications that fully address a complete and detailed solution to the noise problem.

(d) The October 2, 1975, letter raised two other issues: (1) annexation of lands for the relocated town; and (2) the matter of Exhibit A (initial town boundary) to the Relocation Contract. The letter concluded that contract negotiations between the Corps and the A/E design contractor must not continue until the Scope of Work is formally approved by the Town in writing.

57. On October 6, 1975, representatives of the Town and the Corps met and initialled a revised Exhibit A to the Relocation Contract that depicts the Initial Town Boundary by a continuous line that encloses a single discrete area. Scope of Work Article 12, section 2, Preliminary Town Design, could not become operative in the absence of an agreement on the initial town area. That section requires the A/E design contractor to prepare a preliminary design of the town and related work, and to obtain approval before preparing the final initial town design.

58. On October 7, 1975, the District engineer met with the mayor in the mayor's office and both parties signed the Septem-

ber 26, 1975, approval letter. The letter includes the following:

This approval is conditioned on the agreement by the Corps of Engineers and the City that nothing in the enclosed Scope of Work or the Design A/E Contract shall be deemed to modify the Relocation Contract executed by the Corps and the City on August 19, 1975, or to abrogate any right to which the parties, or either of them, might otherwise be entitled under any of the following:

a) Memorandum of Agreement between the City and the United States, dated July 26, 1974, contract no. DACW 57-75-C-0032;

b) Mutually agreed Scope of Work between the City and the United States, dated October 8, 1974;

c) Contract for professional services between the City and Royston, Hanamoto, Beck & Abey, dated November 19, 1974;

d) Memorandum of Agreement between the City and the United States dated May 23, 1975.

59. (a) Contract No. DACW 57-75-C-0077, the A/E design contract, was awarded by the Corps on October 10, 1975, to DMJM/Hilton. The contract consisted of three sections: (1) Standard General Provisions applicable to architect-engineering contracts, (2) Appendix A, Scope of Work for Design Contract, and (3) Appendix B, the Corps of Engineers standard provisions for preparation of drawings and specifications. In addition to the 12 Articles approved on October 7, 1975, the Scope of Work had two new articles: Article 13, Tax Reimbursement, and Article 14, Cable TV System. Article 13 provided that the contractor and any subcontractor shall be reimbursed by the Government for all taxes imposed by either the State of Washington or the Town of North Bonneville.

(b) The Scope of Work contained elaborate procedures for involvement of the Town and its planning staff in the design process. Essentially, the Scope of Work was an agreement on procedures and policies to be used as a basis for further contractual arrangements between the parties on the particular municipal features, facilities and utilities to be designed.

(c) Provisions of the Scope of Work for the A/E design contract particularly relevant to plaintiff's claims include the following:

Article 1—Obligations of the Contractor

Section 1 required DMJM/Hilton to design and prepare contract drawings and specifications for construction of the new Town of North Bonneville in accordance with the general concepts for the development of the design as set forth in the following: (1) DM 8, (2) Exhibit A, (3) the May 23, 1975, Memorandum of Agreement, and (4) the August 19, 1975, Relocation Contract.

Section 2 required DMJM/Hilton to conduct two workshops in the Town, a minimum of two design briefings with the council and planning commission of the Town, and five checkpoint conferences.

Section 2(a) includes the following guidance:

The Government recognizes the paramount interest of the City in the design as the ultimate owner of the municipal facilities to be built. The workshops and design briefings shall be oriented to effectively involve the City and its residents in the final design process as it applies to the refinement of the site plan and development of the final preliminary site plan, interface with the day-use area, spoils placement and contours, design development of municipal buildings, official city plat, park and open space design and landscaping, and physical layout of the central business district. In addition, checkpoint materials will be submitted and critiqued at checkpoint conferences as provided herein.

Section 2(b) required DMJM/Hilton at workshop (1) to supply a printed brochure for every resident and participant of the workshop. The brochure (150 in number) was required to contain a map of the selected site as set forth in DM 8

with designated areas that portrayed the major impacts which are causing the C2 Site Plan to be modified, including a brief verbal and technical description of the cause of change, a summary of the Critical Path Method, and an explanation of the design briefings. The brochure also was to give an explanation of what DMJM/Hilton needed as citizen imput in completing the architectural design of municipal buildings, the physical layout of the central business district, the conceptual design of the initial industrial central business district, the conceptual design of the initial industrial area, the concept for the determination of betterments, and it was to contain a copy of the Government furnished publication: Concept for Betterment Determination.

Section 2(c) required DMJM/Hilton to conduct a second workshop of 2 days duration of 6 hours each to review a final preliminary plan for site development and an articulation of standards and criteria to be used as design determinants for individual features of the town. As a tool for discussion during workshop 2, several alternative concepts were to be presented for all municipal buildings. DMJM/Hilton also was to discuss the preliminary town plat and concepts behind layouts for the industrial area, central business district and town center, mixed-use area, and multi-family and single family residential areas.

Article 2—Obligations of the Government

Primarily this Article was concerned with a list (A to W) of information to be made available to the contractor. It also provided in Section 3, that, within 60 days after contract award, the contracting officer will indicate whether or not the final design would include design of the community center building.

Article 3—Period of Service and Schedule

Section 1 included a provision that all work shall be completed within 185 days. The A/E design contract changed the period for completion of plans and specifications that had been agreed upon in the August 19, 1975, Relocation Contract. The Relocation Contract provided 120 days from the notice to proceed in the A/E design contract; in the A/E design contract, the period for completion of plans and specifications was extended to 185 days.

Section 2 contained the following schedule of events:

SCHEDULE OF EVENTS

| Day | DMJM/Hilton Date* | Event |
|---|---|---|
| 1 | 13 Oct 75 | Contract Award. |
| 8 | 20 Oct 75 | Submit material Checkpoint 1. |
| 10 | 22 Oct 75 | Checkpoint 1. |
| Prior to 15 | 28 Oct 75 | Workshop 1. |
| 25 | 6 Nov 75 | Submit material Checkpoint 2. |
| 29 approx. | 10 Nov 75 | Design Briefing 1. |
| Prior to 30 | 11 Nov 75 | Submit location of town bridge. |
| 30 | 11 Nov 75 | Checkpoint 2. |
| 50 | 1 Dec 75 | Workshop 2. |
| 55 | 6 Dec 75 | Submit material Checkpoint 3. |
| 60 | | a. Government to furnish results of foundation exploration. |
| | | b. Government to inform Contractor on school or community center. |
| | | c. Government to furnish sequence of excavation and materials to be excavated. |

| Day | DMJM/Hilton Date* | Event |
|---|---|---|
| 65 | 16 Dec 75 | Checkpoint 3. |
| 75 | 26 Dec 75 | Submit preliminary Town Plat and Workshop 2/ Checkpoint 3 Statement |
| 80 | 31 Dec 75 | Submit material Checkpoint 4. |
| 84 approx. | 5 Jan 76 | Design Briefing 2. |
| 85 | 5 Jan 76 | Checkpoint 4. |
| 105 | 25 Jan 76 | Submit final Town Plat. |
| 135 | 24 Feb 76 | Submit Material Checkpoint 5. |
| 165 | 25 Mar 76 | Checkpoint 5. |
| 185 | 14 Apr 76 | Complete revisions, submit material; completion of contract. |

*DMJM/Hilton design schedule—notice to proceed given on Monday, Oct. 13, 1975.

Section 3 required DMJM/Hilton to submit 50 copies of the Workshop 2/Checkpoint 3 statement within 75 days after contract award.

Section 4 required DMJM/Hilton to submit within 75 days after contract award the preliminary town plat, complete in sufficient detail to sell lots, ready for the Town to file. The final town plat was to be submitted 105 days after contract award. Article 5—Standards, Criteria and Betterments

Section 1 required DMJM/Hilton to use DM 8 as the prevailing guide for capacities and standards and criteria to be used as design determinants in the development of the final preliminary site plan, municipal buildings, and construction plans and specifications for replacement municipal facilities/utilities. Section 1 specified, however, that DM 8 does not necessarily establish the Government's obligations to the Town.

Section 2 provided that the standards and criteria set forth in the Scope of Work for the November 19, 1974, A/E planning contract are accepted by the Town and the Government.

Section 3 provided that, except for necessary municipal facilities, Section 83 requires municipal facilities to be substitute facilities. In the absence of standards required by Federal and state laws, the Government will furnish replacement municipal facilities meeting standards and criteria recognized by professional technical groups, custom or good practice and representing wise use of resources in space allocations and design, provided that the size and type of these facilities shall be fully justified by the reasonable requirements for services to development of the initial town.

Article 12—Design of the New Town of North Bonneville and Related Work

Section 1(a) excepted nine items from the requirement to justify to the Joint Board of Review deviations from the standards and criteria set forth in DM 8. These included:

(1) Berm barriers for sound abatement, plantings, or any other structures shall not be constructed on railroad right-of-way for purposes of sound abatement unless otherwise directed.

(2) The grading plan for the initial and optimum town shall be such as to provide a minimum elevation of 40.0 feet at all building sites.

(3) Necessary revisions shall be made to the town plan to avoid disturbing the warm water springs southwest of the existing railroad bridge across Hamilton Creek.

(4) No berm barriers shall be located on BPA property unless otherwise directed.

(5) No construction shall be provided for the canoe pond in Hamilton Creek, except placement of fill around the canoe pond area.

(6) No construction shall be provided for the marina, except placement of fill around the reserved area.

(7) No storm sewer shall discharge into Hamilton Creek upstream of its confluence with Hamilton Slough.

(8) No work shall be performed in Hamilton Creek near the existing gas lines.

(9) The sanitary sewer connection to the powerhouse shall be deleted.

Section 1(c) provided there are three areas that will be of concern to the contractor, (1) the initial town area; (2) the optimum town area, which wholly contains the initial town area; and (3) the area outside the optimum town boundary that lies within the Bonneville project boundary and which will be used as a disposal site for most of the approximately 23,000,000 cubic yards of excavation. DMJM/Hilton shall confine its work to the initial town area, and to such work outside the initial town boundary that is necessary to complete the design of the initial town.

Article 12 provided detailed instructions, in addition to the general requirements, to control the design of the following:

2. Preliminary Town Design
3. Fill Contract
4. City Park
5. Streets
6. Public and Municipal Buildings
7. Community Center and School
8. Open Space
9. Layout of Central Business District
10. Industrial Area
11. Utilities
12. Sanitary Facilities
13. Water System
14. Heating and Ventilation
15. Storm Drainage
16. Electrical Power System
17. Telephone System
18. TV Cable System
19. Highway Channelization Lighting
20. Gas
21. City Bridge
22. Highway and Railroad Bridges and Structures
23. Sound Barrier Berms
24. Landscaping and Town Entrances

60. (a) The Town asked for changes in the criteria specified in the A/E design contract Scope of Work, and for changes in the work of other Corps contractors.

(b) Scope of Work Article 12, section 3 recites that the Government planned to award a separate contract in September 1975 to provide a compacted fill in most of the low areas in the portion of the initial town south of the railroad track, that the fill material of about 1 million cubic yards would be obtained from the south side of Hamilton Island, and that top soil from the filled area would be stockpiled for future use. On October 14, 1975, the Town notified the contracting officer that it had reviewed plans and specifications for the initial town fill contract which had been supplied to the Town on August 29, 1975, and that thereafter the Town had requested information from the United States Soil Conservation Service on a soil profile for tree growth and drainage. On October 2, 1975, the Town had received an SCS recommendation for an ideal fill profile.

(c) In its October 14, 1975, letter the Town requested that the standards and criteria in the separate contract for the initial town fill be revised to include these new standards. The Town also recommended that the fill contract be revised to require the stripping of all areas of the Columbia loan to a depth sufficient to cover all initial town fill areas with a 2 foot top layer.

(d) On November 11, 1975, the District responded to the Town's October 14, 1975, letter and argued against the Town's requested change in the separate fill contract. The letter stated that, while the soil profile suggested by the Town is an ideal profile for planting, it represents an unwise use of the top soil resource, which is in limited supply in the area. The letter stated that the fill material coming out of the

Garrison Rapids borrow area made ideal fill material for foundations for streets, sidewalks and structures, and that, with appropriate top soil, it also was adequate for growth of trees and other vegetation. The Corps proposed to provide 2 feet of top soil obtained from stripping on Hamilton Island or the Pierce property west of Hamilton Creek, and that prior to placing this material, the compacted surface of the Garrison Rapids fill material would be scarified in order to more easily blend with the underlying fill material.

61. (a) On October 22, 1975, the Town filed a law suit in the Western District Court of Washington against the Corps (case No. C75–211T) to enforce the provisions of the Memorandum of Agreement relative to annexation of Government lands needed for relocation.

(b) On November 21, 1975, OCE instructed the Portland District with respect to the Town's request to annex Corps property needed for relocation. OCE was concerned with Washington State law requirements that the area to be annexed must be contiguous to the existing town, and with the Town's intention to retain within the new town boundaries that portion of the old town site where the second powerhouse project was to be constructed. OCE authorized the District engineer to present a petition for annexation to the Town based upon a land assembly that encompassed the optimum town boundaries only after the Town had furnished: (a) evidence of contiguity as required by state law; (b) an opinion from the Washington state attorney general that the annexation will be in conformance with Washington state law and will not violate the disincorporation/incorporation requirements of Washington law; and (c) proof a referendum had been held by the Town, and ratified by the Town council, that approved the reduction of the Town's boundaries upon an agreed date to exclude that part of the old town site where the powerhouse is to be constructed.

(c) This instruction was transmitted to the Town by the District engineer on November 25, 1975. On that date, the Town was advised that the Department of Army had not approved the petition for annexation.

62. Senate Report No. 94–505, dated December 4, 1975, incorporated the clarifying language for Section 83 substantially as had been recommended in the Memorandum of Agreement.

63. On December 17, 1975, by duly executed supplemental agreement, Exhibit A to the Relocation Contract was deleted and the revised Exhibit A that had been initialed on October 6, 1975, was substituted.

64. On December 23, 1975, the Town council enacted ordinance No. 304 which amended the B & O tax ordinance (No. 285) by taxing all activities uniformly at a rate of ½ of 1 percent (.005).

65. The Public Works Appropriations Act for FY 1976 was passed by Congress on December 26, 1975. (Pub.L. No. 94–180, 89 Stat 1035 (1975)).

66. (a) On December 31, 1975, the District engineer reiterated OCE's requirements for Corps consent to annex Government lands needed for relocation. The District engineer emphasized that there was an urgent need for the Town to complete annexation, and that there could be no relocated town in the selected area without annexation of certain Government lands. He reminded the Town that the Corps will not ask for construction bids on the Town until annexation is finalized, and that the Corps' present schedules called for an IFB for a construction contract for the new town site to be issued on May 1, 1976. He noted that at a meeting on December 31, 1975, the Town council expressed unwillingness to withdraw its boundaries from around Powerhouse II at the time the Town accepted beneficial occupancy of the newly relocated city, and that a deadlock had resulted.

(b) The District engineer in the December 31, 1975, letter, gave notice that, if the Town had not replied by January 15, 1976, that it would comply with the Corps' necessary steps leading to annexation, the District engineer would request the full sup-

port of the U.S. Attorney's office to resolve judicially not only the annexation problem, but also the disputed B & O taxes being levied upon powerhouse construction, and whether Section 83 provided sufficient legal justification for all of the existing contract commitments between the Town and the District. These existing contract commitments were stated to include: (1) acquisition of land by the Federal Government for optimum town expansion, and (2) the extension of Federal credit for the purchase of land outside the initial relocated town for resale for private development.

67. (a) DMJM/Hilton delivered a document captioned New Town Plan, dated November 30, 1975, for use as the basis for discussion and revision in workshop No. 2 on December 1 and 2, 1975, and in workshop No. 3 on January 5–7, 1976. Workshop No. 3 was an additional workshop for the design of municipal buildings. A preliminary town plat was received by the Town on January 2, 1976.

(b) The January 1976 Workshop Summary Statement prepared by DMJM/Hilton summarized the work accomplished in workshop No. 2, on December 1 and 2, 1975, in checkpoint No. 3 on December 16, 1975, and in workshop No. 3 on January 5, 6 and 7, 1976. The Final New Town Plan dated November 30, 1975, discussed at these workshops had evolved from the basic C2 initial town plan as the selected site in DM 8.

(c) In the course of the workshops many aspects of the Final New Town Plan, dated November 30, 1975, were modified, including: average residential lot size, the circulation system for vehicular traffic, access to the existing golf course, the pedestrian walkway/bikeway system and locations for specific sites relative to preference for church sites and clinic sites. Other areas in which changes in design concepts evolved included: layout of central business district, treatment of open space, modification of floor plans and building forms in municipal buildings and post office, disposal berms, alternatives in town bridge styles, pedestrian overpasses, municipal parking, town entrance, and landscape and park concepts.

(d) On January 13, 1976, the Town council voted to accept the concept of the town bridge, town hall and layout of the central business district so that DMJM/Hilton could proceed with the final design.

68. (a) On January 23, 1976, the District engineer by memorandum notified the Portland District staff that litigation between the Corps and the Town would not be permitted to impact on the powerhouse construction schedule. The memorandum stated decisions would have to be made to allow for concurrent litigation and construction progress in two areas that had come to his attention: (1) plans and specifications for the grading contract for the relocation, and (2) real estate problems associated with the purchasing of land for the optimum town and initial town outside the powerhouse project boundaries. To avoid delays to the powerhouse schedule, the memorandum said many normal engineering and real estate procedures may have to be violated to allow for concurrent litigation and construction. An example was a settlement with Mr. Pierce to permit building the initial town to proceed, even though this may require the assumption that there will be no purchasing for the optimum town. He instructed the District staff to assume, at this stage, for planning purposes, that the initial town will be built and that optimum town land purchase is doubtful.

(b) On January 23, 1976, the District engineer, in a letter to the Town, reiterated his understanding of the Town's position that it was not planning to comply with the Government's conditions for annexation of Government lands, and that the Town intended to leave its boundaries around the existing town. The letter stated that the documents that the Town had submitted to justify annexation did not meet the requirements of Washington State law and that additional documents, or an opinion from the Washington State attorney general, to satisfy the Corps that the proposed annexa-

tion would comply with Washington State law must be provided.

(c) The January 23, 1976, letter further stated that the Corps' evaluation of the Town's financial capability for the binding contractual commitment was based only on the initial town without betterments, and that the Town's B & O tax, as applied to construction of Powerhouse II, had never been considered legal. He concluded with a statement that the Government was proceeding with the necessary steps leading to a judicial decision.

69. (a) On January 28, 1976, representatives of OCE, the Department of Justice, the North Pacific Division, and the Portland District met in the Office of Counsel, OCE. Their purpose was to prepare for a meeting on January 29, 1976, with the Town's attorney, who had requested the meeting, and to make certain all parties were in agreement as to the Corps' position concerning the Town. The minutes of the meeting reflect a wide range of positions among the Corps participants.

(b) According to the minutes, the Corps' representatives agreed that the B & O tax of North Bonneville was definitely not in the best interest of the Government. Although DM 8 did discuss and recommend the B & O tax, the Corps did not officially adopt DM 8 as valid, but only as a planning guide.

(c) The Portland District engineer pointed out that during the negotiations at OCE with the Town, which ended with the signed agreement of May 23, 1975, there was no knowledge given to the Corps at all by the Town that a few days earlier it had adopted the B & O tax. Subsequently, he said the August 19, 1975, Relocation Contract had only looked at the taxing principle, but had not made any specific agreement.

(d) Portland District counsel recalled that, when he heard of the B & O tax, he had told the Town attorney and others that he firmly felt it was a big rip off against the Government, illegal, and not in accord with Section 83 and that the B & O tax would have to be an isolated issue not agreed to by the Corps during efforts to resolve the other problems which eventually led to the August 19, 1975, signing of the Relocation Contract.

(e) The minutes show that Washington State laws on annexation were discussed. The District engineer pointed out that if the petition route were taken, it would require 80 percent approval of the landowners of the area involved, and if the election or referendum route were followed, it would then take a 60 percent affirmative vote from the number casting votes. He speculated that the Town may bring up matters of betterments and the "need" for the optimum town. The District engineer said the Pierce Ranch is desired in toto, as it would be far more expensive to acquire it piecemeal, and that Mr. Pierce had indicated he may give part of this property to the state for park purposes. It was noted that if the City definitely wants this property, they must have the funds available to reimburse the Government.

(f) The OCE representatives inquired if the Town presently, and without the B & O tax, could finance their costs if plans were limited to the initial town. The District engineer said yes—especially if the Town would be willing to give up some excess open spaces or unneeded home properties as a tradeoff or a credit with the Government. He pointed out that the Town through November 1, 1977, could pickup about $225,000 through B & O taxes. If they had to buy 100 Town lots at an average cost of $100 per lot, it would then mean $100,000, plus perhaps another $100,000 in betterments, and the Town would still be viable. Portland District counsel pointed out that the Town's economic analyses were overly optimistic and really no good. In his opinion, the capital improvements planned for the optimum town, in normal practice, usually were done by private developers.

(g) The District engineer said annexation and the B & O tax were the main issues of interest to the Town. He said the initial town properties give no cause for concern,

only the optimum town properties. The conferees agreed they must make clear to the Town that the Government must insist on clear proof of the cash ability to pay for the betterments for optimum town needs, but that there was room for tradeoffs. District counsel wanted documentary proof such as an independent CPA certifying that there was compliance with Washington State laws and that the Town should prove its legal capacity to contract and certify properly on financial ability.

70. (a) On January 29, 1976, the Town's attorney, James Mason, met in Washington, D.C. with representatives from OCE, the North Pacific Division, the Portland District, and the Department of Justice. Summary Minutes of this meeting were made by the Corps. The Town had requested the meeting to explain its position on the issues that threatened to stop relocation and the powerhouse project. The Town attorney identified three main problems: (1) the annexation of the Town; (2) disincorporation of the second powerhouse site by the Town; and (3) the B & O tax. The Town's position on each of these topics was given by the Town attorney.

(b) The Corps' minutes of this meeting show that the Town attorney said the Town's tax basis has been substantially eroded since the Corps initiated the project: the Town's revenues were decreasing; and the Town's expenses had increased; and the Town's budget was up to $78,000 for the next current year. The Town attorney stated that the B & O tax, which had been adopted on May 19, 1975, demonstrated the Town's financial capability to satisfy the requirements of Section 83 and the contracts. The Corps' estimate of the tax on the powerhouse site was $1.1 million and could go to as much as $2.5 million on the total project. If the Town gets the top figure, it could then meet all claims from the Corps. The Town attorney said it was his opinion that if the Town de-annexed the powerhouse site area now, it would be an irresponsible act because by doing so, the Town would be cutting off their prime source of revenues.

(c) According to the Corps' record, Mr. Mason, the Town attorney, said it would appear the Corps now is suggesting it will sue if the Town does not agree 100 percent with its views. This would be a tragic thing to do and it was also contrary to current efforts trying to end various law suits. He argued that the Town was enforcing its rights when trying to enjoin the powerhouse project, and that it believed it could still do so. Mr. Mason felt a TRO was a good possibility. He noted there was no environmental statement for the contract for Fort Rains, and there was no EIS on the substantial dredging that the Corps had underway. He noted that if the Memorandum of Agreement were found to be invalid it would relieve the Town of further obligations not to litigate. He asserted it was not in the best interest of the Corps to litigate.

(d) Portland District counsel stated that the basic difference between the parties concerned the Federal Government's obligation to the Town under Section 83. He said the planning under Contract DACW 57–76–C–0039 was proper under the statutes, insofar as it applies to planning needs, and that DM 8 also was proper. The District counsel said he had pointed out consistently that he did not agree with all items and concepts of DM 8, and that he did not agree to obligations of the Government. He noted that planning, in and of itself, did not create Government obligations. He also stated that the town plan had not been fully accepted as a package by the Government. District counsel agreed the basic contracts between the parties did say generally what Mr. Mason was saying—the Corps would not object to his annexation views. District counsel referred to the May 23, 1975, Memorandum of Agreement and its incorporation of the May 20, 1975, memorandum without objections by the Corps, and the references to the same in the August 19, 1975, Relocation Contract. He acknowledged that the Town advisor had recommended to the Town to hold on to the old town lines. Nothing was expressly stated at the negotiations, however, and the Corps felt it is not

bound by any of the agreements to permit usage of the B & O tax in the old town.

(e) On the matter of boundaries, the District counsel said the first time the Government was aware of the Town's intention to retain the old boundaries was just before execution of the August 19, 1975, Relocation Contract. On August 5, 1975, the Corps was told for the first time of the Town's intention. The Relocation Contract is silent on B & O taxes and boundary lines, understanding and intent, and the Corps later had told the Town that the Government felt the tax was unfair, and illegal. The District counsel believed the Town in retaining its old boundaries, was going contrary to law and Section 83. He said the Corps, in order to consider the human involvement, avoided these questions at that time and signed off on the contract. District counsel pointed out that the Corps consistently had stressed the need for annexation, but "needs" are not the basis to change law, and charity would have to come from congressional authorization.

(f) Mr. Mason said in his opinion the B & O tax is legal and needed, and the Corps did know about the B & O tax, because it was passed well in advance of the August 19, 1975, Relocation Contract. Mr. Mason noted this is the first time the Corps has asserted that the Town's plans on optimum lands are not yet approved. He suggested that the Corps consider a willingness to postpone the disincorporation of the powerhouse site area, and the B & O tax and get on with the new town. He said the Town is free and flexible, and that they will be willing to put dollars in escrow or anything else that is reasonable to avoid a face off now. He said he wanted the Corps to permit annexation now, and argue out the remaining problems later.

(g) The District engineer said there was a short-range versus a long-range concept to resolve—current annexation versus a later legal challenge on the whole thing. Mr. Mason thought the Corps could proceed ordinarily and these problems could be ironed out later. Mr. Mason pointed out that the Town could annex in various ways and gave assurance Corps' areas could be annexed. He felt that if there is a law suit, it should be *United States v. State of Washington* rather than *United States v. Town of North Bonneville* on the B & O tax matter.

71. (a) On January 29, 1976, the Corps was advised by DMJM/Hilton that recent decisions affecting the central business district lots made at workshop 3 on January 7, 1976, precluded DMJM/Hilton's submittal of the final plat on the contract date of January 26, 1976. Prints of the proposed draft final plat were transmitted to the Town for review on January 30, 1976.

(b) On February 13, 1976, the Town requested the preparation of a bid alternate to the plans and specifications to reflect a larger pipe size for the storm drain system.

(c) On February 24, 1976, DMJM/Hilton advised the Corps that, "delay in obtaining many planning decisions and the need to move ahead on design drawings without final decision resulted in a slowdown in production and required constant revision of the design as work progressed."

72. (a) On February 24, 1976, the District engineer notified the Town that the proposed annexation described in the Town's February 20, 1976, notice of public hearing included land owned by the United States of America and that the Department of the Army formally objects to the Town's proposed annexation of Government lands. The contracting officer contended the Town's annexation is a nullity as far as Government lands is concerned and no resulting annexation will be recognized.

(b) On February 24, 1976, the Town council enacted ordinance No. 306 relating to annexation of the relocation area.

(c) On February 24, 1976, the Town council approved a portion of the Pierce Ranch land for purchase for Blocks 1, 2 and 3, and approved certain open space area in the initial town.

73. On March 5, 1976, the new District engineer/contracting officer (Col. H.L. Arnold) by memorandum confirmed to the

District staff that the guidance given on January 21, 1976, by the preceding District engineer/contracting officer (Col. C.D. Gilkey) continued in effect. The memorandum stated there is no reason to think the initial town will not be built, and the plan has been, and will continue to be, to have the entire town relocated by November 1977 and that any acceleration of that date is highly impractical and unlikely. The memorandum noted there could be a delay because of the need for coordination with the Town of North Bonneville.

74. (a) On March 8, 1976, OCE responded to an inquiry from Senator Jackson concerning a complaint the Town had made about the Corps' resistance to the Town's requests for annexation of Government lands. OCE explained the critical issue outstanding as follows: (1) whether it is the intent of Section 83 of Pub.L. No. 93–251 to permit the Town to retain jurisdiction over that portion of the old town area, after the Town occupies the relocated town; and the related issue (2) the B & O tax on all construction and maintenance contract work performed within the boundaries of the Town applied to Federal contractors constructing the Second Powerhouse facility, as well as the new town, and would result in tax revenues far exceeding the total annual operating budget of the Town as that budget existed prior to initiation of the Town's relocation. Senator Jackson was advised that, because the Corps could not obtain agreement with the Town, the Government had no alternative but to obtain a judicial resolution of the issues. He was further advised that the Corps took the position it had no authority to provide replacement commercial facilities for the North Bonneville business community in the new town.

(b) OCE's letter concluded with a summary that included the following: (1) The current estimated cost of relocating the Town is over $18 million. (2) The present estimate of relocatees expected to move into the new town is 225 persons, or 85 families. To date, the estimated cost per person for the planned relocation is $84,-000. (3) The Government has contracted to build an initial town for 600 people, to include 210 residential lots, and up to 50 commercial lots. Only 225 relocatees or 85 families are expected to move into the relocated initial town site.

75. (a) On March 16, 1976, the Town's mayor provided to the District Engineer a list of items that required funds in hand by the Town before the mayor could recommend to the council any steps which could lead to a modification of existing town boundaries in the second powerhouse area. The list of items for municipal revenue balance required agreements between the parties on financing a wide range of relocation costs.

(b) The list was divided into the following six categories:

A.  Costs under Relocation Contract.
    Item 1 included all items listed in Exhibit C, and any betterment costs determined by the Government to exist. Item 5 covered nonreimbursed staff expenses, including (a) staff overtime, (b) legal expense, and (c) general Government costs.

B.  Reimbursement to Town Because of Relocation Process.
    Item 1 covered real estate tax payment.
    Item 4 covered lost water revenues.

C.  Reimbursement to ·Town of Expenses Incurred Because of Relocation, But Not Otherwise Provided For.
    Item 1 covered consultant expenses hitherto expended.
    Item 2 covered consultant expenses to be expended in the future.

D.  Municipal Reserve Fund as Described in Economic Income Analysis in DM 8, to Cover Projected General Government Deficit in Initial Years Following Relocation (e.g. sewer operation).

E.  Additional Facilities Required by State Regulation or by Good Custom and Practice, But Which the Government Does Not Recognize as Being Covered by the Relocation Contract.

F.  Design and Construction of Post Office.

76. On March 23, 1976, DMJM/Hilton notified the Portland District that, with only approximately 3 weeks remaining to contract completion date, eight items on the Town plat were unresolved and, moreover, additional revisions were to be expected after checkpoint No. 5. Unresolved items listed were:

1. Approval of the Central Business District (CBD) plat layout.

2. Layout of the two multi-family areas.

3. Location of the church lot adjacent to the road leading to the sewage treatment plant.

4. The platting of two commercial lots adjacent to the marina.

5. The commercial plat layout, road alignment and town boundary.

6. Approval of the plat layout adjacent to the well site.

7. Approval of the reservoir site area and easements.

8. Approval of the initial plat boundary.

77. (a) On March 25, 1976, the Portland District engineer in a memorandum to his staff outlined the position the District should adopt in a meeting to be held with Town leaders on April 1, 1976. The District staff was advised to limit its discussion at the meeting to the de-annexation issue, and to include the annexation issue only to the extent required by its being tied to de-annexation. The B & O tax issue and the optimum town issue should be avoided.

(b) The memorandum noted that at a meeting on March 8, 1976, the Town officials had said they were willing to agree to de-annexation, but that the Town should not pay for fill on optimum town land, and that the Town needs money for the purchase of optimum town land. At that meeting, the Corps representatives stated that a negotiated date for de-annexation would be acceptable, that the Corps would attempt to ignore the B & O tax issue, and that the Corps should attempt to agree to de-annexation on a date when the Town would have accumulated sufficient funds to pay for a reasonable list of Town obligations.

(c) The memorandum stated that on March 9, 1976, the District engineer and the North Pacific Division engineer confirmed their opinion that the Town should not be permitted to accumulate B & O tax funds for the purchase of lands in the optimum town. They agreed that the Corps unofficially could assist the Town in the dollar calculations involved in a negotiated de-annexation date.

(d) The memorandum noted that on March 19, 1976, Corps personnel in the Portland District and in the North Pacific Division believed the current attitude at OCE was that negotiations with the Town should be liberal, but that the personnel detected "a bit of a snake pit feeling."

(e) The memorandum noted that on March 22, 1976, in a lengthy off-the-record meeting with the Town's mayor and planning director, when the District engineer emphasized that an agreement on de-annexation must be ratified by a Town referendum, the Town representatives were optimistic that an agreement could be reached. The District engineer concluded the Town wanted to avoid litigation and noted that the Town citizens tied the de-annexation issue directly to the optimum town issue and felt that the Corps was using the construction contract as a club to take away their optimum town.

78. (a) On March 29, 1976, the Town notified the District of a number of design and platting changes to be made as a result of the Town council's review of the design for the CBD. The adjustments and changes which the Town council formally had approved were listed in four categories, each of which contained numerous items:

(1) Open Spaces;

(2) Commercial Lots, Subitems (a) through (h);

(3) Parking Lots; and

(4) CBD Entrance.

(b) Final adjustments to be made in the CBD plat were as indicated in an attached drawing.

79. (a) On March 30, 1976, at a regular Town council meeting, the Town council agreed that the initial town boundary should be redrawn to include all of the Town's acres.

(b) The Town's planning director reported that, at the last meeting of the Joint Board of Review, fill costs had been eliminated as a betterment cost.

(c) The Joint Board of Review actions and related betterment costs estimates were reported. These included: (a) increasing the size of the city hall to 274 square feet from 244 square feet; (b) agreement of the Corps to provide an arched bridge for aesthetic value; and (c) increase of average lot size in platting to 0.31 acres instead of 0.267. The estimated betterment cost for all items reported was $109,-144. The time schedule for payments of betterments had not been resolved.

80. (a) On April 1, 1976, DMJM/Hilton requested an extension of time to May 14, 1976, to complete the design contract as a result of changes requested by the Town. The request provided a detailed accounting for costs for changes under the following headings: (a) Changes to the Central Business District; (b) West End Changes; (c) Boundary and Miscellaneous Plat Changes; and (d) Changes in Main Roadway Lighting. DMJM/Hilton stated that as a result of the Town's request, it had to consider changes in all of the CBD drawings relating to utilities, road, landscaping, etc., and the plat also would have to be changed and recomputed. The West End changes involved upgrading the existing West End lots to a similar standard as the remainder of the new town, which involved a detailed study of storm drainage problems.

(b) On April 2, 1976, the District's engineering staff approved the work in items (a), (c) and (d) and recommended a time extension to May 3. Item (b), West End Changes, was set aside until approval by the Town of the betterment involved. On April 5, 1976, the contracting officer granted DMJM/Hilton a time extension to May 3, 1976, to complete the design contract.

81. (a) On April 2, 1976, the Portland District engineer refined the Corps proposal on the de-annexation issue. He proposed that the parties establish a beneficial occupancy date, and, on the agreed upon date, the Town concurrently would relinquish its jurisdiction over the old town area where the second powerhouse was to be constructed.

(b) Transfer would occur upon completion and acceptance by the Town of the following municipal facilities and utilities:
   a. Water System
   b. Storm Drain System
   c. Sewage Collection and Treatment Facility
   d. Streets
   e. Walkways
   f. Parks
   g. Town Bridge
   h. Municipal Lighting
   i. City Hall
   j. Fire Station
   k. Maintenance Building
   l. Municipal Parking Lots

(c) Under the proposal, acceptance would be the time when the Town notified the District that it accepts the facility as being constructed in accordance with approved plans and specifications. The District engineer requested that the Town council act upon the proposal, and noted that a prompt written response was expected. He stated that all necessary steps preliminary to actual relinquishment of jurisdiction must be completed by June 15, 1976.

82. On April 13, 1976, at a regular meeting of the Town council, it was decided that Exhibit A, the initial town boundary map included in the Relocation Contract, would be revised for submittal to the Corps, with those lands not to be purchased crossed out. This action was taken in response to information from District representatives that an approved boundary was needed because changes made after the Relocation Contract was signed made the District uncertain as to which lands the Corps was authorized to purchase.

83. On April 14, 1976, the Town by letter rejected the Corps' April 2, 1976, proposal that the parties establish a date for beneficial occupancy and agree on concurrent release of Town jurisdiction. The Town stated that it had no objection to defining the circumstances under which Corps jurisdiction would cease and Town occupancy of the municipal facilities commence, but such occupancy by the Town in no way would imply that the Town council would take any action regarding the boundaries of the Town or de-annexation. The letter stated that the Town's position on de-annexation was inextricably intertwined with municipal finances, and that until the Town is secure in its financial position and is assured that at the conclusion of the relocation process it would be both solvent and debt free, it would be inappropriate to take or even to discuss any action that would jeopardize municipal revenues.

84. (a) On April 20, 1976, the Town attorney reminded the contracting officer that the Relocation Contract authorized Exhibit A to be modified by written agreement of the parties, and that modification of Exhibit A now was appropriate. He gave notice that the Town would prepare an Exhibit A and an addendum to the August 19, 1975, contract.

(b) The April 20, 1976, letter also noted that the Corps' failure to acquire lands in the initial town area had delayed completion and approval of the plat, and that this could affect movement of people and improvement into the relocation area. Inasmuch as the Town would be the purchaser of initial town land not otherwise sold, any increase in costs due to delay would cause the Town further expense. The letter gave notice that the Town would look to the United States for reimbursement of any loss or damage caused by the Corps' failure to acquire property as agreed in the Relocation Contract.

85. (a) On April 28, 1976, the Town notified the District that the Corps' rejection of thousands of dollars of relocation expenses, and the Corps' opposition to the Town's annexation proceedings, were viewed by the council as a breach of the Relocation Contract. The letter asserted that the people were frustrated and the Town was being killed. Further protracted discussion on relocation issues was called a luxury the Town no longer could afford.

(b) The following quotation from the Town mayor's letter defines the scope of the Town council's action:

1. The City Staff shall no longer have the option of negotiating the resolution of remaining relocation problems. All conversations are to be directly with the City Council at their regularly scheduled Council meetings on every Tuesday evening at 8:00 P.M. Any issue relating to construction activity within the Town will be presented, in writing, with a summary of any proposal at Council meetings. The proposal will be considered by the Council at a subsequent regular Council meeting, as scheduled, for any necessary decisions.

2. By formal motion the City of North Bonneville shall not act on any further Corps business until such time as the below listed items have been settled.

a) Purchase all lands for the initial town as set forth in our Relocation Contract.

b) Submit a completed final plat in a form required by State law as set forth in our Relocation Contract and mutually agreed Scope of Work, with all necessary approvals from appropriate agencies together with certification of ownership of all affected lands.

c) Immediate availability of lots at the existing West End and areas north of the Burlington Northern tract along Greenleaf Lake.

d) Fill requirements for the initial town industrial area and optimum town—placement and cost agreed upon in Relocation Contract.

e) Annexation of relocation area lands shall be accepted in writing to guarantee no further delay with, plat, comprehensive plan and remaining school boundary issues.

f) Direct assistance, financial and otherwise, for the Housing Authority and its efforts to provide housing within the financial means of low income and fixed income citizens forced with relocation.

(c) In conclusion, the letter requested that the District engineer, as contracting officer authorized to make decisions, personally represent the Corps at regular council meetings until these issues are completely and finally resolved.

86. On May 3, 1976, DMJM/Hilton advised the Corps that it had revised the plans and specifications for the construction contract in accordance with comments it had received at checkpoint No. 5 and that it had incorporated the additional requirements of the Town, for which a time extension to its contract had been given. On May 3, 1976, DMJM/Hilton submitted the revised plans and specifications to the Corps.

87. (a) On May 5, 1976, the Skamania County Planning Department was advised by the county prosecuting attorney that the land being considered for the new town site of North Bonneville still remained in county jurisdiction and that the plat of the new town site would have to proceed through the County Planning Department in accordance with county Subdivision and Platting Ordinance 1971–1.

(b) On May 7, 1976, two representatives from the Corps and two members of DMJM/Hilton visited the Skamania County Planning Department and were advised of the county's procedures and regulations concerning platting approvals and records. Inasmuch as the Corps did not yet own all of the land being proposed for platting, the Skamania County Planning Department advised that final plat approval and filing may have to be done in stages as ownership of platted areas is resolved.

88. (a) On May 5, 1976, the Town confirmed in writing to the contracting officer that the Town council on May 4, 1976, had approved, for site plan purposes only, the preliminary plat of the relocated area of North Bonneville. The council action was subject to two conditions: (1) it is not to be deemed a plat approval under the laws of Washington governing approval of plats by municipalities, which required approval by the State Department of Ecology prior to processing by the Town; and (2) it is not to be deemed a modification of the initial town boundaries as defined in the Relocation Contract.

(b) On May 10, 1976, the Town's attorney requested the Skamania County Planning Department not to take action on approval of a preliminary plat for the relocated area of the Town absent an approval from the Town, which in turn must await approval from the Department of Ecology.

89. (a) On May 10, 1976, the Portland District engineer submitted to the North Pacific Division a recommendation that litigation be started in connection with the relocation activities. This recommendation followed a series of meetings in Portland and Washington, D.C. that involved representatives of the Portland District, the North Pacific Division, OCE, and staff members of the congressional delegations.

(b) These discussions involved possible legal proceedings on the following issues: (a) Reimbursement of Town's Legal Fees; (b) Annexation—De-annexation; (c) B & O Tax; and (d) Optimum Town. Litigation to resolve the issue of the Corps' liability to reimburse the Town's legal fees was not recommended. As to the B & O tax issue, the District engineer recommended that the matter be forwarded to Army JAG for further study and not be included in the litigation currently being recommended. The memorandum requested authority to separate the annexation problem from that of de-annexation, and noted that the annexation issue would be affected by the result of a suit by the Port of Skamania in Washington State Superior Court.

(c) The optimum town issue was said to involve the Town's authority to participate directly in acquisition of land for expansion, and possible violations of the Town's debt ceiling under Washington State law. Inclusion of this issue in litigation was

opposed by some Corps representatives and by congressional staff members as a direct attack on the negotiations that led to the Memorandum of Agreement and the Relocation Contract. As a result, the District engineer recommended that the optimum town issue be included in the litigation only on the general question of capacity, the appropriate size of the new town.

(d) The final recommendation of the District engineer was that the United States seek a declaratory judgment of Section 83 concerning only the issues of de-annexation and capacity. The District engineer recommended this litigation because he thought judicial clarification had become necessary due to a complete failure to reach a reasonable agreement through negotiation, and because the Town now had refused to continue negotiations unless assured benefits that he believed were in excess of the Corps' authority to provide under Section 83.

(e) Pending judicial resolution of these issues, the memorandum stated the Corps would proceed generally as scheduled with some minor accommodations. The accommodations, as stated, were to concentrate contractor effort in portions of the new town required for a smaller population, and acquisition by condemnation of land outside the initial town only for project purposes.

90. (a) On May 13, 1976, the North Pacific Division engineer concurred in the District engineer's recommendation that the issue of de-annexation be judicially resolved. He did not concur, however, with the recommendation that the issue of new town capacity be included in judicial action.

(b) The basis for nonconcurrence was his concept of the validity under Section 83 of the Corps' obligation in the Relocation Contract to provide a new town of 210 lots to accommodate 600 people. At the time that commitment was made, only 56 percent of the population by actual count planned to move to the new town; the 210 lots, however, were approved to provide for 100 percent capacity of the original town. Accordingly, he believed the Government was obligated to provide 210 lots, unless the

number of relocatees drops so low as to raise the question of whether a town of any size should be constructed.

(c) The Division engineer advised OCE that, in view of the negotiations leading to the Memorandum of Agreement and the Relocation Contract, he did not consider it appropriate to raise the issue as to the authority of the Government to acquire lands for the optimum town. He recommended that unless OCE determines that the Relocation Contract is void, due to the debt limitation or for any other reason, that the Government should honor the optimum town provision as written.

91. On May 14, 1976, the District engineer advised the District staff of the actions it should take pending resolution by OCE of the recommendations as to the scope of litigation. His instructions were:

(1) The District staff would not phase the town construction contract. Without the capacity issue in litigation, there would not be sufficient justification for the delay and expense involved in phasing.

(2) The District staff would not advertise the construction contract until the plans and specifications have been approved by the Town and by the North Pacific Division.

(3) The District staff would not condemn lands outside the initial Town area purely at the request of the Town. Pending determination by OCE of legality of the Relocation Contract, the District would honor the contract but interpret it to exclude acquisition of optimum town land, except from willing sellers or for project purposes additional to the Town's request.

92. On May 14, 1976, the revised plans and specifications prepared by DMJM/Hilton were forwarded by the Corps to the Town for its review and approval.

93. (a) On May 18, 1976, at a regular meeting of the Town council, a request from the Corps for a writ of entry permit for construction in the vicinity of the water tanks was tabled on a motion that no action

be taken until all six conditions in the April 28, 1976, letter were satisfied.

(b) The Town council considered a letter from the contracting officer, dated May 18, 1976. In that letter the District concurred that the Town's approval of the preliminary plat of the relocated area (1) was not considered to be a plat approval under the laws of the State of Washington, but rather was a site plan approved under the Relocation Contract, and (2) was not considered to be a modification of initial town boundaries as there defined. On the basis of this letter, the Town council approved the preliminary plat as a site plan approval as a preliminary step required by the Relocation Contract.

(c) On May 18, 1976, the District sent to the Division five sets of plans and specifications for the construction contract for review, and requested authority to advertise for the construction contract concurrent with Division review. On May 18, 1976, the Division denied the District's request for concurrent review. The Division noted that even though the Town might approve the plans and specification at this time, there were outstanding problems that the Division felt must be resolved prior to its approval to advertise. One question was the capacity issue, which had to be ruled on by OCE. Another reason to withhold approval to advertise was the large number of changes still to be generated and incorporated in the drawings; the Division did not want a large amendment to follow soon after advertisement.

(d) On May 24, 1976, at the request of the Town, representatives of the Town and the District conferred and reviewed the revised plans and specifications.

(e) On May 25, 1976, at a regular session of the Town council, the Town again considered the Corps' request for a writ of entry permit for construction of temporary water storage tanks. A member reminded the council of the six conditions contained in the April 28, 1976, letter. The District representative then addressed the Corps' position on each of the six subjects. With respect to No. 5, the annexation issue, the District representative stated annexation was related to the de-annexation issue, and after de-annexation was resolved, the Corps would not object to annexation. He stated the de-annexation matter had been referred to the Justice Department. After further discussion, the Town council approved the Corps' application for a writ of entry permit.

94. The Town council on May 25, 1976, adopted Ordinance No. 308—Regulations and Procedures for Plats and Subdivisions. Ordinance No. 308 was adopted pursuant to Washington State law authorizing regulations and control by various cities, towns and counties for the handling of plats and subdivisions.

95. (a) On June 3, 1976, the District by letter requested the Town's approval to advertise in their present form, prior to review by the Town, the plans and specifications prepared by DMJM/Hilton for the construction contract. In the request, the District agreed: (1) to make such changes as were necessary or agreed to; (2) to obtain the Town's approval of such changes; and (3) to make those changes either by amendment before bid opening or by modification after contract award. Early advertising was requested in order to proceed with construction of houses prior to the onset of winter weather, and because of the pressure of meeting the power-on-line date.

(b) The letter enclosed a draft schedule that listed 12 additional construction items that the Town had requested at a May 24, 1976, review conference and confirmed by letter on May 26, 1976. The construction schedule provided that portions of the relocation construction would be performed between 1977 and 1978.

(c) On June 3, 1976, the Town council, subject to enumerated conditions, approved the plans and specifications for the relocated area.

96. (a) On June 4, 1976, OCE advised the North Pacific Division that it had concluded that a suit seeking declaratory judgment as to the meaning of Section 83 would

not be instituted at this time. OCE's decision was reached after the following issues were considered: (i) Validity of the Town's B & O tax; (ii) Validity of the Relocation Contract; (iii) Betterments to the planned municipal facilities; (iv) Conveyance of land within the relocated town; (v) Optimum town lands for development; (vi) Annexation of the new town site and the relinquishment by the Town of its jurisdiction in the old town site.

(b) OCE's rationale as to each issue was:

(i) Since business activities other than Government existed in the Town, the B & O tax was considered to be nondiscriminatory.

(ii) Since the B & O tax was considered to be valid when enacted in 1975, the Town's binding contractual commitment in the Relocation Contract also was considered to be valid because the Town did not exceed its statutory debt limitation.

(iii) The IFB for the construction contract would contain alternative bid schedules: covering (1) basic construction, and (2) construction with betterments. If the Town did not pay for betterments prior to award, the contract would specify only basic construction.

(iv) Lands acquired by the Corps for the new town would not be conveyed to the Town or individual purchasers until payment is received.

(v) Lands necessary for optimum town development would not be provided. OCE took the position that the Town was without authority to enter this part of the Relocation Contract.

(vi) The Town's unilateral annexation of lands necessary for the initial town was being challenged by Skamania County, and pending resolution of that dispute, the Corps would not act on the annexation issue, or on the de-annexation issue.

97. (a) On June 8, 1976, the Town's mayor notified the District engineer of the conditions which applied to the Town's approval of the final plans and specifications for the construction contract. The conditions were stated on seven pages under 13 numbered topics. No. 1 stated that final approval applied only to those items included in the plans and specifications, as qualified in the letter, and would not constitute a final approval of all items that would become a part of separate construction contracts.

(b) Conditions were stated for the following items:

2. Water System
  (a) Storage Tank
  (b) Well
  (c) Supply Facilities
3. Streets and Concrete Gutters
  (a) Base Course
  (b) Concrete Gutters
4. Fire Alarm Systems
5. Town Bridge
6. Lighting
  (a) Arterial and Residential Streets
  (b) Pathways
7. Bank Protection
  (a) City Bridge
  (b) State Highway Bridge—Railroad Bridge—Commercial Lots C–8, C–9—Hamilton Creek
8. Final Grading and Top Soil Placement
  (a) Fill Placement
  (b) Top Soil Placement
9. Landscaping
10. Municipal Buildings—Material Finishes
  (a) Sewer Plant Control Building
  (b) Well House
  (c) City Hall
11. West End
12. Survey and Monumentation
13. As Built Drawings for All Systems

(c) The letter concluded with the statement that the Town's approval of the plans and specifications fulfills the requirements of Article 1, Section 5 of the Relocation Contract. The Town formally requested that the construction contract be advertised for bids.

98. On June 9, 1976, the District engineer notified the Town that he had made a betterments determination on the size of

the town hall to be supplied as a replacement at Government expense. The Government's obligation under Section 83 was the construction of a town hall of 3661 square feet; and any increase in size would constitute a betterment. The Town had requested a town hall of 4,410 square feet; accordingly, the additional 749 square feet constituted a betterment, and the cost was increased to $27,638. The Town was notified that that amount would be required prior to the award of a construction contract.

99. On June 10, 1976, the Town submitted to the District a map and boundary description for the revised initial town area, with an amendment to substitute a new Exhibit A to the Relocation Contract.

100. (a) On June 14, 1976, the Division engineer notified the District that plans and specifications for the construction contract were approved but that permission to advertise would continue to be withheld until the District provided information (1) on how it intended to handle the problem of betterments, and (2) how the District would incorporate changes to the plans and specifications that had been recommended by the Division and by the Town after the checkpoint No. 5 meeting.

(b) On June 15, 1976, the District requested the Division to reconsider the decision not to authorize advertisement of the construction contract until the changes were incorporated in the plans and specifications, and asked for authority to advertise the plans and specifications in the condition as previously furnished to the Division for review. The memorandum noted that the Town had approved the plans and specifications, subject to 13 qualifications, and had requested advertisement. It was recognized that early advertisement of the plans and specifications subsequently would involve amendments, but that course was recommended in the interests of starting construction before winter.

(c) The District stated that after further study it had concluded there was no way that it could advertise alternatives to cover the Town's betterment contingencies. The District proposed to advertise only the Government's obligation for all betterments, except for the town hall and the betterment associated with the 0.31 acre lots. The District then would add by contract modification those betterments for which the Town provided payment prior to contract award.

101. On June 17, 1976, the Town made its initial formal request for acquisition of lands for the optimum town under Relocation Contract, Article 5, Section 3, paragraph 3.03. The request identified three parcels: A, B, and C. Parcel B and parcel C were situated totally within the currently designated Bonneville Powerhouse project lands as defined in the Relocation Contract. Parcel A, an area on the Pierce Ranch, was a parcel that fell outside the initial town on currently designated project lands.

102. (a) On June 22, 1976, the District responded to the conditions listed in the Town's June 8, 1976, letter limiting its approval of the final plans and specifications. The District's letter responded to each of the 13 conditions the Town had specified. The letter noted that generally the District agreed with the Town's comments but it was restricted on some items by regulations and agreements.

(b) The letter identified the following items of nonconcurrence by the District:

2. Water System
   (a) storage tank
   (b) well
3. Streets and Concrete Gutters
   (a) base course
   (b) concrete gutters
7. Bank Protection
   (b) steel highway bridge—railroad bridge
8. Final Grading and Top Soil Placement
   (a) fill placement
   (b) top soil placement
9. Landscaping
11. West End

(c) The letter explained that Items 7(b) and 11 would be subject to other contracts and would be submitted for approval with

those contracts; items 8(a), (b) and 9 were deferred, subject to later discussions.

103. (a) On June 22, 1976, at a regular session of the Town council, the District representative explained the Corps' procedures for bids on the construction contract. Under Corps regulations, the IFB could ask for bids only for items the District intended to build. The IFB would ask for alternative bids to cover: (A) the Government obligations and (B) betterments. B minus A would represent the actual cost of betterments. The District representative told the council that, if the Town deposited money based upon the A/E estimate of the betterment cost at least 15 days prior to bid opening, the Corps would pay the difference if actual cost was higher than the estimate, and would make a refund if cost was less. If the Town's money were not deposited 15 days prior to award, the betterment money was required to be deposited on the date of bid opening, and the amount to be paid by the Town would be the actual bid amount. The Town planner stated that a deposit of money previously had been agreed upon, and that the Town would deposit betterment money in an escrow account.

(b) Betterment costs discussed at the June 22, 1976, meeting were as follows:

| | |
|---|---|
| City Hall | $ 27,890.00 |
| Storm Drains | 20,800.00 |
| City Bridge | 26,000.00 |
| Lot Sizing (utilities) | 25,440.00 |
| West End (initial) | 38,091.00 |
| Fire Hydrants (7) | 2,800.00 (est.) |
| Water Tank | 26,300.00 |
| | $167,321.00 |

(c) On June 23, 1976, at a continued session of the regular Town council meeting, the District engineer reported the decision OCE had made on June 4, 1976, relative to proposed litigation to clarify the meaning of Section 83. The Town council was advised (1) that OCE did not believe judicial clarification was necessary, (2) that the Corps has been told it has authority and direction to build the initial town sized for 600 occupants, and (3) that the Corps could not participate in any way in the optimum town. The minutes report that the District engineer advised that OCE had concluded that the provision in the Relocation Contract for the Corps to buy land for the optimum town and sell it to the Town could not be implemented.

(d) The District engineer advised the Town that on June 23, 1976, the annexation/de-annexation issues had not been resolved and that OCE was waiting to see how the challenge by the Port of Skamania would be resolved. The Town attorney questioned the existence of any challenge. He noted that the only current litigation was that brought by the Skamania School District, and that he was not aware of any challenge by the Port of Skamania.

104. (a) On June 24, 1976, the Portland District staff met with North Pacific Division staff to discuss bidding procedures on the plans and specifications for the construction contract, the status of changes, alternative schedules, and betterment issues. At the conclusion of the meeting, it was decided that there would be a 45–day bidding period to allow the Government time to amend the IFB before award if necessary.

(b) During the discussion, the Division engineer expressed the view that since the Government was committed to provide an initial town, it should waive the technical objection on annexation of Government properties within the Town's boundaries. After the meeting, Division counsel consulted with OCE and inquired whether the Corps could give approval to annexation of Government properties insofar as the initial new town only was concerned, and thus separate the annexation issue from the de-annexation issue. OCE's answer was negative. OCE stated that approval of annexation of Government properties in the initial town area would be a recognition of the B & O tax as being legitimate to the entire area. It also would give recognition of a right to the Town to acquire the new town merely as an enlargement of the old town. Further, the annexations could adversely affect the Government's position in the future as to the validity of the B & O tax.

105. (a) On June 25, 1976, the Town responded to the District's June 22, 1976, letter and reiterated the conditions for the Town's approval of the plans and specifications for the construction contract. The Town agreed with the District's June 22, 1976, position on some of the conditions the Town previously had asserted, but continued its conditions as to other items.

(b) The Town continued conditions with respect to the following:

2. Water System
   (a) storage tank
3. Streets and Concrete Gutters
   (a) base course
   (b) concrete gutters
8. Final Grading and Top Soil Placement
   (a) fill placement
9. Landscaping
11. West End

(c) With respect to item 3(b), the Corps' solution was rejected. The Town required a storm drain discharge to an area other than Greenleaf Lake. The Town concurred that concrete gutters along Evergreen and Cascade Drives north of the railroad were not needed provided the storm drain issue was resolved adequately.

(d) The letter concluded with the statement that the Town's final approval applied only to those items included in the plans and specifications, as qualified, and did not constitute a final approval of all items that remained to be performed in separate construction contracts.

106. (a) The plans and specifications for the Town's construction of the relocated town were advertised in the IFB on June 25, 1976.

(b) On June 28, 1976, the District engineer responded to the Town's June 17, 1976, request for the acquisition of three parcels of land for the optimum town. The Town's request was denied on the basis of OCE's decision, which the District engineer had explained at the June 23, 1976, Town council meeting.

107. (a) On June 29, 1976, District counsel in a letter to the prosecuting attorney of Skamania County, Washington forwarded a copy of the District engineer's June 28, 1976, letter to the Town and provided information about the Corps' position not to participate in either the acquisition or development of an optimum town. District counsel advised the Skamania County prosecuting attorney that the Government had not consented to the Town's attempt to annex a large land area, which included Corps' owned property. The letter further stated that, if the Town would meet certain prerequisites, including de-annexation of the old town, District counsel anticipated that the Town would then readily secure Corps approval for incorporation of so much of the Corps land as comprises the initial relocated new town.

(b) On July 16, 1976, an action was brought, in the Superior Court of Washington for Skamania County, by Skamania County as plaintiff. The Town of North Bonneville and the members of its council were named as defendants (Case No. 5957). The suit was for a declaratory judgment as to Town Ordinance No. 306, purporting to annex certain designated Federal properties. The complaint alleged that the United States had not signed the petition for annexation, had not consented and in fact had objected to the annexation. The complaint sought judgment that Ordinance No. 306 be declared null and void.

108. (a) On July 20, 1976, the IFB for the construction contract, Solicitation No. DACW 57-76-B-0149, was amended to provide the following subparagraph in technical provision 2C: Site Grading:

2.1 *Soil Materials*

2.1.1 *Topsoil.* Silt, sand, sandy silt, or silty sand containing not more than 10 percent plus No. 4 sieve size materials shall be excavated from the area noted on the drawing as topsoil borrow area. After the topsoil from the topsoil borrow area has been completely used, obtain additional topsoil material from the stockpile designated on the drawings as topsoil stockpile area.

(b) On July 20, 1976, the District started negotiations with Mr. and Mrs. Pierce concerning the acquisition of a portion of their property for the initial town area. The District had obtained an appraisal of the Pierce property on March 24, 1976.

109. (a) On July 22, 1976, the Town council enacted Emergency Ordinance No. 313, to authorize the issuance of Capital Improvement Bonds in the principal amount of $30,000 for the purpose of providing part of the money required as a deposit for betterments pursuant to the Relocation Contract. On that date, the Town council also enacted Emergency Ordinance No. 314, appropriating and budgeting $58,613 from the relocation capital improvement fund for payment of the following betterments:

| | |
|---|---|
| City Hall | $ 27,638.00 |
| City Hall stone facing | 1,822.00 |
| Water Tank | 29,153.00 |
| | $ 58,613.00 |

(b) On August 11, 1976, an escrow agreement was executed by Rainier National Bank, the Town, and the Corps contracting officer to create with the bank an escrow fund in the amount of $58,613 which amount was to be deposited in the fund 15 days prior to the date of bid opening of the construction contract. In the escrow agreement, the Town agreed to add additional sums if required to meet the Town's share of construction funds due to modification of the construction contract related to betterments.

110. Bids on the construction contract were opened on August 17, 1976. Six bids were received; Valley Inland Pacific Company (VIPCO) was the low bidder. The approval of the award by the Corps was signed August 24, 1976, and the contract, No. DACW 57–76–C–0274, was awarded to VIPCO. The notice to proceed was August 24, 1976, effective August 25, 1976.

PART II CONSTRUCTION and DAMAGES

111. (a) During the construction phase of the Town's relocation, contractors other than VIPCO were engaged in construction activities related to the powerhouse project. Some of these other contractors also performed work that was related to, or a product of, the planning and design for relocation.

(b) A seepage cutoff wall was constructed to encircle the powerhouse project site; most of the seepage cutoff wall was temporary and was removed after the powerhouse was built; approximately 600 feet was incorporated into a permanent cutoff wall. Work on the seepage cutoff wall began in August 1974, and was completed in August 1977. The contractors were ICOS Corporation of America and Bencor-Petrifond, a joint venture.

(c) Harry Claterbos Company (Claterbos) was the contractor on the grading, highway relocation, and railroad relocation contract. Claterbos had to place fill over much of the town site before VIPCO could start work. Claterbos' notice to proceed was June 1, 1976; west town fill was completed by October 16, 1976; work on Hamilton Creek Bridge, Central Highway & Railroad underpasses was completed by September 25, 1976; final completion date for all work was August 19, 1978.

(d) R.A. Heintz Construction Company (Heintz) was the contractor to clear, grub, and fill areas for the relocated town area and to construct a temporary bridge. The contract was let September 19, 1975, and work on embankments using fill from the Garrison Rapids borrow area was performed from September 29, 1975, to October 9, 1975. The fill was unsatisfactory for use with specified compaction equipment and the contract was changed to authorize different equipment to achieve compaction. By October 6, 1976, all excavation and embankment work had been completed. Heintz's claim under GP-4—Differing Site Conditions, was allowed in the amount of $328,247, with no change in time of performance.

(e) S.J. Groves Construction Co. (SJG) was general contractor on the powerhouse excavation contract to remove 6 million cubic yards of excavation and build spoil berms. Notice to proceed was April 14, 1977, work was substantially complete on

July 10, 1978, and final completion was August 1, 1978.

(f) Groves-Kiewit-Granite (GKG), a joint venture, was the general contractor on the main powerhouse contract. It did the town relocation construction north of the relocated highway and railroad: Cascade Drive, Evergreen Drive, Industrial Area and utility service (underground power and telephone, street lighting). The town related work was scheduled to start on June 29, 1978; it actually started July 25, 1978. Town work was complete on November 15, 1978, except for landscaping, seeding, finish grading, street lighting, bike trails, and ditching. All GKG town work was completed by August 24, 1979.

112. The A/E design contract (DACW 57–76–C–0077) was the subject of 10 change orders. Contract modifications 3, 5, 6, 7, and 8 added the following money and time extensions:

| Mod. | Date | Subject | Cost | Time |
|------|------|---------|------|------|
| 3 | Feb. 9, 1976 | Special workshop | $10,067 | No change |
| 5 | Jan. 24, 1977 | Nine changes 3/1/76 – 9/3/76 | 68,894.30 | +217 days |
| 6 | —— | Final Town Plat Submission | 8,518 | to 1/12/77 |
| 7 | Feb. 8, 1977 | Extend Plat Submittals | 11,297 | + 25 days |
| 8 | Apr. 18, 1977 | Revise Plats Railroad & Highway Changes | 40,153 | + 78 days |

113. On June 28, 1977, Revision No. 2 of Exhibit A to the Relocation Contract (DACW 57–76–C–0039) was substituted for the December 17, 1975 Revised Exhibit A. Revision No. 2 was based upon additional planning and changes desired by the Town and agreed to by the Portland District in conversations between February 17 and March 8, 1977.

114. (a) On September 28, 1976, the Town notified the District that the failure to deliver a final town plat on January 27, 1976, was a breach of the Relocation Contract and A/E design contract schedule. The Town contended that continued failure to deliver a final town plat was unreasonable and injurious to orderly relocation of the Town as a community.

(b) Changes requested by the Town after its approval of the preliminary plat on May 5, 1976, required changes to be made in the plat. On October 29, 1976, DMJM/Hilton advised the District that plat submission had been changed from one complete plat to three plats:

(1) Plat of Relocated Town (all land south of the relocated highway);

(2) Addition 1—(West End)

(3) Addition 2—(Area to north of highway, including the new industrial park). DMJM/Hilton stated its work on (1) and (2) was complete, and (3) would be completed in 7 days.

(c) On December 15, 1976, in a case brought by defendant (No. C76–260T) to enjoin enforcement of the Town's noise ordinance, a stipulation and order was entered that, in one part, required the District to present to the Town by January 17, 1977, a plat of parts 1 and 2 of the new town site in a form suitable for filing. The stipulation included a reservation that presentation of the plat was not an admission of the legality of the Town's annexation action or of any other matter in issue. Preliminary drafts of parts 1 and 2 of the plat were presented to the Town on December 21, 1976.

(d) The Town council discussed changes to be made in the plat at meetings on

November 3, November 30 and December 29, 1976. At the December 29, 1976, meeting, the Town council rejected the most recent draft of the preliminary plat that had been submitted by the District on December 21, 1976.

(e) On January 14, 1977, the District submitted to Skamania County the original sheets of Part 1, Final Plat of Relocated North Bonneville, and Part 2, the First Addition to the Plat. Pursuant to the Stipulation and order in Civil No. C76–260T, the District submitted to the Town mylar copies produced by photographic means of the originals.

(f) At a regular meeting on January 18, 1977, the Town council accepted the plats filed on January 14, 1977, as preliminary plats under state law, and the Planning Commission was directed to schedule a public hearing on January 31, 1977, the results of which were to be considered on February 23, 1977. The planning director advised the Town council that its approval of the plat could be conditioned, and that the Town could not issue a building permit without certification as to soil compaction. He also advised the Town council that after the preliminary plat was approved, the Corps could be required under the court order and the contract to submit the original plats to the Town.

(g) The Town council at a continued meeting on February 17, 1977, reviewed recommendations from the Planning Commission, and agreed that the plat would not be approved until guarantees were provided that individuals would receive warranty deeds and title insurance.

(h) On March 14, 1977, the Town mayor advised the District engineer of actions to be taken to obtain Town approval of the Final Plat for Relocation of North Bonneville. The Town's instructions included:

1. The mylar copies submitted on January 14, 1977, were not complete and did not accord with survey information.

2. The Town had to file the originals of the plats with the Skamania County auditor per RCW 58.17.170.

3. Monumentation had to be certified on the plats, per RCW 58.17.240 and RCW 57.17.250. The location and number of permanent control monuments was to be determined by the Town.

4. The Town council approved additional requirements that applied to submission of the final plat, including:

(i) Monumentation;

(ii) Title insurance: Corps to provide a written guarantee that each private individual receiving lots from the Government will receive warranty deeds and title insurance;

(iii) Soils Engineering Report—certified by a professional geologist—to indicate degree of problems expected to be experienced with future settlement of foundation materials, and suggested remedial measures;

(iv) West End Drainage; and

(v) Land Use—specific uses prescribed for 10 identified areas.

The letter also requested six adjustments be made in the area of the industrial site.

(i) At a regular meeting of the Town council on June 14, 1977, the District presented the original of the First Addition (West End) of the plat for approval and filing. The District also presented a copy of the original of the plat that had been submitted to Skamania County on January 14, 1977, with the signature sheet altered by the Corps to enable the Town council to accept and file the plat.

(j) Plats have been filed with Skamania County as follows:

| Title of Plat | Recording Date by Skamania County Auditor |
|---|---|
| Plat of Relocated North Bonneville | 13 July 1977 |
| First Addition to the Plats of Relocated North Bonneville | 1 August 1979 |
| Second Addition to the Plats of Relocated North Bonneville | Plat has not been recorded |
| Third Addition to the Plats of Relocated North Bonneville | 20 October 1977 |
| Fourth Addition to the Plats of Relocated North Bonneville | Plat has not been recorded |
| Fifth Addition to the Plats of Relocated North Bonneville | 25 May 1982 |

The Town has not accepted for filing the plats for the Second and Fourth Additions because it does not believe they are complete.

115. (a) At a regular meeting on September 7, 1976, the Town council directed the Town attorney to prepare a draft of a breach of contract complaint. On September 13, 1976, the Town attorney wrote to the District engineer and noted that the portion of the Pierce property acquired by the Corps did not extend beyond the initial town boundary. The letter reminded the District that the fill contract and construction contract required the fill area to extend at least 50 feet beyond the initial town boundary, with a 2 foot horizontal and 1 foot vertical slope, and requested that the fill contractor be instructed to comply with the contract.

(b) On September 28, 1976, the Town mayor by letter notified the District engineer that the following actions and conditions constituted a breach by the Corps of the Relocation Contract: (1) failure to deliver a final town plat suitable for filing; (2) announcement of plans to construct the fourth phase of the coffer dam and to advance date of powerhouse excavation from November 1, 1977, to March 1, 1977, and attendant interference with orderly relocation; (3) refusal on June 28, 1976, to participate in acquisition, transfer, and filling of optimum town lands; and (4) the options given by the Corps to the North Bonneville School District to (a) sell to the Government at the $282,000 appraised value, or (b) replacement by Government if need for continuation of services is shown. The letter gave notice that the Town mayor was declaring a public emergency in regard to the general health, safety, and welfare of the citizens, the Town, its trade, commerce and manufacturers. The state of emergency was to remain in effect until these matters were resolved. The letter gave notice that the Town attorney was preparing a formal action for breach of contract.

(c) At a regular meeting on September 28, 1976, the Town council adopted Emergency Ordinance No. 317. The ordinance declares that any act, nuisance or occupation or violation of municipal ordinances that affect overall peace, good government and welfare of the Town shall constitute an emergency. The ordinance listed 10 disruptive or deleterious acts that could constitute an emergency, including:

6. Construction activity that substantially disrupts rights of direct and convenient access, providing of municipal services and the normal conduct of trade, commerce, manufacturing and private utility services.

7. Land acquisition by public agencies that materially affects the corporation ability to incur debt as provided by State Law (Debt incurred based on a percentage of the assessed valuation of land within the corporation).

8. Breach of Contract—Any breach of contract with the corporation by any entity, public agency or contractor that materially affects the City council's ability to conduct good government, meet its financial obligations or to provide for essential community services required for viable conduct of trade, commerce, and manufacturing.

9. Eviction notices—Notices of evictions given to private home owners, tenants, and businesses by any public agency without provisions for replacement of public, private and commercial facilities within the corporation.

10. Relocation assistance advisory services—Failure to provide an adequate Relocation Assistance Advisory Program which provides absolute guarantees that, within a reasonable period of time, prior to displacement of any individual, business, industry or other entity, there will be available in areas not generally less desirable in regard to public utilities and public and commercial facilities and at rents and prices within the financial means of the families and individuals displaced decent safe and sanitary dwellings, equal in number of the number of and available to such displaced persons who require such dwellings and reason-

ably accessible to their places of employment.

116. (a) At a regular meeting on October 5 and at a continued meeting on October 14, 1976, the Town council received reports about recorded readings of noise levels that had been made under the emergency ordinance. The recorded readings exceeded allowable levels in accordance with state law.

(b) At a regular meeting on October 19, 1976, the Town council adopted Noise Control Ordinance No. 320, effective November 1, 1976, subject to approval by the state Department of Ecology. The ordinance applied to the control of all sound and vibrations that affected any residential, commercial, industrial property within the Town limits. There was an exemption for sounds originating from temporary construction sites as a result of construction activity, but the exemption did not apply in residential areas between the hours of 10 p.m. and 7 a.m.

117. At a regular meeting on October 19, 1976, the Town council discussed permit applications from Bencor-Petrifond that had been submitted on October 1, 1976, and tabled at that time. The Town council denied six permit applications.

118. (a) On December 6, 1976, the United States filed a motion for a preliminary injunction to enjoin enforcement of Ordinances 317 and 320 in *United States v. Town of North Bonneville*, U.S. District Court, Western District of Washington, No. C76-260T. Residents of the Town also had sought an injunction against the Secretary of the Army, Case No. C76-235T.

(b) On December 15, 1976, the motions were withdrawn on stipulation of the parties. The stipulated order provided: Municipal Ordinance No. 317 shall not be enforced against officers and employees of the Corps of Engineers performing their functions and duties in relation to the Bonneville Second Powerhouse Project, including relocation. Ordinance No. 317 also shall not be enforced against any Corps contractor, subcontractor, or employee engaged in the Second Powerhouse Project.

Municipal Ordinance No. 320, as amended, also referred to as the "noise ordinance", shall not be enforced against any Corps contractor, subcontractor, or employee as long as there is no contract work prior to April 1, 1977, involving off-road haul vehicles not in compliance with the noise ordinance between the hours of 10 p.m. and 7 a.m., except in the event of unexpected contingencies appropriate Town officials would discuss mitigative measures. The stipulation was based on the assumption that Claterbos shall continue to make all reasonable efforts to obtain and use the best generally available noise suppression equipment, specifically mufflers. In the event the Town determined that the noise ordinance should be enforced against any Corps contractor, subcontractor, or employee, the Town agreed to give 15 days written notice of its intention to both the alleged violator and the Area Engineer before issuing any summons or citation.

119. (a) On March 1, 1977, the Town gave the District 15 days written notice that the noise ordinance would be enforced against all Corps contractors, subcontractors and employees. The Town published in three area newspapers notice to that effect.

(b) On March 31, 1977, the District engineer advised the Town that deeding of lots to individuals would be further delayed because of the insistence to enforce state noise standards for residential areas as soon as residents begin living in the new town area. The letter contended that the best technology did not permit compliance with the standards for residential areas while powerhouse construction was underway, and that unless a temporary waiver was provided, the new town would not be able to be occupied until powerhouse construction would be nearly completed in late 1981.

(c) The Corps applied to the state for a variance under the noise ordinance; the variance would be given in two parts: one dealing with the old town, and the other with the new town area. The Corps pro-

posed to install a 20 foot high wall along areas most accessible to the noise problem.

(d) On May 17, 1977, the District confirmed by letter discussions had with the Town mayor on May 12, 1977. The District had decided to proceed with the deeding of lots and would commence actions immediately leading to lot selection and offering of deeds to relocatees at the earliest possible date. To do so, it would first be necessary for the Government to receive an enduring and comprehensive noise variance from the State of Washington covering both interim and permanent housing during the powerhouse construction period. The timely receipt of this variance would depend, to a great extent, upon the cooperation of all parties in the review of the draft variance.

(e) The May 17, 1977, letter also advised the Town that the Government would have no additional project requirements for Parcels B and C following the completion of second powerhouse construction and would have no objections to their disposal. Normal disposal actions involve screening needs through Federal, State and local entities prior to public sale by General Services Administration. Since this method does not provide firm assurances that the Town would, in fact, have the opportunity to acquire the property, the letter said the Corps would investigate the possibility of sale to the Town under the authority of Section 83.

120. (a) On April 19, 1977, the Town council at a regular meeting postponed action on an application from SJG for a permit for a street closure and utility modification. On May 17, 1977, at a regular meeting, the Town council approved the application for a permit that had been submitted by SJG on April 19, 1977.

(b) On June 14, 1977, at a regular meeting, the Town council considered 5 applications for street closings or for permanent shutoff of water and storm sewers submitted by Bencor-Petrifond. Three were approved and two were tabled.

(c) On September 22, 1977, SJG was served a summons by the Town for demolition without a permit.

121. (a) On October 12, 1976, the Town filed *Town of North Bonneville v. Howard A. Calloway, Secretary of the Army,* civil action No. C76–204T, in the U.S. District Court for the Western District of Washington.

(b) On March 29, 1977, defendant filed *United States v. Town of North Bonneville,* civil action No. C77–56T, in the U.S. District Court for the Western District of Washington.

(c) These cases were directed at a judicial resolution of alleged breaches by the Corps of the Relocation Contract, Memorandum of Agreement, the A/E design contract, acquisition and sale to the Town of optimum town lands, the annexation/de-annexation issues, and the validity of the B & O tax as applied to contractors engaged in powerhouse construction.

(d) On September 13, 1977, SJG and the Town were summoned to appear in the Superior Court of Skamania County as co-defendants in a complaint for injunctive relief relative to vacation and abandonment of Town facilities. On September 16, 1977, the Secretary of the Army requested the United States Attorney General to seek an order that granted the United States the right to take immediate possession of the streets, alleys and utilities of the Town. On this request, a condemnation action, case No. C77–179T, was filed on September 20, 1977, in the U.S. District Court for the Western District of Washington.

(e) The site of the second powerhouse is owned and operated by the United States. The United States has acquired possession of and has demolished substantially all of the streets, public buildings and other municipal facilities in the Town as it existed prior to 1975. The Town has not disincorporated the site of the second powerhouse.

122. (a) VIPCO was the general contractor with the Corps on the town relocation contract. Five subcontractors were used on the work; they were responsible for over 70 percent of the total reported payroll time. The subcontractors were:

Sewers· - J.J. Welcome
Water Distribution - Tri State
Earth Work and - Elting
   Roadway Work
Curb and Gutter - Cushing Brothers
Power - Base Electric

(b) The plans and specifications provided through the DMJM/Hilton contract and approved by the Town and by the Corps contained a large number of design errors. Staff of the Corps completed the redesigns required during construction. The Town signed all significant change orders, and approved the changes that were made during the construction phase.

(c) A list, dated December 6, 1976, of design problems discovered during administration of the construction contract, indicates the nature and extent of design deficiencies. The list identified design problems in the following construction areas:

   Cascade Drive & Evergreen Drive Utilities

   Town Bridge

   Municipal Buildings—Fire Station

   Sheets 22 & 23: Parking Lot Island Layout

   Sheets 45 & 46: Water Lines

   Sheet 48: Concrete Curb Layout at Parking Lot Loading Zones

   Sheets 88, 101, 111: Wrong Floor Slab Joints

   Sheet 120: Lack of Sufficient Design Detail and Inconsistency in Details

   Conflicts Between Plats and Contract Drawings:

      Drawing 14/11

      Drawing 14/12

      Drawing 14/16

      Drawing 14/22

      Drawing 14/23

   Town Bridge Problems: Involved Changes 10, 14, 17, 18

   Sheets 154 & 155: End Closure Panels

   Electrical Problems: Drawings 66, 67, 68, 69, 70, 72, 74, 99, 146, and 173

(d) The initial schedule of performance in the VIPCO contract was modified as a result of construction changes. VIPCO change orders that revised contract time included:

| Change Order | Cost | Time |
|---|---|---|
| 56 | $43,474.94 | + 15 Days |
| 58 | $93,804.42 | + 9 Days |
| 67 | $13,314.00 | + 7 Days |
| 72 | $30,651.47 | + 40 Days |
| 79 | $ 3,234.99 | + 5 Days |
| 82 | $14,660.50 | + 10 Days |
| 84 | $ 5,192.71 | + 10 Days |
| 94 | $231,979.00 | + 30 Days |
| 107 | $35,645.41 | + 68 Days |
| 108 | $65,117.68 | + 31 Days |
| 109 | $55,300.28 | + 10 Days |
| 110 | $11,933.00 | + 4 Days |

(e) The effective date of the notice to proceed in the VIPCO contract was August 25, 1976. The Corps' final inspections were:

| | |
|---|---|
| Block No. 8 & No. 9 | Oct. 19, 1977 |
| Municipal Buildings (Town Hall, Fire Station, Sewage Treatment Plant) | Nov. 16, 1977 |
| Remainder of Contract | Dec. 7, 1977 |

Substantial progress on punch list work was not completed until October 1978.

123. (a) During the construction phase, the District became concerned that pending litigation and the Corps' position on the annexation/de-annexation issues would delay disposal of lots in the new town and have an adverse impact on the relocation schedule and the powerhouse power-on-line schedule. On January 25, 1977, the District engineer requested guidance from OCE on an acceptable procedure for recognition of the Town's annexation of the initial town area. The District proposed to negotiate with the Town and agree to conditions under which the Town could request, and the Government could approve, annexation of the initial town area only. One approach suggested was to ask the Town to agree at that time to relinquish jurisdiction in the powerhouse area effective September 30, 1978, and concurrent with the agreement to make a properly drafted request to annex the initial town, which would be approved. This procedure would allow the remaining issues in C76–204T to be considered by the court. The September 30, 1978, date was based on scheduled completion of the last municipal facility (a small section of Evergreen Drive) and was almost a year later than

what appeared to be a reasonable date for beneficial occupancy of the new town site. The District engineer's recommendation concluded with a statement that he saw no alternative to unfortunate delay in the occupation of the new town, except by the negotiation of an agreement leading to a stipulation and court order in partial settlement of C76–204T and subsequent approval of annexation of the initial town area by the Town.

(b) On January 27, 1977, the North Pacific Division engineer concurred in the District's request for authority to negotiate with the Town of North Bonneville some interim solution to the problems related to the annexation of the initial town site. The approval endorsement noted (1) that the Town cannot enact a zoning ordinance without authority obtained through annexation, (2) that lots should not be deeded to individuals until a zoning ordinance is established, and (3) that without deeds, individuals could not obtain loans and permits that were necessary to build new homes and relocate in the new town. The Division engineer requested OCE for its concurrence to authorize the District to negotiate an agreement that would be acceptable to the Town, to the Government, and to the court, and which would permit the cloud of litigation to be removed from the orderly deeding of property.

(c) In October 1977, the District continued to be concerned with the question of whether the Corps should permit the Town to occupy municipal facilities in the new town site, which were expected to be completed in November 1977. The District explored the potential effect on the Government's position in case No. C77–56T. Inquiry to the Seattle office of the Department of Justice on October 6, 1977, resulted in an official comment on the Government's litigating position. This comment, as recorded by District counsel, included:

This matter is in litigation after a thorough staffing at OCE, Secretary of the Army's Office, and the Department of Justice, Washington. I (Mansfield) have at least, as concerns C77–56T, the right to control matters affecting this litigation. Any recognition of the Town's rights to benefit under Section 83 will undercut the United States' case in C77–56T, and hence I am entirely opposed to it.

As long as the Town maintains its jurisdiction over the old Town and inflicts B & O Tax assessments against Corps contractors, the Town's breach of the purpose and intent of Contract 0039 and of the McCormack Legislation goes to such an essential element of the contract and the enabling statute as to constitute a *primary breach*. Hence, the Government cannot go forward in granting benefits to the Town citing the Contract and Sec. 83 as authority. Contract 0039 is just one element of the reciprocal duties required by the statute of the Corps and the Town. I will be outraged if the Corps attempts any action to recognize the Town's rights under the McCormack Legislation or under the contract, under these circumstances.

There will never be a viable new Town of North Bonneville unless the Government acquiesces to the payment of the B & O Tax of the Town to Corps contractors. To do so, at least within the old town area, is absolutely illegal and hence, outside the authority of the agency to agree to.

124. (a) In July 1977, the Town adopted a resolution (Res. No. 179) to appoint a single individual, the Town planning director, to represent the Town in matters pertaining to implementation of the Relocation Contract. At a meeting on July 22, 1977, with the North Pacific Division engineer and the Portland District engineer, the Town planning director requested that such matters be conducted personally and exclusively between the Division engineer and the Town's representative.

(b) On August 5, 1977, the Division engineer by letter declined to participate in such a procedure. The letter to the Town mayor explained that he had charged the Portland District engineer with the responsibility to carry out all matters pertaining

to the implementation of contract No. DACW 57–76–C–0039 for the Government and that the District engineer or his appointed representatives were the appropriate individuals to assist the Town in resolving normal issues and would do so within the scope of their delegated authority.

(c) The August 5, 1977, letter also noted that the Portland District was transferring title to purchasers of residential lots and that the basic conceptual details for interim business relocations had been worked out with the Town planning director so that the objective of keeping the business community intact could be met.

125. (a) On July 22, 1977, the Town planning director, Pollard Dickson, met with the North Pacific Division engineer, Major General Wesley E. Peel, and the Portland District engineer, Col. Harvey L. Arnold. There was a discussion of extension of the provisions of the Relocation Contract providing for reimbursement to the Town for staff and expenses necessary for the relocation effort. At that meeting, it was agreed that the contract would be modified to extend the reimbursement period to June 30, 1978.

(b) On September 21, 1977, the District engineer, as contracting officer, forwarded three copies of Mod. P00003 to the Relocation Contract, for signature and return of two copies. The transmittal letter stated that the Corps had decided to modify the contract to extend Government reimbursement to June 30, 1978.

(c) MOD P00003 recited that delays in design and construction of the relocated town had extended the time for beneficial occupancy by the Town, thus necessitating Government reimbursement of reasonable and necessary Town expenses beyond June 30, 1977. The modification, in relevant part, provided that:

(1) Staff positions will be reimbursed by the Government until June 30, 1978, for so much of the work as is reasonable and necessary for the relocation effort as originally authorized under the contract, limited to Administrative Assistant, Planning Director, Senior Planner, Secretary, and Building Inspector.

(2) The Government will continue to reimburse reasonable and necessary costs of the Town, incurred solely as the result of the Government relocation of the Town, until June 30, 1978.

(3) The Government shall reimburse the Town for reasonable and necessary legal services incurred by the Town through June 30, 1978, which are directly related to the Government's obligation to relocate the Town, but not where related to litigation or lobbying activities.

(4) The Government shall prepare a scope of work for an architect-engineer firm to revise and complete the Comprehensive Plan, shall procure a firm, and shall administer the contract, with periodic consultation with the Town council and staff.

(d) The record does not contain an executed copy of Modification P00003. There is no direct testimony that Modification P00003 was executed.

126. (a) As the relocation construction phase neared its termination in 1977, the District offered to allow Town possession of certain municipal facilities in the new town site under a Government rent free lease. The District also offered to allow possession under a formal stipulation that would have preserved the rights of the parties pending final resolution of optimum town rights and annexation/de-annexation issues in case No. C77–56T in the U.S. District Court, Western District of Washington. The Town council rejected these proposals.

(b) On January 20, 1978, the District engineer in a letter to the Town attorney noted that the Town council on January 17, 1978, had insisted on an exchange of title by deeds for the municipal facilities in the old town for the municipal facilities in the new town site as a prerequisite to the Town's entering into occupancy of new municipal facilities designated by the Corps.

(c) The District engineer, in the January 20, 1978, letter, rejected an informal suggestion by the Town attorney that the

Town might consider occupying the new facilities without a lease, formal stipulation, or other such formal document, as being contrary to both Corps' regulations and law. The District engineer stated further written proposals or extensions of negotiations would serve no useful purpose.

127. (a) On January 25, 1978, the District by letter proposed an exchange of municipal facilities, and on January 25, 1978, forwarded a proposed agreement. On January 30, 1978, the Town attorney notified the District engineer that the Town accepted the proposal.

(b) A document, captioned: Letter of Understanding and Agreement, concerning an exchange of municipal facilities, was executed by the Town and by the District engineer on February 28, 1978. It was approved by the Division engineer on March 1, 1978.

(c) The Letter of Understanding and Agreement recited the pendency of litigation in cases Nos. C77–56T and C76–204T, and that court dockets and backlog was expected to preclude judicial resolution of the issues in the immediate future. The recitals also stated the Town desired to take possession and title of the newly constructed facilities, municipal buildings and utilities in the new town site as early as possible, and in turn was willing to exchange title and possession of its municipally owned buildings, facilities and utilities in the old town site with the United States; and that the Portland District, acting for the Secretary of Army, desired to have immediate title and possession of said municipal buildings, facilities, and utilities in the old town site. The recitals also provided that none of the legal rights of either the Town, the United States Government, or any third party beneficiaries are prejudiced, and that by conveying these properties the parties do not waive nor prejudice any rights that they have or claim to have in current or future legal suits between the Town and the Government relating to or growing out of the relocation of the Town.

(d) The Government, in the Letter, agreed to convey by quit claim deed and to give possession to the Town the following new Corps-constructed municipal buildings, facilities and utilities in the new town site, to wit: Lot M–17 (Town Hall); M–20 (Sewage Treatment Plant); M–21 (Fire Station); Lot 1, Block 5 (Park); Lots M–1 through M–18; M–19 and M–22. Water supply facilities including Lot M–23 and M–26, Water Well, and Lot M–25, Water Reservoir with Easement for access and 14″ service line, would be conveyed following required approval for use by the State of Washington. Simultaneously with execution and delivery of deeds for municipal buildings, the Government would convey by deed and grant possession to the Town, all streets, alleys, sewer and water utilities, open space areas, bicycle paths and other public facilities situated in areas as to which plats have been recorded.

(e) The Town, in the Letter, agreed to convey to the Government by good and sufficient warranty deed all right, title and interest to lands and municipal facilities and utilities in the old town area lying within the Bonneville Second Powerhouse Project Area.

(f) The Letter of Understanding and Agreement provided that neither party waived any right in any present or future litigation between the parties, and that the Government specifically did not waive the right to receive title back if it was judicially determined at a later date that the Government should not have conveyed such new town facilities.

(g) The parties agreed in the Letter that implementation of the agreement was subject to approval by the Chief of Engineers, or his designee, and, that the approval, if obtained, would allow the District engineer to release deeds to the Town only on three conditions, one of which was:

c. It is further understood and agreed to by the Town and the Government that the time for delivery of deeds and physical possession of the area in the old town site to the Government will be on or before 15 March 1978. Should the instal-

lation of carpeting in the new Town Hall not be completed by that date, vacation of the old Town Hall and Fire Station by the Town shall be coordinated to take place immediately upon completion of the carpet installation. Under no circumstances shall the time of delivery of deeds and possession of these facilities be extended beyond 30 March 1978. The possible delay beyond the 15 March 1978 date applies only to the Town Hall and Fire Station.

128. (a) By March 14, 1978, OCE had made arrangements for the Secretary of the Army to execute the required quit claim deeds. OCE's memo to the Secretary stated the conveyances would fulfill the Government's obligations in the Relocation Contract to replace certain facilities, namely the community center, city hall, fire station, sewage treatment plant and park.

(b) The parties continued inspections and negotiations for corrections. On March 15, 1978, the Town requested the District engineer to provide a written confirmation of agreement on corrective actions to be taken. The Town council requested a clear resolution of contentions relative to:

1.) West End Streets and drainage—catch basins—curbs—base course and leveling courses.

2.) Street condition of newly constructed streets—crown, puddling, and elevation of catch basins.

3.) Turfing of City Park vs. planting lawn.

The letter also asked the District engineer to provide in writing the exact procedure and guarantees that were to be provided to the Town through contractor warranties. No deed would be signed by the Town councilmen until after a full explanation of the warranty issue.

129. (a) On June 6, 1978, at a regular session, the Town council passed Resolution No. 194. The resolution includes the following provisions:

1. In accordance with Article 2, Section 2 of Contract No. DACW 57–76–C–0039 the City of North Bonneville shall not accept newly constructed facilities from the Government until such time as they are complete and free from all construction deficiencies.

2. Upon receipt of written notice from the Government that construction of municipal facilities & utilities is completed the city will inspect said facilities and, if found that they have been constructed in accordance with the approved plans and specifications, or modification thereto shall immediately notify the Government in writing of its acceptance of the new facilities. Upon acceptance from the Government of totally completed facilities by quit claim deed, after execution of the city's written acceptance based upon the city's final inspection and completion of the relocation as contemplated in Contract DACW 57–76–C–0039, the City shall assume all obligations for future maintenance and operation cost of such facilities.

\*    \*    \*    \*    \*    \*

6. No official of the City of North Bonneville shall sign any form of acceptance of any facilities from the Government without first having the specific authorization, by resolution, which shall include the detailed terms of acceptance, from the City Council.

130. (a) During the design phase, DMJM/Hilton completed the community center only through preliminary design because of continuing uncertainty as to whether the school district would relocate in the new town. The preliminary design work was done by the architectural firm of Kirk, Wallace, and McKinley. On November 10, 1977, the school district accepted cash payment rather than relocation by way of replacement facilities. The school district has not and apparently does not intend to put a school in the new town.

(b) On March 15, 1978, the Town requested the District engineer to initiate the design for a community center and suggested a format for a mutually agreed scope of work. On June 20, 1978, the Town attorney requested the District engineer to schedule a design workshop per

Article 1, Sec. 3, of the Relocation Contract to address the proposed community center.

(c) The District provided to the Town a draft scope of work for the design of a community center that was based upon the work previously done in the RHBA planning contract and the A/E design contract. On June 27, 1978, the Town notified the District engineer that the District's proposed scope of work was unsatisfactory, and that the Town would respond with a redraft of a scope of work for the community center. The Town proposed to concentrate on the workshop and conceptual design of the space, its specific location, and relationship to other public structures. On June 30, 1978, the District advised the Town that under the A/E design contract, DMJM/Hilton had conducted a workshop and design briefing on the community center, and that no additional workshops would be held unless the Town paid for them. On July 7, 1978, the District engineer responded to the Town's June 27, 1978, notice and stated that the design contract scope of work provided for final design of the community center and that the planning and preliminary design had been completed by DMJM/Hilton. He stated that the work by DMJM/Hilton already had involved workshops, conceptual design of the space and the building's specific location and relationship to other public structures, and if the Town wanted additional workshops it would have to pay in advance for all associated costs. The District engineer reminded the Town that all direct reimbursements to the Town had ceased as of June 30, 1978, and stated the Corps would not negotiate a lump sum amount for additional work to arrive at an approved scope of work for a community center.

(d) On November 28, 1978, the District engineer by memorandum to the Division engineer requested authority to negotiate a cash payment to the Town in the amount of $370,000 to avoid the complications that would arise in attempting to design a community center that would meet the Town's desires, and to satisfy the Government's contract obligation under the clarifying language of Section 83. The District engineer stated that the new town could not be considered relocated until the Town has either a community center or the school board decides to provide a school in the new town. The memorandum requested approval by December 29, 1978, of authority to negotiate. The District engineer assumed that, if Division had not responded by that date, there were no objections and the proposal would be submitted to the Town.

(e) On June 8, 1979, the Corps notified the Town that it had not approved the Town's scope of work regarding the community center, and that it had not selected and/or approved of an architect for design of the facility. The Town was notified that any financial obligations that the Town incurred as a result of negotiations with architectural firms regarding design of the community center, in particular, the firm the Town had suggested, McKinley Architects, would be solely the responsibility of the Town. The notice stated there are no Federal funds available now or later for paying any costs the Town incurred in its dealings with the firm of McKinley Architects prior to Corps approval in regard to the design of a community center.

(f) The Town hired McKinley Architects to complete a preliminary design for the community center based on a scope of work the Town had prepared. McKinley Architects' report is dated August 16, 1979.

(g) On November 23, 1979, the successor District engineer, Col. Terence J. Connell, reviewed previous correspondence and reiterated the Government's position regarding community center facilities. The following positions that Corps had taken were set forth:

a. Preliminary plans provided for a community center with maximum gross area of 5,169 square feet, depending on options selected, and no outside play area or gymnasium. The document "North Bonneville New Town Design Municipal Building Design Analysis, Rationale and Standards, and Criteria for Design De-

velopment" dated 24 November 1975 and prepared under the design contract by Kirk, Wallace, McKinley, AIA and Associates, established the extent of the above-mentioned Government's obligations relating to the community center facilities, and this office indicated its acceptance of those obligations to your office by letter dated 18 April 1978.

b. Any modifications in the design of the community center desired by North Bonneville, which increase space and/or costs beyond the previously agreed upon Government obligations, would be betterments which require betterments cost payments by the City following terms under the relocation contract.

c. The Government will continue to insure that Lot 2, Block 5 is available for siting of either a community center or a school. Final disposition will await resolution of the community center issue.

d. The Government is obligated to provide replacement community facilities through the provision of a community center only when the City of North Bonneville has accepted all municipal facilities in total and assuming there is no school facility in North Bonneville.

e. The offer for a cash settlement in the amount of $385,000 in lieu of construction and based on January 1979 prices is still viable for replacement of the subject facilities....

131. (a) The "as performed" schedule for various elements of the Town relocation and second powerhouse construction was as follows:

Town Relocation

| | | |
|---|---|---|
| Planning | November 19, 1974 | – April 28, 1975 |
| Design | October 13, 1975 | – May 3, 1976 |
| Advertisement | July 25, 1976 | – August 17, 1976 |
| Construction | August 24, 1976 | – April 1, 1978 * |
| North Highway and Railway | July 25, 1978 | – Nov. 15, 1978 ** |
| Dwelling Construction | September 1977 | – December 1979 |
| Town Fill | September 19, 1975 | – October 16, 1976 |
| Railroad and Highway Construction | June 1, 1976 | – August 19, 1978 |
| Haul Road Contruction | June 1, 1976 | – October 16, 1976 |
| Seepage Cutoff Wall Construction | August 24, 1974 | – August 15, 1977 |
| Powerhouse Excavation | March 31, 1977 | – July 10, 1978 |
| Powerhouse Construction | April 20, 1978 | – *** |

\* Beneficial Occupancy of Town Hall, Fire Station, and Sewage Treatment Plant

\*\* Except for landscaping, seeding, finish grading, street lighting, bike trails, and ditching, which were completed by August 24, 1979

\*\*\* Power-on-line – May 1, 1981

(b) Other completion dates were:

| | |
|---|---|
| Fort Rains Overpass | August 10, 1977 |
| Railroad Tunnel Construction | September 16, 1977 |
| Central Highway Overpass | November 2, 1977 |
| Hamilton Creek Highway Bridge | January 25, 1978 |
| Interim Industrial Building Construction | March 2, 1978 |
| Interim Commercial Building Construction | March 4, 1978 |
| 20 Mobile Homes Construction | April 5, 1978 |
| West Highway Underpass Tunnel | April 28, 1978 |
| New Town North of State Highway 14 | November 15, 1978 |

132. (a) As of June 30, 1979, the Corps' records showed a total of $33,117,000 had been expended to relocate the Town. This included:

| | |
|---|---|
| Relocated Town Facilities and Utilities | $12,987,000 |
| Highway Relocation | 4,478,000 |
| Railroad Relocation | 1,344,000 |
| Interim Housing | 1,580,000 |
| Interim Business | 1,232,000 |

(b) Payments under RHBA planning contract were $713,000. Payments under DMJM/Hilton design contract were $833,-000.

(c) Related Government costs, including operating and maintenance costs, as of the time of trial brings the total Town relocation cost to over $36 million.

(d) On July 27, 1977, the contracting officer requested disbursement from the Escrow Agreement made August 11, 1976, with the Rainier Bank in the amount of $58,613 to meet the Town's share of relocation betterments for the following items, all 100 percent complete:

| | | |
|---|---|---|
| Water tanks | $ | 29,153 |
| City Hall—Square Footage | | 27,638 |
| City Hall—Stone Facing | | 1,822 |
| TOTAL | $ | 58,613 |

133. On March 18, 1980, the District transmitted to the Town the final delivery of "as constructed" drawings and operation and maintenance manuals related to the completed town. The delivery included materials from the following contracts:

| | |
|---|---|
| DACW 57–76–C–0274 | VIPCO |
| DACW 57–76–C–0167 | Claterbos |
| DACW 57–78–C–0076 | GKG |
| DACW 57–79–C–0051 | Martinez |

134. (a) The relocated town consists of 196 new residential lots, 82 of which are vacant as of August 1984; 11 existing residential lots in the old town's West End which were upgraded; 50 commercial lots, 42 of which are vacant as of August 1984; and 4 Industrial lots, 2 of which are vacant as of August 1984. These figures apply only to platted lots.

(b) The following chart compares facilities in the new town with those in the old town:

COMPARISON OF FACILITIES PROVIDED IN NEW TOWN
WITH THOSE IN OLD TOWN

| | | OLD TOWN | NEW TOWN |
|---|---|---|---|
| 1. | Streets and Appurtenances * | | |
| | a. Right-of-way | 23 acres width—47.3 ft. | 48 acres width—60 ft. |
| | b. Roadway | Light Bituminus, 66,583 SY; Gravel, 1,864 SY; width varies | 107,644 SY, 3″ asphalt concrete, 28–32 ft. width |
| | c. Curbs | 5,678 LF standard concrete (4,960 LF along existing Hwy 14 business district) | 47,050 LF concrete curb and gutter, 6,500 LF, concrete curb |
| | d. Pedestrian Ways | 4,198 LF, 4″ concrete sidewalks, 5.5 ft. width (3,480 LF along existing Hwy 14 business district) | 37,420 LF, 3″ asphalt concrete pedestrian/bicycle pathways; 8 ft. width. 46,300 SF concrete side in CBD mall |
| | e. Parking | 210 on-street spaces existing business district | 210 off-street spaces, municipal & CBD parking lots |
| | f. Lighting | Street lighting: 87 luminaries, mercury vapor | Street lighting: 238 luminaries, mercury vapor; Pathway lighting: 115 luminaries, fluorescent |
| 2. | Storm Sewer System | 10,320 LF, 6″–24″ corrugated steel pipe, 51 basins, 32 manholes, system undersized | 20,152 LF, 4″–36″ concrete pipe, 130 inlets, 69 manholes 5-yr. storm design |
| 3. | Domestic Water Distribution System | 1½″–10″ diameter, asbestos cement, PVC and iron pipe material, app. 26,000 LF. | 2″–14″ diameter, asbestos cement, PVC and ductile iron pipe material, 40,536 LF. |

| | | OLD TOWN | NEW TOWN |
|---|---|---|---|
| | | Reconstructed in 1970, 26 fire hydrants, inadequate fire flows | 48 fire hydrants meeting standards for minimum fire flows |
| 4. | Wastewater Disposal System * | No central sewage treatment system | 125,000 GPD wastewater collection & treatment system, for initial town & 10 yrs. growth |
| 5. | Maintenance Facilities * | 800 SF maintenance shed; wood frame, sheet metal, dirt floor | 3,600 SF control, laboratory & maintenance building, wood frame, cedar shingles & siding |
| 6. | Irrigation System | None | Subsurface irrigation system serving CBD and city park |
| 7. | Open Space | None | 125 acres, landscaped; including noise attenuation berms |
| 8. | Water System | | |
| | a. Well | 8″ diameter; no other information available | 169 ft. deep; 20″ diameter; pump 1,000 gpm with drawdown of 2.5 ft.; pump 2,000 gpm with drawdown of 6 ft. |
| | b. Pump | Electric Motor driven deep well turbine pump produced 500 gpm± | Electric motor driven deep well turbine pump producing 800 gpm at maximum head |
| | c. Pump Standby Power | Direct drive by gasoline engine through clutch & gear box | Diesel-electric motor generator |
| | d. Reservoir | Two steel tanks 90,000± gals. each total of 180,000 gallons | 500,000 gal. steel reservoir. Note: 250,000 gals. paid for by Town as betterment |
| | e. Chlorination | None | Dual gas chlorination system, one service chlorinator & a standby chlorinator |
| | f. Pump House | 144 sq. ft., wood frame sheet metal | 350 sq. ft., timber frame, cedar siding & cedar shingles |
| 9. | Town Park | | |
| | a. Site | 0.5 acres, grass, fenced 2 sides, some trees | 5.0 acres, landscaped, subsurface irrigation, 4,500 sq. ft. of sand play area; quiet sitting areas |
| | b. Picnic | 1 picnic table, benches | 10 picnic tables and benches; 480 sq. ft. picnic shelter, timber framed, cedar shingles |
| | c. Play | Metal swing set, slide | Native boulder and fallen tree climbers; spiral slide and swing set; timber framed; |

|  | OLD TOWN | NEW TOWN |
|---|---|---|
|  |  | timber climbing devices & playhorses |
| d. Recreation | None | 50 ft. × 84 ft. basketball court set in oval asphalt; paved, curbed multi-use area (suitable for ice skating rink) |
| e. Building | None | 480 sq. ft. shelter building (restroom) timber framed, cedar shingled and sided |

\* SY = square yards
LY = linear feet
SF = square feet
GPD = gallons per day

(c) The following table shows the status of the Town's commercial establishments:

| Business | Operating 1971 | Status 1975 Closed | Status 1975 Operating | Operating (7) Aug. 1984 |
|---|---|---|---|---|
| Tavern | 3 | 1 | 2 | |
| Restaurant | 2 | 1 | 1 | |
| Clothing Store | 1 | – | – | |
| Grocery Store | 2 | – | 2 | 1 |
| Variety Store | 1 | – | 2(1) | |
| Thrift Store | 1 | – | 1(2) | |
| Hardware Store | 1 | – | 1(3) | |
| Art Store | 1 | 1 | 1(4) | |
| Gas Station | 3 | 2 | 1 | |
| Bait Shop | 1 | 1 | 1 | |
| Antique Store | 1 | 1 | – | |
| Used Furniture | 1 | 1 | – | |
| Beauty Parlor | 1 | – | 1 | 1 |
| Barber Shop | 1 | – | 1 | |
| Shoe Repair | 1 | – | 1 | |
| Bank | 1 | – | 1(5) | |
| Theater | 1 | 1 | – | |
| Motel | 2 | 2 | – | |
| Real Estate Office | 1 | 1 | – | |
| Food Storage | 1 | 1 | – | |
| Nursing Home | 1 | 1 | – | |
| Auto Rebuilding | 1 | 1 | – | |
| Machine Shop | 1 | 1 | – | |
| Total | 30 | 16 | 16(6) | |

(1) – one recently opened.
(2) – occasionally.
(3) – part-time.
(4) – recently opened.
(5) – two days per week.
(6) – two recently opened.
(7) – of original 1971 establishments.

135. (a) During the period 1975–82, the Town collected B & O taxes in the following amounts:

|  | Federal Sources | Other Sources |
|---|---|---|
| 1975 | $ 10,760.09 | $ 951.16 |
| 1976 | 60,497.62 | 6,498.51 |
| 1977 | 108,387.81 | 48,628.20 |
| 1978 | 213,744.00 | 59,832.78 |
| 1979 | 497,984.21 | 19,802.20 |
| 1980 | 575,469.32 | 15,988.39 |
| 1981 | 287,836.38 | 23,375.13 |
| 1982 | 60,706.96 | 20,749.57 |
| TOTAL | $1,815,386.39 | $195,825.94 |

Total All Sources = $2,011,212.33

(b) From 1979 through 1982, B & O taxes from Federal sources totaled $1,421,996.70.

136. (a) On December 31, 1983, the portion of the Pierce Ranch included in Parcel A of the Town's June 13, 1976, request for conveyance of optimum town lands was donated to the United States Fish and Wildlife Service for use as a wildlife refuge.

(b) During the period July 2, 1984, to May 23, 1985, the Corps and the Town negotiated toward a sale of land in Parcels B and C outside the initial town boundary shown on Exhibit A to the Relocation Contract. The negotiations were conducted in part between Town officials and Corps' administrative officers, and in part between attorneys for the respective parties in docket No. 564–80C in this court. These negotiations did not result in a sale of Parcels B and C to the Town.

(c) During the course of negotiations, the Town agreed to accommodate the wildlife refuge and to substitute other land for

Parcel A, and the parties agreed upon a legal description of land in Parcels B and C that would be involved in the sale transaction. The Town agreed to pay $176,706.25 for the land in Parcels B and C and deposited that amount with the Department of Justice. The Corps' price of the land in Parcels B and C at one time was $176,927.85 and finally was $191,100.74. The parties failed to reach agreement on numerous other contentions and the Town's deposit was returned.

## CONCLUSION

On the basis of the foregoing opinion and the findings of fact, plaintiff is entitled to $567,093.10 in damages on its claims. However, any judgment that plaintiff would be entitled to in that amount is more than set-off by defendant's entitlement to $1,421,996.70 as part of its counterclaim. In addition, and apart therefrom, defendant is entitled to recover $365,181.32 in damages on its counterclaim. The Clerk will enter judgment accordingly. No costs.

